Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Independentista Puertorriqueño<br><br>   Recurridos<br><br><br>         v.<br><br><br>Estado Libre Asociado de Puerto Rico et al<br><br>   Peticionario | <br><br><br><br>2012 TSPR 111<br><br>186 DPR ____ |

Número del Caso: CT-2012-9


Fecha: 6 de julio de 2012


Abogados de la Parte Peticionaria:

        Lcdo. Eliezer Aldarondo Ortiz
        Lcda. Rosa Campos Silva
        Lcdo. Simone Cataldi Malpica
        Lcdo. Eliezer Aldarondo López


Abogados de la Parte Recurrida:
Partido Independentista Puertorriqueño

        Lcdo. Carlos I. Gorrín Peralta
        Lcdo. Denis Márquez Lebrón
        Lcdo. Adrián González Costa
        Lcdo. Luis Enrique Romero Nieves
        Lcda. María de Lourdes Santiago

Amicus Curiae
         Pro Se
        Lcdo. Eudaldo Baez Galib


        Partido Nuevo Progresista
        Lcdo. Homero González López

Materia: Certificación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Partido Independentista Puertorriqueño | | *Certificación* |
| Recurrido | | |
| v. | CT-2012-0009 | |
| Estado Libre Asociado de Puerto Rico *et al.* | | |
| Peticionario | | |

Opinión del Tribunal emitida por la Jueza Asociada señora PABÓN CHARNECO

En San Juan, Puerto Rico, a 6 de julio de 2012.

Hoy este Tribunal está llamado a expresarse en cuanto a la constitucionalidad de dos piezas legislativas que dispusieron para la celebración de un referéndum el 19 de agosto de 2012. En este se le propondrá al Pueblo enmendar las Secciones 2, 3, 4, y 7 del Art. III de la Constitución de Puerto Rico con el fin de reducir el número de miembros de los Cuerpos Legislativos.[1]

El caso de autos coloca ante nuestra consideración diversas y complejas interrogantes de índole constitucional. Los eminentes intereses públicos involucrados, los argumentos constitucionales sustanciales presentados por ambas partes, y

---

[1] Ese mismo día, y a tenor con la Resolución Concurrente del Senado Número 60, se le propondrá al Pueblo enmendar la Sec. 11 del Art. II de la Constitución de Puerto Rico para disponer que el derecho a la fianza será discrecional en casos de asesinato cometido con premeditación, deliberación o acecho, asesinato cometido en medio de un robo en el hogar, asesinato cometido en el curso de una agresión sexual o secuestro, asesinato cometido al disparar un arma de fuego desde un vehículo de motor o en un lugar abierto al público, poniendo en riesgo la vida de más de una persona o cuando la víctima del asesinato sea un agente del orden público que se encuentre en el cumplimiento de su deber. Su constitucionalidad no está en controversia en el caso de autos.

la proximidad de la fecha en la cual se celebrará el referéndum que le propondrá al Pueblo enmendar su *lex superior*, obligan a este Tribunal a hacer uso de la razón principal por la cual fue creado: interpretar la Constitución de Puerto Rico y pautar Derecho para el correcto y adecuado funcionamiento del ordenamiento constitucional. No obstante, nuestra encomienda en este caso se limita a interpretar si las propuestas de enmienda y el proceso mediante el cual se aprobaron cumplen con los requisitos que el Art. VII de la Constitución impone. Por ende, nuestra labor no se extiende a pasar juicio en cuanto a las bondades de las enmiendas propuestas.

Antes de adentrarnos a resolver las controversias que presenta el caso de autos, pasemos a exponer los hechos que lo generaron.

I

El 13 de abril de 2010 se presentó la Resolución Concurrente del Senado Número 35 (en adelante Res. Concurrente Núm. 35) la cual tenía como fin proponer al Pueblo una serie de enmiendas al Art. III de la Constitución de Puerto Rico.

Las enmiendas propuestas en la referida Resolución Concurrente se pueden resumir de la manera siguiente: reducir los escaños del Senado de Puerto Rico de veintisiete (27) a diecisiete (17); reducir los escaños de la Cámara de Representantes de cincuenta y uno (51) a treinta y nueve (39); aumentar los distritos senatoriales de ocho (8) a once (11); reducir los distritos representativos de cuarenta (40) a treinta

y tres (33); reducir los distritos representativos en cada distrito senatorial de cinco (5) a tres (3); reducir la cantidad de senadores de cada distrito senatorial de dos (2) a uno (1); y reducir la cantidad de escaños que se añadirían en caso de que se activaran la disposiciones de la Sec. 7 del Art. III de la Constitución en el Senado de nueve (9) a seis (6) y en la Cámara de Representantes de diecisiete (17) a trece (13). De aprobarse las enmiendas, estas entrarían en vigor a partir de las elecciones generales de 2016. Finalmente, la Res. Concurrente Núm. 35 facultó al Gobernador de Puerto Rico para convocar a la Junta Constitucional Revisora de Distritos Senatoriales y Legislativos para configurar los nuevos distritos utilizando la información del censo del año 2010.

La Res. Concurrente Núm. 35 se aprobó en la Cámara de Representantes de Puerto Rico el 28 de septiembre de 2011. La votación en ese cuerpo legislativo fue de treinta y siete (37) votos a favor, dieciséis (16) en contra y un (1) representante ausente. Posteriormente, el 10 de octubre de 2011 el Senado de Puerto Rico aprobó la Res. Concurrente Núm. 35 con una votación final de veinte (20) votos a favor, ocho (8) en contra, un (1) senador ausente y dos (2) escaños vacantes.

Así las cosas, el 9 de enero de 2012 el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, firmó la Ley 12-2012, conocida como Ley Habilitadora del Referéndum sobre Reforma Legislativa de 2012. Este estatuto establece la fecha de celebración del referéndum y ordena a la Comisión Estatal de Elecciones (en adelante C.E.E.) a anunciar su celebración con no menos de

noventa (90) días de antelación. Efectivamente, el 18 de mayo de 2012 se publicó la Proclama que anuncia la celebración del referéndum en diversos medios periodísticos.

Posteriormente, el 23 de mayo de 2012 el Partido Independentista Puertorriqueño (en adelante P.I.P.) presentó una Demanda en el Tribunal de Primera Instancia, Sala Superior de San Juan en la cual solicitó que se declarara inconstitucional tanto la Res. Concurrente Núm. 35, *supra*, como la Ley Núm. 12, *supra*. A esos efectos, peticionó que el foro de instancia emitiera una orden de interdicto preliminar y una Sentencia de *injunction* permanente que le ordenara a la C.E.E. y a su Presidente, Hon. Héctor Conty Pérez, desistir de poner en vigor la Res. Concurrente Núm. 35, *supra*, y la Ley Núm. 12, *supra*.

*Inter alia*, y en extrema síntesis, el P.I.P. alegó que la Res. Concurrente Núm. 35 no fue aprobada por el número de dos terceras (2/3) partes de todos los miembros que componen la totalidad de los miembros del Senado de Puerto Rico y que el referéndum a celebrarse el próximo 19 de agosto contiene nueve (9) propuestas de enmiendas constitucionales, en contravención del Art. VII de la Constitución de Puerto Rico y la decisión de este Tribunal en *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195 (1994).

Por interpretarse que la Demanda presentada por el P.I.P. era una de naturaleza electoral al amparo del Código Electoral de Puerto Rico para el Siglo XXI, el caso fue asignado a la Sala de la Jueza Superior, Hon. Georgina Candal Segurola. Esta celebró una vista el 30 de mayo de 2012 en la cual el Gobierno de Puerto

Rico (en adelante el peticionario) solicitó que el caso fuera asignado a otra sala por entender que el mismo no era de naturaleza electoral. Esta solicitud fue denegada por el foro de instancia.

Acto seguido, el peticionario argumentó que el caso de autos no era justiciable por faltar partes indispensables, porque el P.I.P. no ostenta legitimación activa, porque se viola la Doctrina de Separación de Poderes si se procede con la Demanda y porque hubo una violación a la Doctrina de Incuria por parte del P.I.P. Todo ello fue denegado en sala por el Tribunal de Primera Instancia. Esta denegación posteriormente fue consignada en una Minuta-Resolución notificada el 4 de junio de 2012.

Aún insatisfecho, el peticionario presentó una Moción de Desestimación en la cual nuevamente esbozó los argumentos por los cuales entendía el caso no era justiciable. Oportunamente, el P.I.P. presentó una Oposición a la Moción de Desestimación. El foro de instancia le concedió hasta el 18 de junio de 2012 al peticionario para que replicara a esa oposición.

Inconforme con el proceder ante el Tribunal de Primera Instancia, el 14 de junio de 2012 el peticionario presentó un Recurso de Certificación Intrajurisdiccional en el cual argumentó que, ante los eminentes intereses públicos involucrados en el caso de autos y la proximidad de la fecha acordada para la celebración del referéndum en controversia, ameritaba que fuera este Tribunal el que resolviera el asunto en primera instancia.

Examinado el auto de certificación intrajurisdiccional, coincidimos con el peticionario y el 15 de junio de 2012 acordamos certificar. Oportunamente, las partes presentaron sus alegatos y procedimos a convocarlas a una Vista Oral. Celebrada la Vista el 27 de junio de 2012, solo resta que este Tribunal ejerza su función constitucional.[2]

## II

### *Mecanismo de Certificación Intrajurisdiccional*

Nuestro ordenamiento jurídico le concede jurisdicción a este Tribunal para, a través de un auto de certificación intrajurisdiccional, intervenir en casos pendientes ante los tribunales de inferior jerarquía cuando "se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial" al amparo de la Constitución de Puerto Rico o la Constitución de Estados Unidos. 4 L.P.R.A. sec. 24s(e). La Regla 23 del Reglamento de este Tribunal regula la manera en que ha de utilizarse este poder jurisdiccional. Reglamento del Tribunal Supremo de Puerto Rico de 2011, 2011 T.S.P.R. 174, pág. 52.

Cónsono con estas disposiciones, el recurso de certificación intrajurisdiccional ha sido utilizado por este Tribunal "para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención". *U.P.R. v. Laborde Torres y otros I*, 180 D.P.R. 253, 272-273 (2010). Hemos

---

[2] Para la encomienda constitucional que tenemos ante nos contamos también con la comparecencia como *amicus curiae* del Partido Nuevo Progresista y del Lcdo. Eudaldo Báez-Galib.

hecho uso de este mecanismo en múltiples ocasiones, particularmente en casos que involucran controversias de índole electoral. Véase *McClintock v. Rivera Schatz*, 171 D.P.R. 584 (2007); *Suárez v. C.E.E. I,* 163 D.P.R. 347 (2004) (*Per Curiam*).

No hay duda que ante los eminentes intereses públicos expuestos en el caso de marras es meritorio utilizar el mecanismo de certificación intrajurisdiccional. Así, y al igual que en otras ocasiones, al adjudicar las controversias plasmadas en el caso de autos "partimos de la premisa de que este Tribunal tiene la **obligación constitucional** de resolver una controversia como la de autos, en la que está involucrado el derecho fundamental al sufragio a la luz de un ordenamiento totalmente estatal". *Suárez v. C.E.E. I*, supra, pág. 353 (Énfasis suplido).

Como hemos intimado, **estamos a menos de dos (2) meses de la celebración del referéndum que generó la controversia del caso de autos.** Las campañas de los sectores a favor y en contra de las propuestas enmiendas ya han comenzado. Es la obligación constitucional de este Tribunal resolver de una vez y por todas el caso de epígrafe para dejar claro si el ejercicio electoral del 19 de agosto de 2012 puede llevarse a cabo o si, *a contrario sensu*, el procedimiento para su aprobación estuvo plagado de vicios constitucionales que impiden su celebración.

### III

### *Asuntos Presentados*

Conforme intimado, el caso de autos presenta ante la consideración de este Foro una compleja amalgama de controversias

constitucionales. En aras de delimitar los temas que debemos considerar, estructuraremos la presente Opinión de la manera siguiente.

*Ab initio*, debemos considerar si el caso de autos es justiciable. Por ende, debemos determinar si el recurrido P.I.P. ostenta legitimación activa para litigar este caso. De contestar en la afirmativa esa interrogante, debemos entonces resolver si el P.I.P. violó la Doctrina de Incuria al esperar siete (7) meses después de la aprobación de la Res. Concurrente Núm. 35, *supra*, y cuatro (4) meses después de la aprobación de la Ley Núm. 12, *supra*, para presentar la Demanda de epígrafe. De resolver en la negativa, debemos considerar entonces los asuntos constitucionales medulares que nos presentan las partes, a saber: (1) si la Res. Concurrente Núm. 35, *supra*, fue en efecto aprobada por dos terceras (2/3) partes de la totalidad de los miembros que componen el Senado de Puerto Rico; (2) si la proposición de enmienda de Reforma Legislativa contiene más de tres (3) propuestas de enmienda en contravención de la Sec. 1 del Art. VII de la Constitución; (3) si la Res. Concurrente Núm. 35, *supra*, es inconstitucional por facultar al Gobernador de Puerto Rico a convocar la Junta Constitucional Revisora de Distritos Senatoriales y Representativos en medio de una década y (4) si padecen de algún vicio constitucional los anuncios publicados que anuncian el referéndum del 19 de agosto de 2012.

Debidamente delimitados los asuntos hoy ante nosotros, pasamos a resolver.

**IV**

### *Legitimación Activa del P.I.P.*

Según mencionamos, antes de pasar a considerar de lleno las controversias constitucionales presentadas en el caso de autos, debemos determinar si el recurrido P.I.P. ostenta legitimación activa para sustentar el presente pleito.

Es principio reconocido en nuestro ordenamiento que los tribunales solo pueden ejercer su función judicial ante la presencia de casos y controversias reales. *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958). Este principio de Derecho exige que los pleitos que se presenten ante los tribunales sean justiciables. En varias ocasiones hemos reafirmado que uno de los requisitos de justiciabilidad necesarios para dar paso al ejercicio de la función judicial es el que los litigantes ostenten legitimación activa. *Lozada Sánchez v. A.E.E.,* res. el 21 de marzo de 2012, 2012 T.S.P.R. 50, 2012 J.T.S. 63, 184 D.P.R. ___ (2012); *Fund. Surfrider y otros v. A.R.Pe.,* 178 D.P.R. 563 (2010); *Crespo v. Cintrón,* 159 D.P.R. 290 (2003). Este requisito permite a los tribunales asegurarse que las partes que promueven un pleito tienen un interés genuino en la resolución de la controversia. A su vez, ello garantiza que las partes defenderán sus posturas de forma vigorosa y todos los asuntos pertinentes serán colocados ante la consideración del tribunal. *Sánchez et al. v. Srio. de Justicia et al.,* 157 D.P.R. 360, 371 (2002).

Para cumplir con el requisito de legitimación activa, una parte debe demostrar que "(1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, y no abstracto e hipotético; (3) existe una relación causal razonable

entre la acción que se ejercita y el daño alegado, y (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley". *Fund. Surfrider y otros v. A.R.Pe.,* supra, pág. 572.

Por su parte, en el caso de asociaciones o grupos, hemos resuelto que estas tienen legitimación activa para vindicar los daños sufridos por la entidad. *Col. Ópticos de P.R. v. Vani Visual Center,* 124 D.P.R. 559 (1989). Además, la asociación puede comparecer a los tribunales a defender los intereses de sus miembros aunque esta no haya sufrido daños propios. En ese escenario, hemos establecido que para demandar a nombre de sus miembros la asociación "tiene que demostrar: (1) el miembro tiene legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren participación individual". *Fund. Surfrider y otros v. A.R.Pe,* supra, pág. 573.

En el caso de autos, el Gobierno de Puerto Rico cuestiona la legitimación activa del P.I.P. Entendemos que este último ha cumplido con los requisitos necesarios antes enumerados para conferir legitimación activa ya que puede representar de manera efectiva los daños sufridos por los miembros de su colectividad.

Ciertamente, los electores del P.I.P. tienen un derecho a que no se les obligue a votar por más de tres (3) propuestas de enmiendas constitucionales y a que se les presenten de manera separada. Ello representa un daño real, claro y concreto que puede ser representado por el P.I.P. a nombre de sus electores. Definitivamente, los intereses que pretende proteger el P.I.P.

son afines a los objetivos de este como organización política. Además, la participación de los electores en su carácter individual en el pleito no es necesaria ya que el P.I.P. es un partido de larga tradición electoral en Puerto Rico, altamente capacitado para representar los intereses de sus miembros y capaz de colocar ante la consideración del Tribunal todos los asuntos pertinentes. Por ende, no le asiste la razón al Gobierno de Puerto Rico, por lo que el caso es justiciable.[3]

V

*Doctrina de Incuria*

Por otro lado, el peticionario alega que el caso de autos no es justiciable debido a que el P.I.P. violó la Doctrina de Incuria al dejar pasar siete (7) meses desde la aprobación de la Res. Concurrente Núm. 35, *supra*, y cuatro (4) meses desde la aprobación de la Ley Núm. 12, *supra*, antes de presentar la Demanda de epígrafe.

Este Tribunal ha definido la Doctrina de Incuria como la "dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad". *Aponte v. Srio. de Hacienda, E.L.A.*, 125

---

[3] Tampoco nos convence el argumento del Gobierno de Puerto Rico en cuanto que el caso de autos no es justiciable por ser de aplicación la Doctrina de Cuestión Política. No hay duda que este Tribunal ha adoptado esa doctrina de justiciabilidad. Véase *Córdova y otros v. Cámara de Representantes,* 171 D.P.R. 789 (2007). No obstante, en el caso de autos la Doctrina de Cuestión Política no es de aplicación ya que no estamos revisando la facultad política de la Rama Legislativa de proponer enmiendas constitucionales, sino auscultando que los requisitos constitucionales para su proposición se hayan cumplido cabalmente. Véase *Powell v. McCormack*, 395 U.S. 486 (1969).

D.P.R. 610, 618 (1990). Su fin es evitar premiar a una parte que se cruza de brazos aun conociendo sobre la existencia de su derecho si con ello se causa perjuicio a la otra parte o se lesionan importantes intereses públicos o privados.

Ahora bien, esta doctrina no opera por el mero paso del tiempo. *Colón Torres v. A.A.A.*, 143 D.P.R. 119, 125 (1997)(*Per Curiam*). Hemos establecido que los tribunales tienen un deber de considerar otros factores antes de desestimar un caso bajo la doctrina de incuria. *Pérez, Pellot v. J.A.S.A.P.,* 139 D.P.R. 588, 599-600 (1995). Entre estos factores debe considerarse la justificación de la demora incurrida, el perjuicio que esta conlleva y el efecto sobre los intereses privados o públicos involucrados en el asunto. *Rivera v. Depto de Servicios Sociales*, 132 D.P.R. 240, 247 (1990).

Aunque se trata de un remedio en equidad, y a pesar de que nuestro ordenamiento es eminentemente de tradición civilista, en nuestra jurisdicción "hemos aplicado la Doctrina de Incuria con relación a remedios extraordinarios dispuestos por nuestro ordenamiento que han sido adoptados del Derecho Angloamericano como por ejemplo el *injunction*, el *mandamus* y el *certiorari*". *Aponte v. Srio. de Hacienda, E.L.A.,* supra, pág. 618. No obstante, hemos sido enfáticos en que cuando se trate de acciones civiles ordinarias cuyo término prescriptivo esté claramente dispuesto por ley, la Defensa de Incuria no procede. *Íd.*[4]

---

[4] En la jurisdicción federal, algunas cortes de distrito han encontrado violaciones a la Doctrina de Incuria en casos en los cuales se retan disposiciones electorales. Véase *Knox v. Milwaukee County Bd. of Elections Com'rs*, 581 F. Supp. 399 (D. E. Wisconsin 1984). Por su parte, el Tribunal Supremo federal también ha sido cauteloso en proveer remedios en casos en

No podemos pasar por alto que la acción del P.I.P. levanta algunas sospechas. **Después de todo, la dama de la justicia es ciega, no ingenua.** Resulta altamente revelador el que el P.I.P. esperara para presentar su Demanda hasta justo después de vencer el término de tres (3) meses que la Constitución provee para anunciarle al Pueblo propuestas de enmiendas constitucionales.[5] Durante siete (7) meses el P.I.P. tuvo conocimiento de la propuesta enmienda constitucional y de todas sus implicaciones, y por cuatro (4) meses supo de las disposiciones de la Ley Núm. 12, *supra*. Aun así, no actuó hasta vencido el término de tres (3) meses para anunciar las enmiendas constitucionales. Ello deja mucho que desear. Como hemos dicho recientemente, "[n]o podemos permitir que las normas procesales de nuestro ordenamiento se interpreten de forma tal que se convierta el proceso judicial en un campo minado, en donde las partes se enfrentan en un juego para ver quién cae en una trampa primero". *Colón Rivera v. Wyeth Pharmaceuticals*, res. 4 de enero de 2012, 2012 T.S.P.R. 1, pág. 10, esc. 3, 183 D.P.R. ___ (2012). Ello es particularmente de mayor aplicación en casos que involucren cuestiones constitucionales.

Un referéndum que propone al Pueblo una serie de enmiendas a su *lex superior* es un evento complejo, sensitivo y altamente regulado. Conlleva el desembolso de una cantidad sustancial de

---

los cuales se cuestionan procesos electorales presentados en una fecha demasiado cercana al día del evento. Véase *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968).

[5] Ese término vencía el 19 de mayo de 2012, y el P.I.P. presentó la Demanda de autos el 23 de mayo de 2012.

fondos del erario,[6] la coordinación de varias campañas y un proceso organizativo complicado de la C.E.E. para llevar a cabo el evento correctamente y educar al Pueblo en cuanto a las propuestas de enmienda. Es cuestionable que una parte espere tanto tiempo para presentar una acción judicial para impugnarlo, particularmente cuando conocía de todos sus pormenores con mucho tiempo de anticipación y cuando se trata de un partido político de largo historial con amplio conocimiento de asuntos constitucionales.

No obstante esta dilación innecesaria y sospechosa por parte del P.I.P., entendemos que la Defensa de Incuria no es de aplicación en el caso de autos. Primero, se trata de un cuestionamiento al proceso de enmienda a la Constitución, lo cual es un procedimiento de alto interés público y en el cual, para el bien del ordenamiento, conviene que se despejen dudas sobre su alegada inconstitucionalidad. Segundo, aunque la acción para impugnar un proceso de enmienda constitucional no tiene término específico establecido por ley por lo cual podría ser de aplicación la Doctrina de Incuria, entendemos que en el caso de marras hay tiempo suficiente para resolver las controversias constitucionales presentadas. Y es que aún no se han impreso las papeletas y las campañas tanto a favor como en contra de las enmiendas se encuentran en sus etapas iniciales. Todo ello pesa a favor de resolver el caso de autos y no aplicar la Defensa de Incuria. No obstante, enfatizamos en que este tipo de acciones

---

[6] Específicamente, el 27 de junio de 2012 se presentó ante este foro un documento de la C.E.E. que certifica que los gastos incurridos por esa entidad para la celebración del referéndum del 19 de agosto de 2012 ascienden a aproximadamente un millón cuatrocientos setenta y cinco mil seiscientos siete dólares con noventa y tres centavos ($1,475,607.93).

pueden estar sujetas a la Doctrina de Incuria y que es impropio de una parte cruzarse de brazos hasta el último momento para instar su acción constitucional. Ello desluce nuestro ordenamiento y tiene el efecto de presentar a las partes como protagonistas de un juego en el cual cada uno intenta hacer al otro caer en una trampa. Nuestro documento constitucional merece mayor respeto.

**VI**

### *El Procedimiento para Enmendar la Constitución de Puerto Rico*

Debidamente resuelto que el caso de autos es justiciable, pasamos a discutir las controversias constitucionales ante nuestra consideración.

El estado es un ente abstracto cuya definición ha sido objeto de debates constantes a través de la existencia humana. Podría decirse que la razón de ser de la disciplina de la ciencia política es precisamente buscar una definición de este concepto. La idea de una constitución escrita como mecanismo de creación de una estructura estatal hizo su aparición por primera vez en el Siglo XVIII. J. M. Kelly, *A Short History of Western Legal Theory*, Ed. Clarendon Press, Oxford, 1992, págs. 277-282. Previo a ese siglo, la creación de un estado sencillamente se justificaba mediante la tradición y las prácticas y costumbres de tiempos inmemorables. Véase L. D. Kramer, *The People Themselves:*

*Popular Constitutionalism and Judicial Review*, Oxford University Press, Nueva York, 2004, págs. 9-34.[7]

En la época política contemporánea el sistema constitucionalista regularmente se sustenta en la existencia de un documento constitucional que representa la *lex superior* del ordenamiento jurídico. Hoy es aceptado que las constituciones son "un conjunto de normas fundamentales que establece[n] las bases jurídicas de la ordenación político-social de un pueblo, protegiendo los derechos y la dignidad esencial de la posición de los ciudadanos, estableciendo las instituciones de gobierno y encauzando los procesos políticos". Escuela de Administración Pública U.P.R., *La Nueva Constitución de Puerto Rico*, Ed. U.P.R., San Juan, ed. facsimilar de 1954, pág. 119.

Es necesario entonces que ante la trascendental importancia de un documento constitucional, el procedimiento para enmendarlo sea uno particularmente detallado y definido. Como estableció la Escuela de Administración Pública de la U.P.R. en su reporte a la Convención Constituyente:

[u]na constitución democrática, fuerte y estable es aquella en la cual siempre hay un alto grado de congruencia entre los principios fundamentales que encierra y el concepto que tiene el público en general sobre lo que deben ser esos principios. Cuando la constitución refleja cambios en actitudes sociales básicas, es una fuerza viviente que une a la sociedad y promueve su desarrollo normal. Cuando no refleja tales cambios, es una fuerza destructora que

---

[7] A esos efectos, menciona el professor Larry D. Kramer que "[t]he word 'constitution' had several meanings in the seventeenth and eighteenth centuries, not all of which correspond to modern understandings. According to one usage, a "constitution" was simply the arrangement of existing laws and practices that, literally, constituted the government; it was neither anterior nor superior to government or ordinary law, making it possible to speak of a law being unconstitutional without it also being illegal." L. D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review*, Oxford University Press, Nueva York, 2004, págs. 9-10.

constituye un obstáculo para el desarrollo saludable y produce la desintegración de la sociedad misma. Escuela de Comunicación Pública U.P.R., *op. cit.*, pág. 520.

Es por ello que para evitar convertirse en un folleto estático que refleje meramente las concepciones sociales de un momento dado, **y ante la imposibilidad de que los tribunales o la Asamblea Legislativa enmienden *motu proprio* su texto,** los documentos constitucionales deben contener una cláusula de enmienda que "más que ninguna otra, da vida a la constitución". Escuela de Comunicación Pública U.P.R., *op. cit.*, pág. 520. No obstante, y por su evidente importancia, las constituciones no pueden ser enmendadas como si fueran cualquier otro estatuto.

Por ende, no hay duda que el poder para enmendar una constitución "debe ejercerse de forma que el ordenamiento constitucional pueda mantener su coherencia, libre de los caprichos momentáneos y arbitrarios de las mayorías. Por tal razón, es necesario que una constitución tenga un procedimiento específico que limite el proceso mediante el cual se revisa; la naturaleza de este procedimiento debe distinguir la Constitución de las leyes ordinarias". *Berríos Martínez v. Gobernador II*, supra, págs. 210-211.

Así, es importante que los mecanismos que provea la propia constitución sean lo suficientemente detallados para cumplir dos (2) propósitos. Primero, encontrar un adecuado balance entre permitir enmiendas al texto constitucional para atemperarlo a los tiempos sin que sea tan fácil como para que las enmiendas sean demasiado constantes. Segundo, garantizar que las enmiendas

verdaderamente se encuentren respaldadas por el consenso general e informado de los ciudadanos.

Con ello en mente, los padres de nuestra Constitución establecieron un procedimiento expreso y detallado de enmienda. El Art. VII de la Constitución de Puerto Rico establece dos (2) mecanismos posibles para enmendar el documento constitucional. Por su pertinencia, citamos *in extenso* de la Sec. 1 de la referida disposición constitucional:

La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe **por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara.** Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. **Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum.** Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. Art. VII, Sec. 1, Const. P.R. Tomo 1, ed. 2008, pág. 442. (Énfasis suplido).

Como puede apreciarse, este primer mecanismo de referéndum presenta dos (2) filtros para garantizar el consenso general necesario para enmendar la Constitución. De entrada se requiere la aprobación de dos terceras (2/3) partes de los miembros de cada cuerpo legislativo para proponer las enmiendas. Posteriormente, se requiere la aprobación por parte del electorado.

La referida disposición también contiene mecanismos de protección para el Pueblo. Si el referéndum se quiere celebrar el mismo día de las elecciones generales, el número de votos a favor de las enmiendas en los cuerpos legislativos aumenta a tres cuartas (3/4) partes. Además, no se le pueden presentar al Pueblo más de tres (3) proposiciones de enmienda y se le debe dar la oportunidad de votar por cada una de forma separada (principio de separabilidad).

Por último, la Sec. 2 del Art. VII de la Constitución provee un segundo método de enmienda constitucional. Específicamente, dispone:

La Asamblea Legislativa podrá, mediante resolución concurrente aprobada por dos terceras partes del número total de los miembros de que se compone cada cámara, consultar a los electores capacitados si desean que se convoque a una **convención constituyente para hacer una revisión de esta Constitución**. La consulta se hará mediante referéndum que se celebrará al mismo tiempo que la elección general; y si se deposita a favor de la revisión una mayoría de los votos emitidos sobre el particular, se procederá a la revisión en Convención Constituyente elegida en la forma que se disponga por ley. Toda revisión de esta Constitución deberá someterse a los electores capacitados en referéndum especial para su aprobación o rechazo por mayoría de los votos que se emitan. Art. VII, Sec. 2, Const. P.R. Tomo 1, ed. 2008, pág. 443. (Énfasis suplido).

Como vemos, este segundo mecanismo para proponer enmiendas a la Constitución también requiere el aval de dos terceras (2/3) partes de los miembros de los Cuerpos Legislativos. De aprobarse, se le consultaría al Pueblo si desea convocar una Convención Constituyente la cual procedería a hacer una revisión estructural de todo el documento constitucional.

Finalmente, la Sec. 3 del Art. VIII establece dos (2) limitaciones absolutas a los procedimientos de enmienda. Primero,

ninguna enmienda puede alterar la forma republicana de gobierno establecida en la Constitución y, segundo, la Carta de Derechos contenida en el Art. II del documento no puede ser abolida.

Surge del historial de la Convención Constituyente que los constituyentes tuvieron ante sí la opción de adoptar diversos métodos para disponer sobre enmiendas a la Constitución. Específicamente, se rechazaron dos (2) métodos alternativos de reforma constitucional: las enmiendas por iniciativa popular y las sumisiones periódicas y automáticas para convocar una Convención Constituyente. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universidad de Puerto Rico, T. III, pág. 259.

Según Trías Monge, el método de enmienda por iniciativa popular se rechazó "por la razón de que la delegación mayoritaria...estaba firmemente en contra de todo método de democracia directa, por haber tal recurso convertido en ocasiones las constituciones afectadas en fácil presa de grupos de presión...". J. Trías Monge, *op. cit.*, pág. 259. El rechazo a ese método de enmienda constitucional quedó claro con nuestra decisión en *Córdova y otros v. Cámara de Representantes*, 171 D.P.R. 789, 806 (2007).

En cuanto al segundo método de enmienda, su rechazo según Trías Monge se debió a factores más complejos. *Íd.* pág. 260. En síntesis, había preocupación en cuanto al efecto que pudiera tener ese método en las relaciones políticas entre Puerto Rico y Estados Unidos. *Íd.* No obstante, señala este tratadista que el repudio de ese método "ciertamente parece, a la distancia de

tantos años de lo sucedido, como uno de los errores graves de la Convención Constituyente". *Íd.*

## VII

### *La Cantidad de Votos Necesarios en los Cuerpos Legislativos*

**A.**

En el caso de autos estamos llamados a interpretar por primera vez la cláusula constitucional que requiere el aval de dos terceras (2/3) partes de la totalidad de los miembros que componen cada Cámara Legislativa para la aprobación de una proposición de enmienda constitucional.

Surge del historial de esa cláusula que la Convención Constituyente tuvo otras alternativas al voto de dos terceras (2/3) partes de los miembros de los Cuerpos Legislativos. En específico, la Escuela de Administración Pública de la U.P.R. consideró que el requisito de dos terceras (2/3) partes de los votos dificultaba demasiado proponer enmiendas constitucionales, por lo cual recomendó que se permitiera a la Asamblea Legislativa proponer "una enmienda por una mayoría absoluta de votos en un periodo, o por una simple mayoría de votos en dos períodos o sesiones consecutivos". Escuela de Administración Pública U.P.R., *op. cit.*, pág. 523.

No obstante, la Convención Constituyente decidió no adoptar esa recomendación y, en cambio, se estableció la actual cláusula que requiere el voto de dos terceras (2/3) partes de los miembros de los Cuerpos Legislativos. Del Diario de Sesiones de la Convención

Constituyente no surge una explicación de qué significa la frase "el número total de los miembros que componen cada cámara".

Las únicas expresiones en la Convención Constituyente pertinentes a este asunto se dieron en el contexto de un debate entre los delegados Miguel A. García Méndez y José Trías Monge. El delegado García Méndez propuso que, una vez aprobada una propuesta constitucional por dos terceras (2/3) partes de los cuerpos legislativos, el electorado a su vez tendría que aprobarla con dos terceras (2/3) partes de votos a favor para que efectivamente procediera la enmienda. A este argumento, replicó Trías Monge:

...[E]stamos insertando en esta proposición de enmiendas, las garantías esenciales a la estabilidad de la constitución, en cuanto se indica que únicamente podrán proponerse enmiendas a esta constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes de los miembros que componen cada cámara. O sea, el punto fundamental es en cuanto a las garantías de limitación a la etapa iniciativa de la enmienda a la constitución. Ahí debidamente reconocemos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, únicamente podrá hacerse por no menos de dos terceras partes *absolutas* de los miembros que componen las cámaras legislativas. 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 1829 (1952)(Énfasis suplido).

La propuesta enmienda del delegado García Méndez fue derrotada. Este intercambio abona a la interpretación que hoy estamos llamados a realizar.

Ante la ausencia explícita en la Convención Constituyente del significado de la frase "dos terceras partes del número total de los miembros de que se compone cada cámara", debemos recurrir entonces al Art. III de la Constitución el cual define la

composición del Senado y de la Cámara de Representantes de Puerto Rico. Ello ya que las disposiciones de la Constitución de Puerto Rico, como *lex superior*, deben ser interpretadas de forma integrada y consistente entre sí.

La Sec. 2 del Art. III de la Constitución dispone:

**El Senado se compondrá de veintisiete Senadores** y la Cámara de Representantes de cincuenta y un Representantes, **excepto cuando dicha composición resultare <u>aumentada</u> a virtud de lo que se dispone en la Sección 7 de este Artículo.** Art. III, Sec. 2, Const. P.R. Tomo 1, ed. 2008, pág. 382. (Énfasis suplido).

Esta disposición constitucional deja claro que en nuestro ordenamiento jurídico la composición de los Cuerpos Legislativos no es necesariamente estática. En un escenario electoral regular, la totalidad de los miembros del Senado es veintisiete (27) Senadores y la totalidad de los miembros de la Cámara de Representantes es cincuenta y un (51) Representantes. En ese escenario constitucional, para que una Resolución Concurrente que proponga enmiendas constitucionales sea válida **debe contar con el aval de por lo menos dieciocho (18) Senadores y treinta y cuatro (34) Representantes,** lo cual representa dos terceras (2/3) partes de los miembros que componen la **<u>totalidad</u>** de los miembros de los Cuerpos Legislativos.

No obstante, la Sec. 2 del Art. III reconoce la posibilidad de que los Cuerpos Legislativos estén compuestos por más miembros. Como vimos, la composición de los Cuerpos Legislativos puede resultar *<u>aumentada</u>* **en virtud de lo que se dispone en la Sección 7 del mismo Art. III.** Esa disposición, conocida popularmente como "La Ley de Minorías", representa "un innovador mecanismo para

garantizar la representación efectiva de las delegaciones minoritarias en la Legislatura". *Suárez Cáceres v. Com. Estatal Elecciones*, 176 D.P.R. 31, 75 (2009). La referida disposición constitucional "se activa s[o]lo bajo determinadas circunstancias y no siempre le asegura a los partidos políticos de minoría un número igual a la tercera parte del número total de miembros". *Íd.*

El Informe de la Comisión de la Rama Legislativa explicó que la "Ley de Minorías" se activa si "un partido o una sola candidatura elige más de dos terceras partes de los miembros de una cámara,[entonces] **se <u>aument[a]</u> de manera automática la <u>composición</u>** de esa cámara para fortalecer la representación minoritaria...". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2596 (1952). (Énfasis suplido).

Así, la Sec. 7 del Art. III dispone los dos (2) escenarios en los cuales puede darse el caso de aumento automático de la composición de los Cuerpos Legislativos:

(a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

(b) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido más de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, y uno o más partidos de minoría no eligieron el número de miembros que les correspondía en el Senado o en la Cámara de Representantes o en ambos cuerpos, según fuere el caso, en proporción a los votos depositados por cada uno de ellos para el cargo de Gobernador, se declararán electos adicionalmente sus candidatos hasta completar dicha proporción en lo que fuere posible, pero los Senadores de todos los partidos de minoría no serán nunca, bajo esta disposición, más de nueve ni los Representantes más de diecisiete. Art. III, Sec. 7, Const. P.R. Tomo 1, ed. 2008, págs. 385-386. (Énfasis suplido).

Nos resulta evidente y forzosa la conclusión de que, una vez se añaden escaños a los Cuerpos Legislativos por darse alguno de los escenarios provistos en la Sec. 7 del Art. III, la composición de estos aumenta. Es decir, estos escaños legislativos tienen que tomarse en consideración al momento de determinar qué cantidad de votos es necesaria para que se alcancen dos terceras (2/3) partes de la totalidad de los miembros que componen cada Cámara.[8] De igual forma, la interpretación que hoy hacemos del Art. VII, Sec. 1 de la Constitución de Puerto Rico, *supra*, se encuentra en armonía con expresiones anteriores nuestras. En particular, en *Sánchez v. López Jiménez*, 116 D.P.R. 392, 395 (1985),

---

[8] Nótese que tanto la Sec. 2 del Art. III como la Sec. 1 del Art. VII de la Constitución utilizan el mismo verbo para establecer la composición de los cuerpos. La Sec. 2 del Art. III establece que "El Senado se **_compondrá_** de veintisiete Senadores. . .", mientras que la Sec. 1 del Art. VII establece que las Resoluciones Concurrentes que propongan enmiendas constitucionales deberán ser aprobadas "por no menos de dos terceras partes del número total de los miembros de que se **_compone_** cada cámara".

interpretamos la condición que se requiere para que este Tribunal pueda declarar inconstitucional una ley, según se encuentra recogida en el Art. V. Sec. 4 de la Constitución de Puerto Rico, L.P.R.A. Tomo I. Como es sabido, esa Sección establece que para declarar inconstitucional una ley es necesario que lo haga una "mayoría del número total de los jueces de que esté compuesto e[ste] tribunal de acuerdo con esta Constitución o con la ley". *Íd.* Luego de auscultar el Diario de la Convención Constituyente, concluimos que para poder declarar una ley inconstitucional se "requiere mayoría *absoluta* de sus miembros indistintamente de que hubiesen vacantes, por lo que éstas se sumarían en el número ideal de sus miembros". *Sánchez v. López Jiménez*, supra, pág. 395. (Énfasis en el original.)

Como se aprecia, el texto constitucional que analizamos en *Sánchez v. López Jiménez*, supra, es parecido al Art. VII, Sec. 1 de nuestra Constitución. En ambas secciones, se hace referencia a la frase número total de los miembros que componen el cuerpo, sea una cámara legislativa o este Tribunal. Procede entonces interpretar nuestra *lex superior* de forma integrada. Por consiguiente, si concluimos que para que este Foro pueda declarar inconstitucional una ley al amparo del Art. V, Sec. 4, es necesario el concurso de una mayoría de los miembros del Tribunal, **incluyendo las vacantes**, no vemos razón para arribar a un resultado distinto en este caso. Así pues, una interpretación holística de nuestra Constitución obliga a razonar que es necesario **incluir las vacantes existentes** al momento de hacer el cómputo para auscultar si se cumplió con el requisito de dos

terceras partes según lo requiere el Art. VII, Sec. 1 de la Constitución de Puerto Rico.

No podemos avalar una interpretación que permita que el número de miembros que componen cada Cámara quede a discreción de los propios legisladores, quienes ante bajas involuntarias o renuncias podrían alterar el número necesario para constituir dos terceras (2/3) partes para proponer enmiendas constitucionales o tres cuartas (3/4) partes para proponer una convocatoria a una Convención Constituyente.

### B.

A la luz del crisol doctrinario anteriormente expuesto, pasemos a resolver si la Res. Concurrente Núm. 35, *supra*, obtuvo el aval necesario de dos terceras (2/3) partes de la totalidad de los miembros del Senado de Puerto Rico. Como resultado de las elecciones generales de noviembre de 2008, la composición de los Cuerpos Legislativos tuvo que ser aumentada por disposición de la "Ley de Minorías". Específicamente, el número de Representantes fue aumentado de cincuenta y uno (51) a cincuenta y cuatro (54) y el número de Senadores de veintisiete (27) a treinta y uno (31). No obstante, al momento de considerarse la Res. Concurrente Núm. 35, *supra*, el Senado de Puerto Rico contaba con dos (2) escaños vacantes.[9]

Así las cosas, el Senado de Puerto Rico aprobó la Res. Concurrente Núm. 35, *supra*, con veinte (20) votos a favor, ocho (8) en contra, una (1) ausencia y dos (2) vacantes. El P.I.P.

---

[9] Estas dos (2) vacantes surgieron tras la renuncia de los Senadores Roberto Arango-Vinent y Antonio Soto.

argumenta que, si se toman en consideración los escaños vacantes, la Resolución Concurrente contó con el aval del sesenta y cuatro porciento (64%) de los miembros del Senado, por lo cual no se logró el aval de dos terceras (2/3) partes del Cuerpo.

*A contrario sensu*, el Gobierno de Puerto Rico argumenta que los escaños vacantes no deben ser tomados en consideración ya que, al momento de la votación, el Senado de Puerto Rico, en efecto, se componía de veintinueve (29) senadores. Por ende, la Res. Concurrente Núm. 35, *supra*, contó con el aval de dos terceras (2/3) partes de los senadores al alcanzar el sesenta y ocho porciento (68%) de los votos a favor. No le asiste la razón al peticionario.

Como discutimos, **los escaños vacantes tienen que tomarse en consideración al momento de determinar la totalidad de los miembros de los Cuerpos Legislativos.** La Sec. 2 del Art. III de la Constitución de Puerto Rico establece que el Senado se compondrá de veintisiete (27) senadores, a menos que su **composición** se viera **alterada** por la aplicación de la "Ley de Minorías". Siendo ello así, la Res. Concurrente Núm. 35, *supra*, no contó con el número necesario de votos a favor al momento de su votación inicial el 10 de octubre de 2011.

Ahora bien, nuestra encomienda en el caso de epígrafe no culmina ahí. El 14 de mayo de 2012 los Cuerpos Legislativos aprobaron la Resolución Concurrente Número 60 (en adelante Res. Concurrente Núm. 60) en la que se acordó proponerle al Pueblo enmendar la Sec. 11 del Art. II de la Constitución para

restringir el derecho a la fianza en casos específicos. En esa Resolución, los Cuerpos Legislativos expresaron lo siguiente:

La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012, conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea Legislativa, **propuesta en la Resolución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual _reiteramos_ en la presente Resolución Concurrente.**[10] (Énfasis suplido)

Esta Resolución fue aprobada en la Cámara de Representantes con cuarenta y tres (43) votos a favor, ocho (8) en contra y dos (2) ausencias. Por su parte, en el Senado de Puerto Rico fue aprobada con veintidós (22) votos a favor, siete (7) en contra y un (1) senador ausente. Evidentemente, la Res. Concurrente Núm. 60, _supra_, se aprobó con el aval de dos terceras (2/3) partes de los miembros que componen la totalidad de los miembros de ambos Cuerpos Legislativos.

Por su pertinencia al caso de autos, conviene exponer específicamente la votación del Senado de Puerto Rico que aprobó la Res. Concurrente Núm. 60, _supra_. La votación fue la siguiente:

| Senador | Voto |
|---|---|
| Arce Ferrer, Luz Z. | A favor |
| Berdiel Rivera, Luis A. | A favor |
| Bhatia Gautier, Eduardo | En contra |
| Burgos Andújar, Norma E. | A favor |

---

[10] Véase alegato del Gobierno de Puerto Rico, pág. 11.

| | |
|---|---|
| Dalmau Santiago, José L. | En contra |
| Díaz Hernández, José R. | A favor |
| Fas Alzamora, Antonio J. | En contra |
| Fernández Rodríguez, Liza M. | A favor |
| García Padilla, Alejandro | En contra |
| González Calderón, Sila M. | A favor |
| González Velázquez, José E. | A favor |
| Hernández Mayoral, Juan E. | En contra |
| Iglesias Suárez, Roger | A favor |
| Martínez Santiago, Ángel | A favor |
| Muñiz Cortés, Luis D. | A favor |
| Nolasco Santiago, Margarita | A favor |
| Padilla Alvelo, Migdalia | A favor |
| Peña Ramírez, Itzamar | A favor |
| Raschke Martínez, Kimmmey | A favor |
| Ríos Santiago, Carmelo | A favor |
| Rivera Schatz, Thomas | A favor |
| Rodríguez Martínez, Miguel A. | A favor |
| Romero Donnelly, Melinda K. | Ausente |
| Santiago González, Luz M. | A favor |
| Seilhamer, Rodríguez, Lawrence | A favor |

Soto Villanueva, Lornna J.                          A favor

Suárez Cáceres, Jorge I.                            En contra

Tirado Rivera, Cirilo                               En contra

Torres Torres, Carlos J.                            A favor

Vázquez Nieves, Evelyn                              A favor[11]

No hay duda que la voluntad de más de dos terceras (2/3) partes de los miembros del Senado de Puerto Rico es proponerle al Pueblo una enmienda constitucional para reducir el tamaño de la legislatura. **Ningún juez de este Tribunal puede controvertir ese hecho.** Y es que las Resoluciones Concurrentes son expresiones que revelan la voluntad de los Cuerpos Legislativos,[12] y en la Res. Concurrente Núm. 60, *supra*, esa voluntad de más de dos terceras (2/3) partes de los miembros del Senado de Puerto Rico fue "***reiterar***" lo dicho en la Res. Concurrente Núm. 35, *supra*. Según la Real Academia Española el verbo reiterar significa "volver a decir o a hacer algo".[13]

---

[11] Véase Ap. Recurso de Certificación, pág. T.S. 103.

[12] La Regla 17.1 del Senado de Puerto Rico establece que:

Las Resoluciones Concurrentes son aquellas medidas aprobadas por ambos Cuerpos, las cuales se utilizan para:

a) Proponer enmiendas a la Constitución de Puerto Rico;
b) Consignar expresiones de la Asamblea Legislativa **que no tienen carácter de legislación;**
c) Disponer sobre el gobierno interno de la Asamblea Legislativa. Reglamento del Senado de Puerto Rico, 16ta Asamblea Legislativa, pág. 56. (Énfasis suplido).

[13] Diccionario de la Real Academia Española, disponible en http://lema.rae.es/drae/?val=reiterar (última visita, 26 de junio de 2012).

Sustentándose en que las Resoluciones Concurrentes deben estar atadas a los requisitos constitucionales necesarios para la aprobación de las leyes, el P.I.P. aduce que la Res. Concurrente Núm. 60, *supra*, no podía reiterar lo expresado en la Res. Concurrente Núm. 35, *supra*, porque el asunto de reforma legislativa no se expresó en su título y esta contendría entonces más de un asunto, en violación a la Sec. 17 del Art. III de la Constitución. No le asiste la razón.

De entrada, aun si fuera cierto que las Resoluciones Concurrentes están atadas al procedimiento constitucional para la aprobación de las leyes, hemos interpretado que el requisito de "un solo asunto" en las leyes se interpreta liberalmente. *Herrero y otros v. E.L.A.*, 179 D.P.R. 277, 296 (2010). A esos fines hemos dicho que "s[o]lo ante un caso claro y terminante se justifica anular una ley por violar dicha disposición constitucional...Hemos adoptado una postura compresiblemente laxa para no maniatar al legislador. Una interpretación estricta de la disposición constitucional podría impedir y obstaculizar el proceso legislativo pues obligaría al legislador a aprobar múltiples leyes para regular un s[o]lo asunto o materia general". *Íd*. pág. 295.

Pero la realidad constitucional es que nada impide que el Senado de Puerto Rico mediante una Resolución Concurrente posterior reitere lo hecho en una Resolución Concurrente anterior. Sencillamente no estamos ante una ley ordinaria, sino ante un proceso legislativo diseñado para recoger la voluntad de un Cuerpo, **el cual no está atado a los procedimientos**

**constitucionales que se requieren para la aprobación de las leyes.** Véase N. J. Singer *et als.*, *Sutherland Statutory Construction*, Ed. West, 2009, 7ma Ed., pág. 648. A esos efectos, el profesor Gorrín Peralta, uno de los abogados de récord de la parte recurrida, define una resolución concurrente como aquellas que "tratan sobre asuntos de la incumbencia de ambas cámaras legislativas y para declaraciones legislativas que no tienen fuerza de ley. Como son declaraciones exclusivas del poder legislativo y no crean normas de aplicación general, no requieren la firma del ejecutivo". C. I. Gorrín Peralta, *Fuentes y Proceso de Investigación Jurídica*, Ed. Equity Publishing Co., New Hampshire, 1991, págs. 296-297.

Lo anterior significa que las resoluciones concurrentes no están sujetas a las reglas y procedimientos necesarios para aprobar una ley. Esta interpretación es cónsona con la Constitución de Puerto Rico, la cual guarda silencio en cuanto a la definición de las Resoluciones Concurrentes. No obstante, en la Sec. 18 del Art. III se establece que "[s]e determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, **pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley**". Art. III, Sec. 18, Const. P.R. Tomo 1, ed. 2008, pág. 399. (Énfasis suplido). **Los padres de la Constitución no impusieron ese requisito a la resolución concurrente, por lo cual no debe imponerlo este Tribunal como sostiene el recurrido.** En palabras de la Jueza Asociada del Tribunal Supremo federal Elena Kagan, el estándar propuesto por el P.I.P. en cuanto a las Resoluciones Concurrentes "comes

from...well, from nowhere". *Martel v. Clair*, 132 S. Ct. 1276, 1285 (2012), 565 U.S. __ (2012).

**Reiterada la Res. Concurrente Núm. 35, *supra*, a través de la Res. Concurrente Núm. 60, *supra*, no procede entonces que este Tribunal eche a un lado la voluntad de dos terceras (2/3) partes del Senado de Puerto Rico.** Según intimado, con la aprobación de la Res. Concurrente Núm. 60, *supra*, se ***reiteró*** la voluntad del Senado expresada en la Res. Concurrente Núm. 35, por lo cual no tiene razón el recurrido P.I.P. en su argumento de que esta última no fue correctamente aprobada.

## VIII

### *El propósito único y la cantidad de enmiendas propuestas*

### A.

Debidamente resuelta la controversia en cuanto a la aprobación de la Res. Concurrente Núm. 35, *supra*, pasamos a resolver la interrogante en cuanto a la cantidad de enmiendas que se le propone presentar al Pueblo.

Según hemos discutido, la Sec. 1 del Art. VII de la Constitución establece unos límites a las propuestas de enmiendas que la Asamblea Legislativa puede presentar para la aprobación del Pueblo. En lo pertinente, esa sección establece:

**Cada proposición de enmienda deberá votarse *separadamente* y en ningún caso se podrá someter más de *tres* proposiciones de enmienda en un mismo referéndum.** Art. VII, Sec. 1, Const. P.R. Tomo 1, ed. 2008, pág. 442. (Énfasis suplido).

El límite de tres (3) propuestas de enmienda fue recomendado favorablemente a la Convención Constituyente por la Escuela de Administración Pública de la U.P.R. Específicamente, se dijo que "[p]ara que los ciudadanos voten con conocimiento de causa, no se les puede sobrecargar sometiéndoles varias enmiendas a la vez. Es importante, por lo tanto, que se imponga alguna clase de límites al número de enmiendas que puede someterse al electorado". Escuela de Administración Pública U.P.R., *op. cit.*, pág. 532. La adopción del límite de tres (3) propuestas constitucionales se debió en gran parte a que ese era el modelo de la mayoría de los estados de la Unión al momento de redactarse la Constitución de Puerto Rico. Véase J. Trías Monge, *op. cit.,* pág. 258.

Este Tribunal interpretó por primera vez la cláusula de limitación numérica y la de separabilidad de proposiciones en *Berríos Martínez v. Gobernador II*, supra. En ese caso, establecimos que "se trata de una sola proposición [de enmienda] si el texto contiene los detalles necesarios para lograr un 'único propósito', de forma que para lograr ese objetivo sea indispensable que todos sean aprobados o rechazados a la vez". *Íd.* pág. 219. A esos efectos, aclaramos que

será necesario evaluar cada enmienda tomando en consideración que la definición del concepto "propósito" no puede ser tan abarcadora como para incluir en su ámbito cualquier combinación de proposiciones como una sola enmienda. Tampoco puede ser tan rígida como para hacer imposible enmendar la Constitución. *Íd.*

En *Berríos Martínez v. Gobernador II*, supra, evaluamos la constitucionalidad de dos (2) propuestas de enmienda que la Asamblea Legislativa aprobó para ser consultadas al Pueblo. La primera proponía limitar a dos (2) términos el cargo de

Gobernador de Puerto Rico, y a tres (3) términos los cargos de legisladores y alcalde. La segunda, proponía al Pueblo aumentar y fijar en nueve (9) el número de jueces de este Tribunal y eliminar la facultad exclusiva de este Foro de iniciar procedimientos para modificar el número de sus miembros.

Utilizando el estándar anunciado de "propósito único", en votación 4-3 resolvimos que la primera propuesta constitucional que limitaba los cargos de funcionarios electivos era inconstitucional ya que no perseguía un fin único: se trataba de "enmiendas totalmente independientes entre sí, que han sido hilvanadas artificial y superficialmente, y no satisfacen los criterios constitucionales de unidad de propósito". *Berríos Martínez v. Gobernador II*, supra, pág. 221.[14]

Nuestra decisión en *Berríos Martínez v. Gobernador II*, supra, ha sido objeto de severas críticas por parte de reconocidos académicos y jueces de este foro. Estas críticas no se han dirigido al estándar anunciado en la Opinión, sino a su **aplicación** a los hechos particulares de ese caso. La primera crítica la esbozó la entonces Jueza Asociada señora Naveira de Rodón en la Opinión Concurrente y Disidente que emitió en *Berrios v. Gobernador II*, supra. La Jueza Asociada señora Naveira de Rodón no tenía reparos con el estándar de "propósito único" utilizado por la mayoría del Tribunal, pero discrepó de su aplicación a los hechos del caso.

---

[14] No obstante, aplicando el mismo estándar, una mayoría del Tribunal concluyó que la propuesta enmienda constitucional sobre los miembros del Tribunal Supremo sí perseguía un propósito único, fijar permanentemente en nueve (9) la composición de este Tribunal.

Pero la crítica más severa a la aplicación del estándar de "propósito único" ha sido la del profesor José Julián Álvarez González. Este ha opinado que "[l]a mayoría [en *Berríos Martínez v. Gobernador II*, supra] sentó una teoría mínimamente adecuada para definir el concepto de 'proposición de enmienda', **pero se** **estrelló a la hora de aplicarla**". J.J. Álvarez González & A.I. García Saúl, *Derecho Constitucional*, 65 Rev. Jur. U.P.R. 799, 868 (1996). (Énfasis suplido).[15]

A pesar de las críticas que se han hecho a la *aplicación* del estándar de "propósito único" que una mayoría del Tribunal realizó en *Berríos Martínez v. Gobernador II*, supra, entendemos que el estándar articulado por el Tribunal en ese caso es la manera correcta de acercarse a estas controversias Hoy nos reafirmamos en ese estándar: se trata de un propósito único si la propuesta presenta al Pueblo un solo fin, objetivo o meta. Si todos los elementos adicionales de la enmienda son **incidentales** y **razonablemente necesarios** para llevar a cabo el fin, objetivo o meta de la propuesta, la enmienda contiene un único propósito.

**B.**

---

[15] Por su pertinencia y excelente rigor analítico, citamos *in extenso* la crítica principal del profesor:

> La falla principal del razonamiento de la mayoría...se produjo al escoger el nivel de generalidad con que aplicaría el criterio de propósito único. **A nuestro juicio, la enmienda sobre la limitación de términos tenía un propósito general único, limitar los términos de cargos electivos.** *Lo demás era todo incidental*. Por supuesto que habría electores razonables que preferirían unas limitaciones a unos cargos y no a otros, y otros electores razonables que discreparían sobre cuáles deben ser las limitaciones a cada cargo. **Pero la gran mayoría de los electores razonables, debatirían sobre una controversia central: ¿debe o no haber en un gobierno democrático limitaciones al número de veces que una persona puede resultar electa a determinado cargo?** J.J. Álvarez González & A.I. García Saúl, *Derecho Constitucional*, 65 Rev. Jur. U.P.R. 799, 871 (1996). (Énfasis suplido).

A tenor con el análisis discutido, pasemos a determinar si la proposición de enmienda aprobada por la Asamblea Legislativa en la Res. Concurrente Núm. 35, *supra*, y reiterada en la Res. Concurrente Núm. 60, *supra*, persigue un único propósito.

*In limine*, el Gobierno de Puerto Rico sostiene que la enmienda constitucional objeto de controversia tiene un único propósito: reducir el número de escaños en la Asamblea Legislativa de Puerto Rico. *A contrario sensu*, el P.I.P. alega que se trata en realidad de más de un asunto ya que se proponen nueve (9) cambios al texto del Art. III de la Constitución y que un elector razonable podría querer votar a favor de algunos de esos cambios y en contra de otros.

De entrada, no nos convence el argumento del P.I.P., un tanto simplista, de que cada cambio al texto de la constitución constituye una proposición de enmienda independiente. Ese estándar de análisis ya fue rechazado por este Tribunal en *Berríos Martínez v. Gobernador II*, supra. Por ende, como primer paso para contestar la interrogante de si la enmienda constitucional en controversia persigue un único fin, meta u objetivo debemos primero preguntarnos qué es lo se le propone al Pueblo y qué pregunta tiene que contestar el elector al momento de ejercer su voto. En segundo lugar, debemos determinar si los cambios en el texto son incidentales y razonablemente necesarios para alcanzar ese fin.

Entendemos que el Pueblo tendrá ante sí una sola pregunta que contestar: ¿debe reducirse el número de escaños disponibles en las Cámaras Legislativas? Ese es el único fin que persigue la

enmienda constitucional propuesta en la Res. Concurrente Núm. 35, *supra*, y reiterada en la Res. Concurrente Núm. 60, *supra*. Debemos entonces determinar si los cambios que se proponen al texto del Art. III de la Constitución son incidentales a ese fin y razonablemente necesarios para llevarlo a cabo.

Entendemos que los cambios son incidentales y **absolutamente** necesarios para que el fin de reducir los escaños legislativos pueda darse. *Por obligación*, si se quiere reducir el número de escaños de uno de los Cuerpos Legislativos, tienen que hacerse cambios en la cantidad de distritos representativos o senatoriales para evitar que algunos de estos se queden vacantes o no tengan representación adecuada. Además, si se reduce el número total de escaños de las cámaras legislativas por obligación habría que reducir el número máximo de legisladores que entrarían por las disposiciones de la "Ley de Minorías" ya que el número que compone una tercera (1/3) parte de cada cuerpo queda alterado. Actualmente, una tercera parte de veintisiete (27) es nueve (9), pero si se reduce el numero de escaños a diecisiete (17), una tercera (1/3) parte es seis (6). **Vemos entonces que la propuesta de enmienda constitucional aspira a alterar la composición de los Cuerpos Legislativos, <u>nada más.</u> No existe proposición para trastocar sus poderes constitucionales o alterar la manera en que los Cuerpos funcionan.**

A su vez, y al igual que expresamos en *Berríos v. Gobernador II*, supra, cuando analizamos la enmienda constitucional que proponía fijar en nueve (9) el número de jueces de este Tribunal, un elector razonable no se vería en la encrucijada de votar a

favor de disposiciones de las cuales pudiera estar en contra. El propósito de la Asamblea Legislativa fue uno: **reducir la totalidad** de los miembros de **ambas** cámaras legislativas pero sin alterar la proporción de legisladores por acumulación y por distrito, ni el tamaño relativo entre las cámaras. Para ello, **por obligación** hay que enmendar el número de distritos senatoriales y representativos y hay que reducir el número de legisladores por adición en caso de activarse la "Ley de Minorías". Sería irrazonable pensar que un elector esté a favor de reducir los escaños legislativos de ambos Cuerpos Legislativos, pero desee conservar la misma cantidad de distritos legislativos y la misma cantidad de legisladores por adición. La única forma de llegar al fin único que persigue la enmienda es a través de los cambios que se proponen al texto del Art. III.

Una interpretación contraria a la cual llegamos hoy tendría como consecuencia lo que el profesor Álvarez González llamó "la muy peligrosa píldora" que el Pueblo tendría que tragar. Si toda enmienda constitucional que proponga cambios a la estructura de la Asamblea Legislativa contuviera más de un propósito, **nunca** se podría llevar a cabo una reforma legislativa mediante el método de referéndum. Para ese fin, el Pueblo tendría que jugar "la ruleta constitucional" y convocar una Convención Constituyente, la cual no está atada por agenda alguna y podría alterar el documento constitucional en su totalidad. Rehusamos avalar ese absurdo.

El estándar que adoptamos en *Berríos v. Gobernador II*, supra, y que hoy reafirmamos no se traduce a que la Asamblea

Legislativa pueda confeccionar cualquier amalgama de asuntos e incluirlos bajo una propuesta de enmienda constitucional con un "propósito único" abstracto. A manera de ejemplo, no podría proponerse una enmienda constitucional para "reformar la Rama Ejecutiva" que incluya cualquier tipo de combinación de cambios al texto constitucional que describa el ámbito, poderes y requisitos de la Rama Ejecutiva. Tiene que proponérsele al Pueblo una pregunta que contenga un solo tema, objetivo o fin. Si la enmienda de "Reforma de la Rama Ejecutiva" contuviera enmiendas relacionadas a los requisitos para ocupar el puesto de Gobernador, unido a un cambio en los poderes del Ejecutivo y una limitación de dos (2) términos a quien ocupe esa posición, no estaríamos ante un propósito único porque no se cumple con el primer paso del estándar que hoy clarificamos: el Pueblo tendría ante sí más de un fin, objetivo o meta en la propuesta enmienda constitucional, por lo cual la proposición de enmienda no procedería.

En conclusión, los cambios que se proponen al texto del Art. III de la Constitución en la Res. Concurrente Núm. 35, *supra*, están inexorablemente entrelazados con el fin único de reducir los escaños legislativos. Por ende, estos son incidentales al propósito único de la enmienda, lo cual forzosamente nos lleva a concluir que no tiene razón el P.I.P. en su planteamiento de que se viola el principio de separabilidad al presentarse más de tres (3) propuestas de enmienda al Pueblo el 19 de agosto de 2012.

**IX**

### *La Convocatoria de la Junta Constitucional Revisora de Distritos Senatoriales y Representativos*

En otro ataque constitucional a la Res. Concurrente Núm. 35, *supra*, y su propuesta de enmienda, el P.I.P. sostiene que es inconstitucional la Sección 4 de esa Resolución la cual dispone que, de resultar favorecida la enmienda, el Gobernador de Puerto Rico convocará a la Junta Constitucional Revisora de Distritos Senatoriales y Representativos para confeccionar los nuevos distritos que vayan acorde con la nueva estructura de la Asamblea Legislativa.

La Junta Constitucional Revisora de Distritos Senatoriales y Representativos es un ente con vida temporera provisto por la Sec. 4 del Art. III. En específico, esa disposición constitucional establece:

En las primeras y siguientes elecciones bajo esta Constitución regirá la división en distritos senatoriales y representativos que aparece en el Artículo VIII. **Dicha división será revisada <u>después</u> de cada censo decenal a partir del año 1960,** por una Junta que estará compuesta del Juez Presidente del Tribunal Supremo como Presidente y de dos miembros adicionales nombrados por el Gobernador con el consejo y consentimiento del Senado. Los dos miembros adicionales no podrán pertenecer a un mismo partido político. Cualquier revisión mantendrá el número de distritos senatoriales y representativos aquí creados, los cuales estarán compuestos de territorios contiguos y compactos y se organizarán, hasta donde sea posible, sobre la base de población y medios de comunicación. Cada distrito senatorial incluirá siempre cinco distritos representativos.

La junta adoptará sus acuerdos por mayoría y sus determinaciones regirán para las elecciones generales que se celebren después de cada revisión. **La Junta quedará disuelta después de practicada cada revisión.** Art. III, Sec. 4, Const. P.R. Tomo 1, ed. 2008, pág. 383. (Énfasis suplido).

Según Trías Monge, existía división entre los miembros de la Convención Constituyente en cuanto a cuál sería el mejor método para revisar la demarcación de los distritos legislativos en

Puerto Rico. Los delegados socialistas proponían que la división original fuera realizada por una Junta Insular de Elecciones. *A contrario sensu*, los delegados del Partido Estadista Republicano no favorecían una revisión periódica, sino que preferían que fuese la propia Asamblea Legislativa la que revisara los distritos electorales. Finalmente, la Escuela de Administración Pública de la U.P.R. proponía que fuese una Junta no política la que revisara los distritos legislativos en intervalos de diez (10) años. Véase J. Trías Monge, *op. cit.*, pág. 147.

Ninguna de estas propuestas fue acogida por la Convención Constituyente. A final de cuentas, fue la intención de los Padres de la Constitución el que, luego de cada censo decenal, el Gobernador nombrara a dos (2) personas de partidos distintos para que, junto al Juez Presidente del Tribunal Supremo de Puerto Rico, procedieran a revisar la distribución de los distritos legislativos.

El P.I.P. argumenta que es inconstitucional la Sección 4 de la Res. Concurrente Núm. 35, *supra*, que dispone para que el Gobernador de Puerto Rico convoque a la Junta Constitucional Revisora si el electorado avala la enmienda constitucional en controversia. Alega que el texto constitucional prohíbe que la Junta Constitucional Revisora sea convocada en más de una ocasión en un decenio.

No nos convence este argumento del P.I.P. No hemos encontrado **nada** en el texto de la Constitución ni en el historial de la Convención Constituyente que ***prohíba*** el que la Junta Constitucional Revisora de Distritos Legislativos sea convocada

en más de una ocasión en una década. Si bien el texto constitucional establece que la Junta quedará disuelta después de cada revisión constitucional, ello no se traduce a que esta no puede volver a ser convocada en un decenio. En vez, esa disposición lo que prohíbe es que, una vez constituida la Junta, esta pueda continuar revisando los distritos electorales luego de realizarse la primera revisión para la cual fue convocada. Por ende, no existe prohibición constitucional alguna que impida que la Junta sea convocada para realizar una revisión de los distritos legislativos en medio de una década, utilizando la data del último censo.

## X

### *Los Anuncios Publicados*

Como último ataque constitucional, el P.I.P. plantea una serie de cuestionamientos a los anuncios que se han publicado para informar a la ciudadanía en cuanto a la celebración del Referéndum del 19 de agosto de 2012.

La Sec. 1 del Art. VII de la Constitución dispone, en lo pertinente, que:

...Aprobada una proposición de enmienda, deberá publicarse
con tres meses de antelación, por lo menos, a la fecha del
referéndum. Art. VII, Sec. 1, Const. P.R. Tomo 1, ed. 2008,
pág. 442. (Énfasis suplido).

Al igual que en varios de los asuntos que hemos atendido en el caso de autos, el historial de la Convención Constituyente guarda silencio en cuanto a cómo se debe publicar una proposición de enmienda.

En cuanto al asunto de los anuncios, los siguientes hechos están incontrovertidos. El 18 de mayo de 2012, antes de vencer el término de tres (3) meses que provee la Constitución para que se publique una proposición de enmienda, fue publicada por varios medios de comunicación una Proclama en la cual se le anuncia al Pueblo, *inter alia*, la aprobación de la Ley Núm. 12, *supra*. La Proclama le anuncia al Pueblo que la propuesta enmienda constitucional tiene como fin "restructurar el Poder Legislativo mediante una reducción en el número de miembros de la Asamblea Legislativa; para determinar su estructura y operación; asignar fondos para la celebración del referéndum y otros fines relacionados".

Por otro lado, la Ley Núm. 12, *supra*, le ordena a la C.E.E. a publicar con no menos de sesenta (60) días de antelación a la celebración del referéndum el texto íntegro de las enmiendas constitucionales propuestas.[16] Efectivamente, el 20 de junio de 2012 la C.E.E. publicó un anuncio en el cual se incluyeron las enmiendas que se proponen al texto del Art. III de la Constitución. No obstante, y según discutieron las partes en la Vista Oral celebrada el 27 de junio de 2012, por alguna razón la C.E.E. omitió incluir en ese anuncio el texto de los cambios propuestas a la Sec. 4 del Art. III de la Constitución. Sin embargo, este anuncio fue publicado nuevamente el 28 de junio de 2012 y en esta ocasión sí se incluyó el texto íntegro de la secciones a ser enmendadas.

---

[16] El texto íntegro de las enmiendas constitucionales propuestas también aparecerá en la papeleta que se le entregará a los electores.

No nos mueven los argumentos que ha presentado el P.I.P. para tratar de invalidar el referéndum del 19 de agosto basado en defectos en la publicación de las enmiendas. Primero, es incontrovertible el hecho de que las propuestas enmiendas constitucionales fueron publicadas antes de tres (3) meses de la celebración del referéndum en el Diario de Sesiones de los Cuerpos Legislativos. Por otro lado, se publicó una Proclama en varios medios de comunicación en el cual se anuncia la celebración del referéndum y se describen los propósitos de las enmiendas. Segundo, el texto íntegro de las enmiendas constitucionales ya fue publicado dentro de los sesenta (60) días que la Ley Núm. 12, *supra*, ordenó para su publicación.

Nos parece absurdo proveer una interpretación constitucional al texto del Art. VII de la Constitución que le permita a un medio de comunicación obtener un poder de veto sobre las propuestas de enmiendas constitucionales que la Asamblea Legislativa tenga a bien hacer. Si interpretáramos que una omisión en la publicación de un anuncio de enmienda constitucional por parte de un medio de comunicación masiva pudiera tener el efecto de invalidar una propuesta para que sea el Pueblo quien se exprese en cuanto a si desea alterar su *lex superior* sería una burla a todo el sistema constitucional. *De facto*, se le reconocería a un periódico o a la C.E.E. el poder de ir por encima de la voluntad de los Cuerpos Legislativos, y en última instancia, del Pueblo de Puerto Rico.

Por todo lo cual, no encontramos vicios constitucionales en la publicación de las enmiendas constitucionales propuestas a través de la Res. Concurrente Núm. 35.

## XI

Como en toda controversia constitucional, es razonable que existan diferencias de criterio en cuanto a la interpretación de las disposiciones del texto constitucional pertinente. Por ende, nos parece necesario atender algunos asuntos discutidos en las opiniones disidentes que hoy se emiten.

El disenso del Juez Presidente señor HERNÁNDEZ DENTON concluye que los requisitos que la Constitución estableció para los proyectos de ley, en específico el requisito de un solo asunto, aplican a las Resoluciones Concurrentes que los Cuerpos Legislativos aprueben para proponer enmiendas a la Constitución de Puerto Rico. En parte, el Juez Presidente basa su conclusión en una lectura acomodaticia de la Regla 17.3 del Reglamento del Senado de Puerto Rico. No obstante, una lectura integral de otras disposiciones reglamentarias revelan la imposibilidad de su interpretación.

Específicamente, la Regla 17.2 del Reglamento del Senado de Puerto Rico, en lo pertinente, dispone que:

Las Resoluciones Concurrentes, excepto las que propongan enmiendas a la Constitución, **luego de radicadas serán referidas a la Comisión de Reglas y Calendario, la cual rendirá su informe**, radicándolo en Secretaría.

*A contrario sensu*, la Regla 17.3 del Reglamento del Senado de Puerto Rico establece, en lo pertinente, que:

Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley, **siendo referidas para su consideración y estudio a las Comisiones Permanentes o Especiales que a estos efectos se disponga.**

Según intimado, el Juez HERNÁNDEZ DENTON interpreta que mediante la Regla 17.3 el Senado de Puerto Rico se autoimpuso mediante reglamento que las Resoluciones Concurrentes que propongan enmiendas a la Constitución deben cumplir los mismos **requisitos constitucionales que deben cumplir los proyectos**. Esa interpretación no va acorde con el funcionamiento interno de los Cuerpos Legislativos ni con una lectura integrada del Reglamento del Senado.

Lo que hace la Regla 17.3 es **diferenciar el <u>trámite interno</u>** de las Resoluciones Concurrentes que propongan enmiendas constitucionales. Esas Resoluciones Concurrentes, al igual que un proyecto de ley, serán referidas para su consideración a las Comisiones Permanentes o Especiales que tengan la encomienda de evaluar ese tipo de medida. **Ese es el trámite <u>interno</u> de los proyectos de ley que regula el Reglamento del Senado.** Por ende, el Senado de Puerto Rico mediante reglamento quiso evitar que una Resolución Concurrente que proponga enmiendas a la Constitución fuera referida a la Comisión de Reglas y Calendario, sino que se refiriera a la Comisión Permanente o Especial que se haya creado y que tenga pericia en el asunto del que versan las enmiendas constitucionales. Esa es la conclusión razonable a la cual debemos llegar para dar coherencia a esa disposición del Senado de Puerto Rico.

Por el contrario, si sostuviéramos la interpretación que hace el Juez HERNÁNDEZ DENTON en cuanto a la Regla 17.3 del Reglamento del Senado de Puerto Rico, tendríamos que concluir también que los demás requisitos constitucionales que deben

cumplir los proyectos de ley son de aplicación a las Resoluciones Concurrentes que propongan enmiendas a la Constitución. Así que, según la lógica del Juez Presidente, ese tipo de Resoluciones Concurrentes **_sí_** requerirían la firma del Gobernador, ya que ese es el "trámite" de un proyecto de ley. Una lectura integrada del Reglamento del Senado de Puerto Rico impide avalar esa interpretación.

Por otro lado, parte de las expresiones que el Juez HERNÁNDEZ DENTON emite hoy chocan irremediablemente con lo que suscribió a nombre del Tribunal en *Berríos Martínez v. Gobernador II*, supra. Específicamente, en ese caso el entonces Juez Asociado HERNÁNDEZ DENTON expresó que ante la labor de interpretar si las propuestas de enmienda que tenía el Tribunal ante sí en 1994 eran constitucionales, llevaríamos a cabo nuestra función constitucional "con el pleno convencimiento de que nuestra labor no es juzgar la sabiduría de las enmiendas propuestas, sino su constitucionalidad". *Íd.* pág. 202.

Sorpresivamente, hoy el Juez HERNANDEZ DENTON emite una Opinión disidente en la cual hace expresamente lo contrario. En específico, dice que hoy estamos validando "la propuesta de unas enmiendas a nuestra Ley Suprema que cambian el ordenamiento constitucional actual que le permite a las minorías tener una mayor posibilidad de estar representadas adecuadamente en la Asamblea Legislativa". Op. disidente HERNÁNDEZ DENTON, pág. 1. Además, el Juez HERNÁNDEZ DENTON aduce que "[l]a aprobación de estas enmiendas podría conllevar el destierro de los partidos

minoritarios, ya que un tercer partido político difícilmente obtendrá un escaño en la Asamblea Legislativa". *Íd*. pág. 34.

Estas expresiones son perturbadoras. Primero, abiertamente el Juez HERNÁNDEZ DENTON utiliza su rol constitucional para juzgar las bondades de una propuesta de enmienda, enviando al olvido sus propias palabras de otros tiempos. Segundo, sus expresiones en esencia se traducen a un voto explicativo de por qué el Juez HERNÁNDEZ DENTON habrá de votar "NO" el 19 de agosto de 2012 en el referéndum que propone reducir los escaños en la Asamblea Legislativa. Es lamentable que las páginas de *Decisiones de Puerto Rico* se utilicen para esa labor. Por nuestra parte, sostenemos que no nos compete como miembros del Tribunal Supremo juzgar la sabiduría de las propuestas de enmienda. **Esa labor es del Pueblo - única, exclusiva y terminantemente del Pueblo.**

Por otra parte, el disenso de la Jueza Asociada señora FIOL MATTA se sustenta en prosa elegante, pero se encuentra laxo de citas de derecho constitucional pertinentes. A la Jueza FIOL MATTA le preocupa que si la Constitución de Puerto Rico no prohíbe expresamente "algo", este Tribunal interprete que ese "algo" sí se pueda hacer. Concluye que al no encontrar una definición específica de aquellas partes de la Constitución que contienen "silencios", este Tribunal claudica su función constitucional de interpretar la Constitución y debilita el concepto de la revisión judicial. Nada más lejos de la verdad. Precisamente son esos "silencios" los que hoy interpretamos. La distinguida compañera difiere de esa interpretación y cataloga de peligroso "encontrar en el silencio el fundamento para no ser

rigurosos". En realidad, en su disenso la Jueza FIOL MATTA procede con la peligrosa suposición de que en nuestro ejercicio de interpretación la Constitución significa lo que nosotros como jueces quisiéramos que significara. Ello no puede ser así. Las disposiciones constitucionales significan exactamente lo que dicen, y encontrar prohibiciones en el silencio constitucional convertiría a los jueces de este Tribunal en miembros *ex post facto* de la Convención Constituyente. El que en una sociedad constitucional democrática ese poder lo ostenten los nueve (9) jueces que en un momento dado compongan este Tribunal es verdaderamente perturbador.

## XII

Para finalizar, y a pesar del entramado constitucional involucrado en el caso de autos, no podemos perder de vista que, según expresó el Juez Presidente del Tribunal Supremo federal John G. Roberts hace unos días, al analizar un ataque constitucional a una pieza legislativa "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *National Federation of Independent Business v. Sebelius*, ___ S. Ct. ____(2012), 567 U.S. ___ (2012) citando a *Hooper* v. *California*, 155 U. S. 648, 657 (1895). No hemos encontrado vicio constitucional alguno en el procedimiento llevado a cabo por la Asamblea Legislativa para proponerle al Pueblo una enmienda a su Constitución. El hecho de que el proceso legislativo sea complejo, frustrante y, francamente, difícil de comprender, no necesariamente se traduce a que con cada traspié legislativo se incurra en fallas constitucionales.

**Además, no debemos olvidar que en última instancia será el Pueblo de Puerto Rico el llamado a decidir sobre la procedencia de las enmiendas constitucionales propuestas. No hemos encontrado vicios constitucionales que impidan el que la voluntad del Pueblo se exprese en las urnas. Nuevamente, no le compete a este Foro juzgar la sabiduría, los defectos o bondades de las propuestas constitucionales que tendrá el Pueblo ante sí el 19 de agosto de 2012. Ante la ausencia de defectos constitucionales en la aprobación de las propuestas de enmienda, la Doctrina de Separación de Poderes nos obliga a dar deferencia al proceso político y a que sea el Pueblo el juzgador final de la enmienda constitucional objeto del caso de autos.**

## XIII

Atendidos todos los asuntos presentados por las partes y por todo lo antes discutido, se desestima la Demanda presentada por el recurrido P.I.P. Consecuentemente, se sostiene la constitucionalidad de la Res. Concurrente Núm. 35, *supra*, y la Ley Núm. 12, *supra*, por lo cual nada impide la celebración del referéndum del 19 de agosto de 2012. Se dictará Sentencia de conformidad.

Mildred G. Pabón Charneco<br>
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Partido Independentista Puertorriqueño | | *Certificación* |
| Recurrido | | |
| v. | CT-2012-0009 | |
| Estado Libre Asociado de Puerto Rico *et al.* | | |
| Peticionario | | |

SENTENCIA

En San Juan, Puerto Rico, a 6 de julio de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se desestima la Demanda presentada por el recurrido Partido Independentista Puertorriqueño. Consecuentemente, se sostiene la constitucionalidad de la Res. Concurrente Núm. 35 y la Ley Núm. 12 por lo cual nada impide la celebración del referéndum del 19 de agosto de 2012.

Notifíquese inmediatamente a las partes por teléfono, correo electrónico y por la vía ordinaria.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió una Opinión Disidente a la cual se unió la Jueza Asociada señora Fiol Matta. La Jueza Asociada señora Fiol Matta emitió una Opinión disidente a la cual se unió la Juez Asociada señora Rodríguez Rodríguez. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez emitió la siguiente expresión:

El Juez Asociado señor Estrella Martínez está conforme con las partes I, II, IV, VI, VII-A, VIII y X; concurre

con los acápites III y V, y disiente de las partes identificadas como VII-B, IX, XI, XII y XIII.



Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Independentista
Puertorriqueño

    Recurrido

       v.                          CT-2012-0009     *Certificación*

Estado Libre Asociado de
P.R., *et al.*

    Peticionarios

Opinión Disidente emitida por el Juez Presidente señor Hernández Denton a la cual se une la Jueza Asociada señora Fiol Matta.

San Juan, Puerto Rico, a 6 de julio de 2012.

Al igual que las compañeras Juezas Asociadas señora Fiol Matta y señora Rodríguez Rodríguez y el compañero Juez Asociado señor Estrella Martínez, disentimos de la decisión de este Tribunal de desestimar la acción incoada por el Partido Independentista Puertorriqueño (P.I.P.).

Con la decisión que hoy se emite, una mayoría de este Tribunal flexibiliza el proceso legislativo de aprobar enmiendas constitucionales y, con ello, deja atrás una interpretación rigurosa que de nuestra Constitución hemos hecho a través de los años para garantizar su estabilidad de generación en generación. Con esta actuación, validan la propuesta de unas enmiendas a nuestra Ley Suprema

que cambian el ordenamiento constitucional actual que le permite a las minorías tener una mayor posibilidad de estar representadas adecuadamente en la Asamblea Legislativa.

En ese sentido, disentimos de la Opinión mayoritaria por entender que la Resolución Concurrente del Senado Núm. 35 no se aprobó por dos terceras partes del número total de los miembros de que se compone cada cámara, por lo que es nula. Por otro lado, la Resolución Concurrente del Senado Núm. 60 contiene más de un asunto y las breves expresiones incluidas sobre la Resolución Concurrente del Senado Núm. 35 no validan un acto nulo *ab initio*. Esas medidas violan la Constitución del Estado Libre Asociado de Puerto Rico (Constitución), el Reglamento del Senado de 2009 y principios jurídicos fundamentales. Del mismo modo, esto constituye un precedente peligroso que permite que en un futuro otras mayorías modifiquen fácilmente la Constitución hasta hacerla inoperante.

I.

El 28 de septiembre de 2011, la Cámara de Representantes de Puerto Rico (Cámara de Representantes) aprobó la Resolución Concurrente del Senado Núm. 35 en una votación de treinta y siete (37) votos a favor, dieciséis (16) votos en contra y una (1) ausencia. Posteriormente, el 10 de octubre de 2011, el Senado de Puerto Rico (Senado) aprobó la misma Resolución, en una votación de veinte (20) votos a favor, ocho (8) votos en contra, una (1) ausencia y dos (2) vacantes por renuncia previa del senador para el distrito de Guayama, Hon. Antonio Soto, y el senador para

el distrito de San Juan, Hon. Roberto Arango. Es decir, la Resolución Concurrente del Senado Núm. 35 contó con el voto afirmativo del 64.52 por ciento del total de los treinta y un (31) escaños que componen el Senado, o sea, con menos de las dos terceras partes (66.66%) del total de escaños que componen esa cámara. El Tribunal de Primera Instancia tomó conocimiento judicial de este hecho.[17]

Así las cosas, el 9 de enero de 2012, el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, firmó la Ley 12-2012 que se conoce como la Ley Habilitadora del Referéndum sobre la Reforma Legislativa. El Art. 2 de ese estatuto indica que la fecha de celebración del Referéndum Especial sería el 19 de agosto de 2012.

Posteriormente, el 10 de mayo de 2012, el Senado aprobó la Resolución Concurrente del Senado Núm. 60, que también propone enmendar la Constitución para permitir que los jueces puedan denegarle a una persona acusada de ciertos tipos de asesinato el derecho a permanecer en libertad bajo fianza. Igualmente, la Cámara de Representantes aprobó esa Resolución Concurrente.

Esa medida establece que la votación para esta enmienda se hará conjuntamente con la votación de enmienda de la Reforma Legislativa. En específico, la versión final aprobada por la Asamblea Legislativa solo cambió en lo sustantivo la Sección 2.[18] El texto final aprobado establece:

---

[17] Apéndice pág. 126.
[18] El 27 de marzo de 2012, el Senado presentó una primera versión de esta Resolución Concurrente. La misma leía:

Sección 2.- La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012, **conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea Legislativa, propuesta en la Resolución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual reiteramos en la presente Resolución Concurrente.** La Comisión Estatal de Elecciones deberá publicar la propuesta de enmienda constitucional con tres (3) meses de antelación a la fecha del referéndum. La Comisión Estatal de Elecciones desarrollará una campaña de orientación durante los sesenta (60) días anteriores a la fecha del Referéndum."[19] (Énfasis suplido).

A esos efectos, el 14 de mayo de 2012, el Gobernador firmó la Ley Habilitadora, Ley Núm. 84-2012, para viabilizar el referéndum de esta enmienda. Esta ordena que esa consulta se haga el mismo día que el referéndum propuesto por la Resolución Concurrente del Senado Núm. 35 y la Ley 12-2012.

Tras varios trámites procesales, certificamos el recurso, celebramos una vista oral el miércoles, 27 de junio de 2012, y, con la comparecencia de las partes, este Tribunal ha resuelto declarar constitucionalmente válidas las acciones legislativas en cuestión. Por los fundamentos que se exponen a continuación, disentimos.

II.

---

Sección 2.- La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012. La Comisión Estatal de Elecciones deberá publicar la propuesta de enmienda constitucional con tres (3) meses de antelación a la fecha del referéndum. La Comisión Estatal de Elecciones desarrollará una campaña de orientación durante los sesenta (60) días anteriores a la fecha del Referéndum.

[19] R. Conc. del S. Núm. 60 de 10 de mayo de 2012.

A.

Concurrimos con la mayoría de este Tribunal en que el presente caso es justiciable. En síntesis, el P.I.P. demostró que tiene legitimación activa para ejercitar la acción en este caso. Además, tiene legitimación activa para representar a sus miembros, especialmente cuando las actuaciones impugnadas hacen onerosa o afectan negativamente y sustancialmente el potencial de un partido minoritario de tener representación legislativa, o lo coloca en una situación de inferioridad. P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984); P.P.D. v. Peña Clós, 140 D.P.R. 779 (1996). Además, entendemos que la acción no presenta una cuestión política que violente la separación de poderes.

Asimismo, coincidimos con la mayoría en que, al momento de aprobar la Resolución Concurrente Núm. 35, el Senado no cumplió con el requisito constitucional de dos terceras partes.

Sin embargo, disentimos en cuanto a los efectos de ese incumplimiento y la posibilidad de subsanarlo. Nuestra posición es que: (1) el incumplimiento con el requisito de dos terceras partes acarrea la nulidad de la Resolución Concurrente Núm. 35 y, por consiguiente, de su Ley Habilitadora, y (2) la Resolución Concurrente Núm. 60 no es un vehículo válido para subsanar el defecto de la primera, entre otras razones, porque contiene más de un asunto. Exponemos nuestros fundamentos a continuación.

Inicialmente, como intérpretes máximos de la Constitución, debemos expresarnos por primera vez sobre el significado de la frase "dos terceras partes del número total de los miembros de que se compone cada cámara" expuesto en el Art. VII, Sec. 1, de la Constitución.[20] Esa sección provee que:

> La Asamblea Legislativa podrá proponer enmiendas a esta Constitución **mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara.** Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. (Énfasis suplido).[21]

Asimismo, nuestra Constitución fija la composición de ambas cámaras. A saber, el Art. III, Sec. 2, expone en lo pertinente que

> El Senado se **compondrá** de veintisiete Senadores y la Cámara de Representantes de cincuenta y un Representantes, excepto cuando dicha **composición** resultare aumentada a virtud de lo que se dispone en la Sección 7 de este Artículo. Art. III, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 382.(Énfasis suplido).

La sección 7 a la que se hace referencia en la disposición citada se refiere a la representación de las minorías.[22] Por virtud de que se activó esa sección, actualmente, la Cámara de Representantes está compuesta por

---

[20] Art. VII, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 442.

[21] Véase Black's Law Dictionary, Ninth Ed., West Publishing Company, "majority of all the members" y "majority of the entire membership" definido como a "majority of all the actual members, disregarding vacancies".

[22] Art. III, Sec. 7, Const. E.L.A., *supra*, pág. 386.

cincuenta y cuatro (54) miembros y el Senado por treinta y un (31) miembros.

Esta composición así delimitada garantiza "la expresión de la voluntad del pueblo en el funcionamiento del poder legislativo".[23] Ese principio no puede sostenerse sin asegurarnos de que se proceda para una representación adecuada y justa, tanto en cuanto a los factores de geografía y población como a los de la diversidad de criterios e ideologías que informan el pensamiento público.[24]

Al interpretar ese lenguaje, debemos preguntarnos si al decir dos terceras partes del número total de los miembros de que se compone cada cámara los constituyentes quisieron referirse a la totalidad de los miembros que componen cada una de las cámaras, independientemente de las ausencias o vacantes que existan al momento de la votación. Es decir, si las vacantes afectan la composición total de la Asamblea Legislativa. Para comprender el significado de esa frase, pasemos a examinar el Diario de Sesiones de la Convención Constituyente.

En el debate entre los miembros de la Convención, en el contexto de enmiendas a la Constitución, el delegado Sr. José Trías Monge aclaró que

> hemos considerado conveniente el que se requiera una votación más alta, no menos de tres cuartas partes de los miembros que componen cada cámara, para así hacer un poco más difícil el someter las enmiendas propuestas a una elección general […]. Y eso justificaría, a nuestro modo de ver, el que se

---

[23] Informe Complementario de la Comisión de la Rama Legislativa de la Convención Constituyente de Puerto Rico 2590 (1951).
[24] Íd.

requiera una votación más alta. 3 Diario de Sesiones de la Convención Constituyente 1365 (2003) (Edición Conmemorativa).

Asimismo, al enfrentar el mismo asunto, el delegado Sr. Miguel García Méndez sugirió una enmienda para que, al igual que una aprobación de la resolución concurrente por dos terceras partes del número total de miembros de cada cámara, la enmienda constitucional debía contar con dos terceras partes o más de los electores que voten. Diario de Sesiones, *supra*, págs. 1828-1829. No obstante, el delegado Trías Monge explicó que

> el punto fundamental es en cuanto a las garantías de limitación a la etapa de iniciativa [en la aprobación de la resolución concurrente] de la enmienda a la constitución. Ahí debidamente reconocemos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, **únicamente podrá hacerse por no menos de dos terceras partes absolutas de los miembros que componen las cámaras legislativas.** Íd., pág. 1829. (Énfasis suplido).

Así debatida, la enmienda sugerida por el delegado García Méndez fue derrotada y prevaleció la postura del delegado Trías Monge. Igualmente, el debate de la Convención tuvo incidencias similares al referirse a las mayorías absolutas establecidas en la Constitución. En efecto, cuando se menciona el total de miembros elegidos se refiere a la composición total de cada cuerpo.[25]

Del mismo modo, de las discusiones en la Convención Constituyente se refleja que las vacantes podrían ser el producto de la muerte, renuncia o expulsión de un miembro

---

[25] Véanse 2 Diario de Sesiones de la Convención Constituyente (2003) (Edición Conmemorativa), págs. 814-819, 1297-1299; Informe de la Comisión de la Rama Legislativa, pág. 2581.

de la Asamblea Legislativa.[26] Como resultado, la Constitución provee un procedimiento para llenar las vacantes, dejando la titularidad del escaño inicialmente sobre el partido al cual pertenecía el legislador antes de producirse.[27] No se elimina ese escaño. O sea, la vacante mantiene un escaño vacío en la composición del cuerpo hasta que sea llenada oficialmente. Además, en diferentes instancias, este Tribunal ha analizado que las vacantes no tienen el efecto de disminuir la composición total de un cuerpo constitucional para efectos de las votaciones que requieren mayoría absoluta.

En específico, ya hemos analizado el texto sobre la composición del número total de miembros con respecto a la forma en que el Tribunal Supremo puede declarar una ley inconstitucional. Ello, pues la Sección 4 del Art. V de la Constitución establece que "[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley".[28]

En ese contexto, para interpretar el mismo lenguaje que ahora está en controversia, dijimos que requiere **mayoría absoluta** de sus miembros indistintamente de que hubiesen **vacantes**, por lo que estas se sumarían en el número ideal de sus miembros. No ocurre así con las

---

[26] Véase la discusión en Diario de Sesiones, *supra*, pág. 2021.
[27] Art. III, Sec. 8, Const. E.L.A., *supra*, pág. 387.
[28] Art. V, Sec. 4, Const. E.L.A., *supra*, pág. 412.

restantes decisiones, las cuales responden al criterio de **mayoría** simple de los presentes.[29]

Lo mismo sucede con las abstenciones en el proceso legislativo. Por tal razón, en Puerto Rico un voto abstenido tiene el mismo efecto que un voto en contra de una medida.[30] Ello, pues no se reduce el total de la composición del cuerpo para contar los votos.

Al analizar de esta manera el significado que la propia Constitución quiso adoptar para el concepto de mayoría absoluta, nos adherimos a una importante corriente interpretativa constitucional encausada por el Profesor Akhil Reed Amar de la Escuela de Derecho de Yale. En su artículo, A.R. Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (2009), Amar establece que:

> Interpreters squeeze meaning from the Constitution through a variety of techniques – by parsing the text of a given clause, by mining the Constitution's history, by deducing entailments of the institutional structure it outlines, by weighing the practicalities of proposed readings of it, by appealing to judicial cases decided under it, and by invoking the American ideals it embraces. Each of these classic techniques extracts meaning from some significant feature of the Constitution – its organization into distinct and carefully worded clauses, its embedment in history, its attention to institutional architecture, its plain aim to make good sense in the real world, its provision for judicial review (and thus judicial doctrine), and its effort to embody the ethos of the American people. **Here is another feature of the Constitution: various words and phrases recur in the document. This feature gives**

---

[29] Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392 (1985)(Énfasis en el original). Véanse además, P.P.D. v. Peña Clós, *supra*; 1 Diario de Sesiones de la Convención Constituyente 520 *et seq.* (1951), págs. 455, 519-569, 594, 595, 616; 3 Diario de Sesiones, *supra*, págs. 1697-1699 (1952); 4 Diario de Sesiones, *supra*, págs. 2349, 2456 y 2612 (1952).
[30] Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).

> **interpreters yet another set of clues as they search for constitutional meaning and gives rise to yet another rich technique of constitutional interpretation. I call this technique intratextualism. In deploying this technique, the interpreter tries to read a contested word or phrase that appears in the Constitution in light of another passage in the Constitution featuring the same (or a very similar) word or phrase.** Íd. pág. 748. (Énfasis suplido).

De esta manera, nos reafirmamos en que no pueden leerse aisladamente conceptos que la Constitución utiliza en más de una ocasión. Los Constituyentes deben haber interesado el mismo propósito en todas las menciones de un mismo concepto. En fin, "el número total de miembros" del cual se compone determinado cuerpo constitucional se calcula de la misma manera para todos ellos.

Por otra parte, a diferencia de nuestra Constitución, la Constitución de los Estados Unidos no incluye una especificación sobre el total de los miembros electos o que componen cada cámara para las enmiendas a esa Constitución. El Art. V de la Constitución federal dispone

> [t]he Congress, **whenever two thirds of both Houses shall deem it necessary,** shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States… Art. V, Const. E.E.U.U., *supra*, pág. 178. (Énfasis y traducción suplida).

Ese artículo contrasta con el lenguaje específico utilizado en nuestra Constitución, al no requerir que sea **del total de los miembros que componen cada cámara**. Por tal razón, el Tribunal Supremo de los Estados Unidos resolvió que el requisito de dos terceras partes, **a menos que se**

**especifique lo contrario**, significa dos terceras partes de los votos emitidos o dos terceras partes de los miembros presentes.

En específico, en State of Rhode Island v. Palmer, 253 U.S. 350 (1920), el Tribunal Supremo federal expresó, respecto a enmiendas a la Constitución de Estados Unidos, que

> The "two-thirds vote" in each house, which is required in proposing an amendment to the Constitution, is a vote of two-thirds of the members **present**, assuming the presence of a quorum, and not a vote of two-thirds of the entire membership. Íd., pág. 386. (Énfasis suplido).

Es decir que, en las disposiciones que no especifiquen la totalidad de los miembros electos o de los que componen el cuerpo, se analizará el voto de dos terceras partes a la luz de los miembros presentes o del quórum.

No obstante, como bien indicaron nuestros constituyentes, la mayoría de las constituciones de los estados sí incluyen un lenguaje específico para enmendar sus constituciones por iniciativa de una mayoría absoluta de las cámaras. Así pues, estos han resuelto que cuando una constitución exige dos terceras partes del total de los miembros, un voto menor, aunque constituya quórum, no es suficiente. Ello, **aunque existan vacantes**, pues el requisito es sobre el total de la composición del cuerpo.[31]

---

[31] Véanse, _In re Opinion of the Justices_ 228 Ala. 140 (Ala., 1934); Warnock v. Lafayette, 4 La. Ann. 419 (La., 1849); Zeiler v. Central Ry. Co., 84 Md. 304 (Md., 1896); Kay Jewelry Co. v. Bd. Of Registration in Optometry, 305 Mass. 581 (Mass., 1940); Southworth v. Palmyra & J.R. Co., 2 Mich. 287 (Mich., 1851); Green v. Weller, 32 Miss. 650 (Miss., 1856); Missouri v. McBride, 4 Mo. 303 (Mo. 1836); City of North Platte v. North Platte Water Works, 56 Neb. 403 (Neb., 1898); English v. Texas, 7 Tex. App.

Consecuentemente, el Reglamento del Senado de Puerto Rico de 2009 utiliza el mismo lenguaje de nuestra Constitución. Dichas reglas que rigen los procesos legislativos del Senado exigen:

Sección 17.4- Aprobación [de Resoluciones Concurrentes]

> Conforme a lo establecido en la Constitución de Puerto Rico en su Artículo VII, 10 Sección 1, las Resoluciones Concurrentes que proponen enmiendas a la Constitución se entenderán aprobadas al obtener el voto afirmativo de por lo menos dos terceras partes del **número total de los miembros que componen cada Cámara.** En tal caso, se someterá la enmienda a los electores mediante un referéndum especial. (Énfasis suplido).

B.

Por otra parte, también contrario a la Constitución federal, nuestra Constitución reglamenta minuciosamente el proceso para la aprobación de leyes.[32] En específico, la Sec. 17 del Art. III de dicho cuerpo legal establece, en lo pertinente, que:

> No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas. Ningún proyecto de ley será enmendado de manera que cambie su propósito original o incorpore

---

171 (Tex., 1879); <u>Buffington Wheel Co. Burnham</u>, 60 Iowa 493 (Iowa, 1883); <u>Griffin v. Messenger</u>, 114 Iowa 99 (Iowa, 1901); <u>Speed v. Crawford</u>, 60 Ky. 207 (Ky., 1860); <u>Blood v. Beal</u>, 100 Me. 30 (Maine, 1905); <u>Whitney v. Village of Hudson</u>, 69 Mich. 189 (Mich., 1888); <u>Pollasky v. Schmid</u>, 128 Mich. 699 (Mich., 1901); <u>Minnesota *ex rel.* Eastland v. Gould</u>, 31 Minn. 189 (Minn., 1883); <u>Minnesota *ex rel.* Kohlman v. Wagner</u>, 130 Minn. 424 (Minn., 1915); <u>Cleveland Cotton Mills v. Cleveland County Comm'rs</u>, 108 N.C. 678 (N.C., 1891).

[32] J.J. Álvarez González, <u>Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales</u>, Bogotá, Ed. Temis, 2009, pág. 244.

materias extrañas al mismo. Art. III, Sec. 17, Const. E.L.A., *supra*, págs. 396-397.

Como podemos ver, la Constitución requiere que todo proyecto de ley aprobado por la Legislatura regule solamente un asunto y que este sea expresado en su título.[33] De lo contrario, el asunto no incluido en el título será nulo.[34]

Con esta exigencia constitucional, se quiso impedir la práctica legislativa conocida como "logrolling".[35] Esta práctica consiste en combinar distintas propuestas incongruentes entre sí en un solo proyecto de ley, para obtener una mayoría artificial al momento de la votación.[36]

Con relación a lo anterior, el Informe de la Comisión de la Rama Legislativa de la Convención Constituyente explicó que

> [l]as disposiciones sobre título y asunto impiden prácticas fraudulentas, facilitan la labor legislativa y hacen imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consideraran separadamente. Diario de Sesiones, *supra*, pág. 2584.

Entre los tipos de "logrolling", figuran los "riders". Estos son disposiciones de ley no relacionadas con el asunto principal de la legislación que son incluidas en proyectos de ley que probablemente serán aprobados debido a su necesidad para el buen funcionamiento del gobierno o a

---

[33] Herrero y Otros v. E.L.A., 179 D.P.R. 277, 291 (2010); Dorante v. Wrangler of P.R., 145 D.P.R. 408, 427 (1998).

[34] Íd.

[35] Herrero y Otros v. E.L.A., *supra,* pág. 293, citando a 1A Singer y Singer, Statutes and Statutory Construction Sec. 17.1, pág. 7 (2009).

[36] Íd.

su aceptación pública.[37] En Puerto Rico, se rechazó esta práctica del Congreso estadounidense con la aprobación de la Sec. 17 del Art. III.[38] En particular, el delegado de la Convención Constituyente Sr. Luis Negrón López explicó:

> Esta oración "no se aprobará ningún proyecto de ley con excepción de los de presupuesto general que contenga más de un asunto, el cual deberá ser claramente expresado en su título" es una disposición encaminada a evitar los *riders*, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención. 2 Diario de Sesiones de la Convención Constituyente 896 (Edición Conmemorativa)(2003).

De esta manera, la regla de un solo asunto en conjunto con el requisito de que este sea incluido en su título impide la aprobación de un proyecto de ley con disposiciones que no son advertidas en su título ("riders") y previene el fraude en la legislación, entre otros.[39] Además, asegura que toda medida legislativa sea considerada por separado y que su aprobación sea decidida por sus méritos individuales.[40] Sobre este particular, la profesora Dragich nos ilustra lo siguiente:

> [s]imply stated, the single subject rule exists "to secure to every distinct measure of legislation a separate consideration and decision, dependent solely upon its individual merits." One leading commentator observed, "limiting each bill to a single subject" allows legislators to "better grasp[] and more intelligently discuss[]" the

---

[37] Herrero y Otros v. E.L.A., *supra,* págs. 293-294.
[38] Álvarez González, *op. cit*.
[39] Herrero y Otros v. E.L.A., *supra,* págs. 295; Dorante v. Wrangler of P.R., *supra;* Cervecería Corona, Inc. v. J.S.M., 98 D.P.R. 801, 812 (1970).
[40] M.J. Dragich, State Constitutional Restrictions on Legislative Procedure: Rethinking the Analysis of Original Purpose, Single Subject, and Clear Title Challenges, 38 Harv. J. on Legis. 103, 114-115 (2001).

issues presented by each bill. Without the rule, the danger is that "several minorities [may combine] their several proposals as different provisions of a single bill and thus consolidat[e] their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal ... could have obtained majority approval separately."[41]

Por su parte, el Manual de Procedimientos Legislativos de Paul Mason se expresa en los mismos términos.[42] Incluso, indica que "[w]hen the requirement of a single subject or separate vote is contained in a constitution or controlling statute, it is binding on the body and cannot be suspended".[43]

No obstante, hemos establecido que solamente ante un caso claro y terminante se justifica anular una ley por violar esta disposición constitucional.[44] Al considerar si una ley cumple con estos requisitos, se debe determinar si sus disposiciones se relacionan entre sí y son afines con el asunto que se expresa en su título.[45] Lo que comprende "un solo asunto" se interpreta liberalmente, pero sin

---

[41] Íd. (Citas omitidas).

[42] En específico, el Manual de Procedimientos Legislativos de Paul Mason expresa lo siguiente:

[t]he constitutions of most states require that no bill shall contain more than one subject. Sometimes, they also contain other provisions, such as requiring, in an election, that candidates be voted upon separately. The purpose of these provisions is to secure the independent judgment of the members on each question and prevent members from being required to vote for one proposition, which they may not approve, in order to secure the enactment of another. P. Mason, Mason's Manual of Legislative Procedure, ed. 2010, Denver, Minnesota, Thomson Reuters, Sec. 310, pág. 225.

[43] P. Mason, Mason's Manual of Legislative Procedure, ed. 2010, Denver, Minnesota, Thomson Reuters, Sec. 312, pág. 226.

[44] Herrero y Otros v. E.L.A., supra, págs. 295; Dorante v. Wrangler of P.R., supra, págs. 429-431; Cervecería Corona, Inc. v. J.S.M., supra, 811-812.

[45] Herrero y Otros v. E.L.A., supra, pág. 296; Cervecería Corona Inc. v. J.S.M., supra, pág. 812.

ignorar el objetivo y propósito del mandato constitucional. Íd. En particular, será válida una ley con varios asuntos, siempre que estos sean "asuntos germanos", es decir, siempre que exista una relación estrecha entre ellos.[46]

En Herrero y Otros v. E.L.A., supra, evaluamos la validez de una condición existente en una medida de recaudo que sujetaba su efectividad a la aprobación del Presupuesto General 2005-2006. Encontramos que la medida de recaudo era necesaria para cubrir el exceso de las asignaciones comparado con los recursos totales estimados para el año económico 2005-2006. Por consiguiente, sostuvimos su validez tras concluir que ambas estaban razonablemente relacionadas.

Por otro lado, en Laboy v. Corp. Azucarera Saurí y Subirá, 65 D.P.R. 422 (1945), invalidamos una parte de una enmienda al Código Penal que introdujo un asunto civil, por este no estar relacionado con el fin de la medida según expuesto en su título. En específico, el Art. 553 del Código Penal de 1902 ordenaba el cierre de ciertos establecimientos comerciales e industriales después del mediodía del domingo. La ley enmendadora extendía la prohibición a los sábados después de las nueve de la noche, según anunciado en su título. Sin embargo, incluía una parte en la que concedía a ciertos empleados el derecho a un día de descanso por cada seis de trabajo.

---

[46] Escuela de Administración Pública de la U.P.R., La nueva constitución de Puerto Rico, edición facsimilar de la primera edición 1954, San Juan, 2005, pág. 403.

Contrario a lo que establece la mayoría de esta Curia, sostenemos que la regla de un asunto también aplica a las resoluciones concurrentes para proponer enmiendas a la Constitución y a las resoluciones conjuntas que no tengan que ver con el presupuesto general. En primer lugar, como vimos anteriormente, la Sec. 17 del Art. III de nuestra Constitución, *supra,* dispone, en parte, que "[n]o se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto". De lo anterior, podemos apreciar que la única excepción a la regla de un asunto que menciona esta disposición es los proyectos de ley sobre el presupuesto general.[47] Como sabemos, el presupuesto general se aprueba mediante resolución conjunta, a lo cual no alude la Constitución. Es evidente, por consiguiente, que la frase "ningún proyecto de ley" es utilizada en la Constitución para incluir los demás tipos de medidas legislativas, como las resoluciones conjuntas y concurrentes. Si la Sec. 17 del Art. III se limitara únicamente a los proyectos de ley, excluyendo las resoluciones concurrentes y resoluciones conjuntas, no tendría sentido la excepción referente al presupuesto general.

En segundo lugar, la Sec. 15.6 del Reglamento del Senado de Puerto Rico de 2009, correspondiente a la actual

---

[47] "Y entonces, como el presupuesto general de gastos va a contener numerosas partidas, por eso se hace la salvedad, para lograr el propósito de prohibir los *riders* y de penarlos con la nulidad de la ley, salvando la validez de una ley que ha de contener más de una partida, más de una asignación, más de un propósito y va a ser válida no obstante eso". Diario de Sesiones, *supra*, pág. 896.

Asamblea Legislativa, dispone que

> [t]odo proyecto de ley **o resolución** tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo, de manera que, de la lectura del título se entienda el propósito de la medida. **Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto.** Íd. (Énfasis nuestro).

**De esta forma, el Senado interpretó la Constitución de manera consistente con lo señalado al referirse a la *medida* y no específicamente a un *proyecto de ley*. Asimismo, el propio Senado delimitó la posibilidad de incluir más de un asunto en cualquier medida, con excepción de las de presupuesto general.**

En tercer lugar, **la Sec. 17.3 de dicho Reglamento establece que** "[l]as Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, <u>se tramitarán en la misma forma que un proyecto de ley</u>". **Íd. (Énfasis suplido). Así ha sido desde 1917:**

> **Reglamento del Senado de Puerto Rico de 1917:** No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título. Regla XVI (12). Las resoluciones concurrentes del Senado tendrán el mismo trámite que los proyectos de ley y resoluciones conjuntas. Regla XVI (18).
> **Reglamento del Senado de Puerto Rico de 1950:** No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título. Regla XI (12). Las resoluciones concurrentes del Senado tendrán el mismo trámite que los proyectos de ley y resoluciones conjuntas. Regla XI (12).
> **Reglamentos del Senado de Puerto Rico de 1966, 1970, 1974 y 1977:** Todo proyecto de ley y toda resolución tendrá un título corto exponiendo, brevemente, la naturaleza del asunto… Regla XV (3). Las resoluciones concurrentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un proyecto de ley, excepto que no

serán remitidas al Gobernador para su aprobación. Regla XVII (2).

**Reglamentos del Senado de Puerto Rico de 1985 y 1989:** Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 14.6. Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 16.3.

**Reglamento del Senado de Puerto Rico de 1993:** Todo proyecto de ley y toda resolución tendrá un título corto exponiendo, brevemente, la naturaleza del asunto… Regla XV (3). Las resoluciones concurrentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un proyecto de ley, excepto que no serán remitidas al Gobernador para su aprobación. Regla XVII (2).

**Reglamentos del Senado de Puerto Rico de 1997 y 2001:** Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 15.6. Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 17.3.

**Reglamento del Senado de Puerto Rico de 2005:** Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo, de manera que, de la lectura del título se entienda el propósito de la medida. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 15.6. Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 17.3.[48]

Es harto sabido que las reglas adoptadas por los

---

[48] Los Reglamentos del Senado de Puerto Rico correspondientes a Asambleas Legislativas anteriores fueron obtenidos a través de la Biblioteca del Tribunal Supremo de Puerto Rico y la Biblioteca del Senado de Puerto Rico. Los Reglamentos de 1954, 1958, 1962 y 1981 no fueron suministrados por el Senado para el momento de certificarse esta opinión.

cuerpos legislativos los vinculan con fuerza de ley.[49] No obstante, en la Opinión de la mayoría no se mencionan estas disposiciones del Reglamento. Estas reglas vinculan a los cuerpos legislativos, sin dejar a un lado que las reglas constitucionales para la aprobación de legislación, como las referentes al título y contenido de las medidas legislativas, prevalecen sobre cualquier otra regla de procedimiento legislativo.[50]

Además, nótese que las Resoluciones Concurrentes se utilizan para asuntos de trascendencia muy distinta. Según establece el Reglamento del Senado de 2009, se utilizan para: a) proponer enmiendas a la Constitución de Puerto Rico; b) consignar expresiones de la Asamblea Legislativa que no tienen carácter de legislación; c) disponer sobre el gobierno interno de la Asamblea Legislativa.[51]

Es decir, entre los diferentes propósitos que puede tener una resolución concurrente, es innegable que el de proponer enmiendas a la Constitución es el de mayor trascendencia. **La única razón por la que los Constituyentes escogieron que esto se hiciera mediante resolución concurrente fue para reservar a la exclusiva jurisdicción del poder legislativo la iniciativa de proponer enmiendas constitucionales, sin que se requiriese la intervención del poder ejecutivo.[52] De ninguna manera puede interpretarse que la intención fue promover un procedimiento más laxo para**

---

[49] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1987, pág. 46.
[50] Escuela de Administración Pública de la U.P.R., *op. cit.*
[51] Sección 17.1 Reglamento del Senado de 2009.
[52] Diario de Sesiones, *supra*, pág. 2559.

**enmendar la Constitución que el de aprobación de una ley.**

Sin embargo, la Opinión mayoritaria, al citar dicha sección, pretende aplicar a la controversia ante nos el inciso (b) (consignar expresiones de la Asamblea Legislativa) como si proponer enmiendas a la Constitución y consignar expresiones de la Asamblea Legislativa fuera la misma cosa. Por nuestra parte, entendemos que el Senado dividió cada uno de los tres objetivos para los que se pueden aprobar resoluciones concurrentes, precisamente porque son asuntos distintos. Así pues, no respaldamos que se trate una enmienda constitucional como si fuera una mera expresión de la Asamblea Legislativa que no tiene carácter de legislación y a la cual no le aplica la regla que limita esta a un asunto.

**Por todo lo anterior, no cabe duda de que el requisito de un solo asunto aplica a las resoluciones concurrentes, por mandato constitucional y reglamentario. El requisito de un asunto contenido en la Sec. 17 del Art. III de nuestra Constitución aplica a todo tipo de medida legislativa, incluyendo las resoluciones concurrentes; no solamente a los proyectos de ley. Asimismo, el requisito de un asunto contenido en la Sec. 15.6 del Reglamento del Senado de 2009 dictamina expresa y terminantemente que ninguna medida podrá contener más de un asunto. Ello incluye las resoluciones concurrentes. Encima, la Sec. 17.3 del mismo Reglamento establece claramente que las resoluciones concurrentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un proyecto de ley,**

**trámite que incluye la prohibición de incluir más de un asunto en una pieza legislativa.**

De hecho, para el referéndum a celebrarse el 6 de noviembre de 1994, la Asamblea Legislativa intentó observar la regla de un asunto al aprobar tres resoluciones concurrentes independientes para cada una de las enmiendas constitucionales que buscaba proponer al electorado: la Resolución Concurrente de la Cámara Núm. 14 de 13 de diciembre de 1993 proponía añadir una Sec. 20 al Art. VI de la Constitución para establecer unos límites al número de términos que una persona podría servir en cada uno de los cargos siguientes: Gobernador, Senador, Representante a la Cámara y Alcalde; la Resolución Concurrente de la Cámara Núm. 32 de 16 de mayo de 1994 proponía enmendar el Art. II, Sec. 11, Pár. 5 de la Constitución para limitar el derecho absoluto a la fianza; y la Resolución Concurrente del Senado Núm. 44 de 6 de julio de 1994 proponía una enmienda al Art. V, Sec. 3 de la Constitución, para fijar en nueve (9) el número de Jueces del Tribunal Supremo de Puerto Rico y, a su vez, derogar la disposición que provee que "[e]l número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo". Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 204 (1994).[53]

En fin, no podemos olvidar que, para enmendar nuestra Constitución, los Constituyentes eligieron un procedimiento

---

[53] En aquella ocasión, declaramos inconstitucional la Resolución Concurrente Núm. 14, *supra*, por violar el requisito de separación de la Sec. 1 del Art. VII de la Constitución, *supra*, al presentar tres (3) proposiciones de enmienda como una (1). Berríos Martínez v. Gobernador II, *supra*, pág. 238.

lo suficientemente rígido como para impartir a esta estabilidad y distinguirla de las leyes ordinarias.[54]

### III.

Al resolver la controversia ante nos, debemos ejercer nuestra función como último intérprete de la Constitución. Ello, teniendo en mente que al analizar la constitucionalidad de una ley, debemos esforzarnos por mantener su constitucionalidad, en deferencia a la interpretación inicial de la Constitución que hacen las ramas políticas de gobierno.[55]

**Así pues, coincidimos con la posición del P.I.P., acogida en la Opinión mayoritaria, en cuanto a que los escaños legislativos vacantes tienen que tomarse en consideración al momento de determinar los votos necesarios para aprobar una resolución concurrente por dos terceras partes de la totalidad de los miembros que componen cada cámara.** Sin lugar a dudas, el requisito de una mayoría absoluta para enmendar la Constitución requiere que se apruebe por dos terceras partes del número total de miembros que componen cada cámara. El lenguaje en la Constitución es claro al fijar el número de miembros que componen cada cámara[56] y solo por activación de la ley de minorías es que se añaden miembros a su composición. Igualmente, es específico el lenguaje que requiere la

---

[54] Córdova y Otros v. Cámara Representantes, 171 D.P.R. 789, 802-03 (2007).

[55] Véase Misión P.R. v. Junta de Planificación, 146 D.P.R. 64 (1998).

[56] Por tal razón, dado que la Constitución establece el número total que compone cada cuerpo, es innecesaria la discusión sobre qué significan *miembros*, según planteado por el representante legal del E.L.A.

mayoría absoluta para aprobar la resolución concurrente para enmendar la Constitución. Además, reafirmamos que ese lenguaje ya fue interpretado por este Tribunal en <u>Sánchez Rodríguez v. López Jiménez</u>, *supra*.

Más aun, como señalamos, las partes estipularon que el Senado está compuesto por treinta y un (31) miembros y el foro de primera instancia tomó conocimiento judicial de que la votación constituyó menos de dos terceras partes del total de escaños. Eso nos parece suficiente para aclarar que la composición del Senado de la Decimosexta Asamblea Legislativa es de treinta y un (31) miembros y que ello no está sujeto a ser reducido por vacantes, muerte, expulsiones, ausencias u otras situaciones que puedan surgir durante su vigencia. Es inaceptable que, contrario a lo estipulado y establecido en la Constitución, el representante legal del E.L.A. que compareció ante nos sostenga que al momento de la votación de la Resolución Concurrente del Senado Núm. 35 ese cuerpo se componía por veintinueve (29) miembros.[57]

Precisamente por ello, porque mantienen un escaño vacío o con efecto de un voto en contra, la ley aborrece las

---

[57] Consignamos nuestra sorpresa y preocupación con el hecho de que durante todo el trámite procesal de esta importante controversia constitucional el E.L.A. estuvo representado por una firma privada de abogados y no por el Procurador General de Puerto Rico. De ordinario, en los casos en los que se cuestiona la validez de una ley, la defensa de la constitucionalidad de la misma la asume el Procurador General, funcionario público con la responsabilidad primaria de representar al E.L.A. ante este Tribunal. Véase Art. 60, Ley 205-2004.

vacantes porque entorpecen la continuación de la administración de los asuntos públicos.[58]

Igualmente, esa exigencia tan rígida para aprobar una resolución concurrente para enmendar la Constitución no puede violar el principio democrático de la representatividad en el funcionamiento de la Asamblea Legislativa. Nótese que las dos vacantes que existían al momento de la aprobación de la Resolución Concurrente Núm. 35 eran de un Senador del distrito de Guayama y otro del distrito de San Juan para cerca de 950,000 ciudadanos representados.[59] Por tal razón, **de autorizar que las vacantes reduzcan la composición del Senado**, dejaríamos dos distritos senatoriales y cerca de un millón de residentes fuera de un proceso tan crítico como iniciar la propuesta de enmiendas a la Constitución. No lo podemos permitir. Hemos reiterado que el principio de "una persona, un voto" consagrado por nuestra Constitución no se limita solamente al proceso eleccionario. De nada sirve que a los ciudadanos se les garantice su derecho al voto, si luego aquellos que fueron depositarios de la confianza de los electores son excluidos en momentos cruciales del proceso legislativo.[60]

Tampoco podemos aceptar la interpretación que presenta el representante legal del E.L.A. respecto al requisito homólogo existente en la Constitución federal. Como explicamos, nuestra Constitución va más allá, mediante un

---

[58] Betancourt v. Gobernador, 119 D.P.R. 435, 447 (1987); Fernández v. Corte, 71 D.P.R. 161, 178 (1950).
[59] Determinación final de la Junta Constitucional de revisión de distritos electorales senatoriales y representativos 2011, pág. 40.
[60] Silva v. Hernández Agosto, 118 D.P.R. 45, 69 (1986).

lenguaje claro y específico. Allí donde la Constitución federal dice dos terceras partes de ambas cámaras, la nuestra establece dos terceras partes del número total de los miembros de que se compone cada cámara. Necesariamente, por esa distinción incluida en la mayoría de las constituciones estatales, es que la interpretación que las dos terceras partes se refiere a los presentes únicamente aplica a aquellas disposiciones que tienen el mismo lenguaje que la Constitución federal. Por el contrario, las cortes supremas de aquellos estados que especifican en su constitución la totalidad de la composición de las cámaras han llegado a la misma conclusión que estamos expresando.

Sin embargo, la Resolución Concurrente Núm. 35 se aprobó en el Senado, el 10 de octubre de 2010, con veinte (20) votos a favor. Se necesitaban veintiún (21) votos afirmativos de dicho cuerpo para aprobarla. Siendo así, no cumplió con el requisito constitucional de las dos terceras partes de los miembros que componen ese cuerpo.[61] Por ello, concluimos que la Resolución Concurrente Núm. 35 es inconstitucional. Por consiguiente, la Ley Habilitadora, Ley 12-2010, creada en virtud de esa resolución concurrente, también es inconstitucional.

Habiendo resuelto lo anterior, es innecesario discutir el resto de los señalamientos sobre la inconstitucionalidad

---

[61] Creemos que el Senado, con el proceder de la aprobación de la Resolución Concurrente Núm. 60, actuó conforme a nuestra interpretación. "Hoy juramentan dos senadores adicionales que nos permiten tener las dos terceras partes que necesitamos" dijo Seilhamer.    http://www.vocero.com/se-aprobara-proyecto-para-limitar-fianza/ revisado 5 de julio de 2012.

de la Resolución Concurrente del Senado Núm. 35 en cuanto a la agrupación indebida de múltiples proposiciones.

Por otra parte, el 27 de marzo de 2012, el Senado radicó la Resolución Concurrente del Senado Núm. 60 para proponer una enmienda constitucional a los efectos de limitar el derecho a la fianza. Finalmente, el 10 de mayo de 2012, aproximadamente siete (7) meses después de la aprobación de la Resolución Concurrente del Senado Núm. 35, el Senado aprobó la versión modificada de esa Resolución Concurrente. Esta vez, como citado anteriormente, la Sección 2 disponía, en lo pertinente, lo siguiente:

> La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012, **conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea legislativa, propuesta en la resolución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual reiteramos en la presente Resolución Concurrente.**(Énfasis suplido).

La versión del 27 de marzo de 2012 no incluía la reiteración de la Resolución Concurrente del Senado Núm. 35. Ni siquiera la mencionaba.

Coincidimos con la mayoría de este Tribunal, cuando expresa que "por su evidente importancia, las constituciones no pueden ser enmendadas como si fueran cualquier estatuto".[62] No obstante lo dicho, la mayoría optó por aplicar unas exigencias procesales menos restrictivas y rigurosas que las que se aplican a los proyectos de ley, al

---

[62] Opinión mayoritaria, pág. 18.

resolver que las Resoluciones Concurrentes para proponer enmiendas a la Constitución no son leyes ordinarias, sino un proceso legislativo diseñado para recoger la voluntad del Cuerpo, el cual no está atado a los procedimientos constitucionales que se requieren para la aprobación de las leyes.[63]

No podemos avalar esa interpretación. Por el contrario, precisamente por esa "evidente importancia" de las enmiendas a la Constitución debemos reconocer que los principios constitucionales referentes a la aprobación de leyes son aplicables a la aprobación de las resoluciones concurrentes para enmendar la Constitución, según la voluntad de los Constituyentes y los Reglamentos así aprobados por el Senado. Cabe recordar que la Opinión mayoritaria ni siquiera menciona el Reglamento del Senado sobre el requisito de un solo asunto.

A la luz de este marco jurídico completo, observamos que el título de la Resolución Concurrente del Senado Núm. 60 solo anuncia la proposición de enmienda constitucional relacionada con la limitación del derecho a la fianza, sin mencionar la "reiteración" de la Resolución Concurrente del Senado Núm. 35 ni la reforma legislativa propuesta por esta. Siendo así, y de acuerdo al derecho aplicable, procede analizar si ambas disposiciones se relacionan entre sí y son afines con el asunto que se expresa en su título.[64]

---

[63] Opinión mayoritaria, pág. 34.
[64] Véanse Herrero y Otros v. E.L.A., *supra,* pág. 296; Cervecería Corona Inc. v. J.S.M., *supra,* pág. 812.

La propuesta de enmienda a nuestra Constitución para cambiar la composición de la Asamblea Legislativa es un asunto de carácter constitucional. Por otro lado, la propuesta de enmienda a nuestra Constitución para limitar el derecho a la fianza es una de carácter penal. **Ciertamente, una reforma legislativa, como mínimo, no tiene relación alguna con el derecho de un acusado a estar libre bajo fianza. Por lo tanto, la Resolución Concurrente del Senado Núm. 60 incluye dos asuntos, en contra de los principios constitucionales de un asunto y del Reglamento del Senado de 2009.**

**Vemos, pues, que la "reiteración" de la Resolución Concurrente del Senado Núm. 35, incluida subrepticiamente en la Sec. 2 de la Resolución Concurrente del Senado Núm. 60, es un "rider". Es una disposición (reforma legislativa) no relacionada con el asunto principal de la legislación (limitación del derecho a la fianza) que fue incluida en la Resolución Concurrente que probablemente iba a ser aprobada, como lo fue.[65] De esta manera, no se aseguró que la reforma legislativa fuera *reconsiderada* por separado y que su aprobación fuera decidida por sus méritos individuales.** Véase Dragich, *op. cit.*

De hecho, es la primera y única vez, al menos desde 1993,[66] que el Senado intenta "reiterar" una propuesta de enmienda constitucional mediante una Resolución Concurrente que no guarda relación alguna con esta, desviándose así de

---

[65] Véase: Herrero y Otros v. E.L.A., *supra,* págs. 293-294.

[66] La información disponible en la página cibernética del Sistema del Trámite Legislativo de la Oficina de Servicios Legislativos solo contiene las resoluciones concurrentes desde 1993.

las exigencias constitucionales discutidas anteriormente y de su propio reglamento.[67] Más aun, esa Resolución Concurrente viola directamente el Reglamento del Senado del 2009 que establece la misma prohibición que nuestra Constitución para toda medida legislativa.

---

[67] Véanse: R. Conc. del S. 2 de 9 de febrero de 1993; R. Conc. del S. 8 de 24 de noviembre de 1993; R. Conc. del S. 16 de 16 de julio de 1993; R. Conc. del S. 9 de 30 de abril de 1993; R. Conc. del S. 26 de 21 de enero de 1994; R. Conc. del S. 28 de 1 de febrero de 1994; R. Conc. del S. 29 de 8 de febrero de 1994; R. Conc. del S. 30 de 10 de febrero de 1994; R. Conc. del S. 37 de 19 de mayo de 1994; R. Conc. del S. 41 de 22 de junio de 1994; R. Conc. del S. 44 del 14 de julio de 1994; R. Conc. del S. 58 de 24 de abril de 1995; R. Conc. del S. 64 de 30 de enero de 1996; R. Conc. del S. 65 del 6 de febrero de 1996; R. Conc. del S. 9 de 4 de marzo de 1997; R. Conc. del S. 10 de 12 de marzo de 1997; R. Conc. del S. 21 de 26  de septiembre de 1997; R. Conc. del S. 22 de 30 de septiembre de 1997; R. Conc. del S. 37 de 6 de abril de 1998; R. Conc. del S. 41 de 2 de febrero de 1999; R. Conc. del S. 42 de 2 de febrero de 1999; R. Conc. del S. 43 de 2 de febrero de 1999; R. Conc. del S. 44 de 3 de febrero de 1999; R. Conc. del S. 48 de 18  de marzo de 1999; R. Conc. del S. 50 de 21 de junio de 1999; R. Conc. del S. 73 de 9 de septiembre de 2000; R. Conc. del S. 1 de 2 de enero de 2001; R. Conc. del S. 13 de 20 de abril de 2001; R. Conc. del S. 21 de 4 de septiembre de 2001; R. Conc. del S. 48 de 12 de noviembre de 2002; R. Conc. del S. 54 de 27 de enero de 2003; R. Conc. del S. 85 de 28 de agosto de 2003; R. Conc. del S. 96 de 18 de diciembre de 2003; R. Conc. del S. 2 de 2 de enero de 2005; R. Conc. del S. 3 de 2 de enero de 2005; R. Conc. del S. 38 de 23 de agosto de 2005; R. Conc. del S. 39 de 24 de agosto de 2005; R. Conc. del S. 64 de 19 de mayo de 2006; R. Conc. del S. 72 de 24 de julio de 2006; R. Conc. del S. 77 de 22 de septiembre de 2006; R. Conc. del S. 78 de 22  de septiembre de 2006; Sustitutivo de las R. Conc. del S. 2, 39, 48, 64, 77, 78 y los P. del S. 1462 y 1671 de 6 de octubre de 2006; R. Conc. del S. 74 de 30 de agosto de 2006; R. Conc. del S. 81 de 23 de enero de 2007; R. Conc. del S. 83 de 23 de enero de 2007; R. Conc. del S. 84 de 23 de enero de 2007; R. Conc. del S. 85 de 23 de enero de 2007; R. Conc. del S. 90 de 13 de febrero de 2007; R. Conc. del S. 99 de 24 de abril de 2007; R. Conc. del S. 104 de 1 de junio de 2007; R. Conc. del S. 81 de 7 de noviembre de 2007; R. Conc. del S. 2 de 2 de enero de 2009; R. Conc. del S. 6 de 12 de enero de 2009; R. Conc. del S. 10 de 3 de abril de 2009; R. Conc. del S. 12 de 6 de mayo de 2009; R. Conc. del S. 14 de 11 de mayo de 2009; R. Conc. del S. 17 de 17 de junio de 2009; R. Conc. del S. 23 de 7 de septiembre de 2009; R. Conc. del S. 25 de 14 de septiembre de 2009; R. Conc. del S. 27 de 18 de septiembre de 2009; R. Conc. del S. 28 de 24 de septiembre de 2009; R. Conc. del S. 29 de 24 de septiembre de 2009; R. Conc. del S. 34 de 6 de abril de 2010; R. Conc. del S. 49 de 8 de junio de 2011; R. Conc. del S. 51 de 2 de septiembre de 2011; R. Conc. del S. 52 de 19 de septiembre de 2011; R. Con. del S. 55 de 17 de octubre de 2011; R. Conc. del S. 63 de 14 de mayo de 2012.

La Opinión mayoritaria expresa que, mediante la votación para la aprobación de la Resolución Concurrente Núm. 60, "no hay duda que la voluntad de más de dos terceras partes de los miembros del Senado de Puerto Rico es proponerle al Pueblo una enmienda constitucional para reducir el tamaño de la legislatura".[68] Respecto a lo anterior, amerita destacar que, según se desprende del historial de ambas Resoluciones Concurrentes, la senadora Hon. Sila M. González Calderón votó en contra de proponer la Reforma Legislativa (R. Conc. del S. 35) y a favor de proponer la limitación al derecho de la fianza (R. Conc. del S. 60). Esto demuestra precisamente lo que la regla de un solo asunto pretende evitar: que un asunto no favorecido se incluya subrepticiamente en una legislación que cuenta con los votos necesarios para ser aprobada.

En este caso, lo secundario no favorecido por la senadora fue la aprobación de la Resolución Concurrente Núm. 35, con la frase aislada insertada en la Sección 2 de la Resolución Concurrente Núm. 60. La mayoría de este Tribunal sostiene que la senadora reconsideró su posición sobre la primera Resolución Concurrente y la favoreció. Lo considera "un hecho" que "ningún juez de este Tribunal puede controvertir."[69] Esta conclusión es contraria a todo lo expuesto anteriormente sobre la inclusión de "riders" en las medidas legislativas y su rechazo expreso por los constituyentes. Nos reafirmamos en que los principios constitucionales pretenden proteger exactamente que el

---

[68] Opinión mayoritaria, pág. 32.
[69] Opinión mayoritaria, pág. 32.

quehacer legislativo refleje claramente la voluntad de los legisladores y que se evite lo que sucedió en este caso. Bien podría ser que los senadores, en particular la senadora González, descansaron en que la Resolución Concurrente Núm. 35 fue aprobada válidamente o que, como mínimo, el voto que ya habían emitido respecto a la Reforma Legislativa no podía cancelarse por una corta referencia a la resolución pertinente.

Más aun, la mayoría establece "que nada impide que el Senado de Puerto Rico mediante una Resolución Concurrente posterior reitere lo hecho en una Resolución Concurrente anterior".[70] De ser así, lo hecho, según resuelto en la propia Opinión mayoritaria, fue no aprobar válidamente una Resolución Concurrente. O sea, no había nada "hecho", nada que reiterar. Realmente, se estaría reiterando la nulidad de la Resolución Concurrente Núm. 35.

**Asimismo, con la conclusión de que la Resolución Concurrente Núm. 60 reiteró y validó la Resolución Concurrente Núm. 35, la mayoría de este Tribunal invierte el trámite cronológico exigido en la Constitución de que el proceso de enmiendas a la Constitución se inicie con la aprobación de la Resolución Concurrente. Es decir, la mayoría resuelve que la Ley Habilitadora 12-2012, aprobada el 9 de enero de 2012, se aprobó válidamente antes que la Resolución Concurrente que inicia el proceso, aprobada el 10 de mayo de 2012.**

---

[70] Opinión mayoritaria, pág. 34.

Por consiguiente, es forzoso concluir que la Sec. 2 de la Resolución Concurrente del Senado Núm. 60 viola la Sec. 17 del Art. III de nuestra Constitución, *supra,* en la medida que, subrepticiamente, intenta reiterar lo aprobado inconstitucionalmente mediante la Resolución Concurrente del Senado Núm. 35. Además, viola la Sec. 15.6 del Reglamento del Senado de 2009 que prohíbe que las medidas aprobadas por ese Cuerpo contengan más de un asunto.

IV.

Las propuestas de enmiendas a la Constitución que la mayoría de este Tribunal valida permiten que las mayorías puedan enmendar la Constitución con exclusión de las minorías. Ello, incide en el objetivo claramente expresado y el espíritu que permeó la Convención Constituyente de garantizarle representación a las minorías. La aprobación de estas enmiendas podría conllevar el destierro de los partidos minoritarios, ya que un tercer partido político difícilmente obtendrá un escaño en la Asamblea Legislativa. Al analizar los resultados de las votaciones para los cargos de Representantes y Senadores por Acumulación a través de los años, resulta notable que en su mayoría, quienes entran entre las primeras seis (6) posiciones pertenecen al partido vencedor de la elección. La propuesta de enmienda en controversia perpetuaría este esquema.

Ello supone una alteración significativa en nuestro ordenamiento político, que reconoce que tanto el P.I.P. al día de hoy, como las minorías en general, son importantes fiscalizadores del proceso legislativo y constitucional y

protegen a los ciudadanos que responden a ideologías minoritarias. Por eso, se requiere la mayor rigurosidad en el proceso de proponer al Pueblo esta enmienda.

Con su decisión, debilitándose al máximo dicho proceso y convirtiéndolo en lo mismo que una expresión de felicitación de la Asamblea Legislativa, la mayoría trata con desprecio dos principios constitucionales firmemente arraigados en nuestra sociedad: garantizar el derecho de las minorías a tener representación dentro del proceso legislativo y garantizar la estabilidad de la Constitución.[71]

**El proceso de enmiendas a la Constitución debe ser uno claro y riguroso. De esta forma, cuando el Pueblo venga llamado a tomar la decisión de reformular cualquier aspecto en la Constitución, podrá confiar en que el Poder Legislativo se adhirió a los postulados allí contenidos.**

Como la opinión mayoritaria es contraria a estos principios, disentimos y declararíamos que la Resolución Concurrente del Senado Núm. 35, la Ley Núm. 12-2012, la Sec. 2 de la Resolución Concurrente del Senado Núm. 60 y la Ley Núm. 84-2012 son inconstitucionales.

Federico Hernández Denton
Juez Presidente

---

[71] Véanse P.P.D. v. Peña Clós, *supra* (1996); P.P.D. v. Gobernador, 139 D.P.R. 643 (1995); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Independentista puertorriqueño

       Recurrido

v.

       CT-2012-009

Estado Libre Asociado de Puerto Rico, *et al.*

       Peticionarios

Opinión disidente emitida por la Jueza Asociada señora Fiol Matta a la cual se une la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 6 de julio de 2012.

Escribo esta Opinión con gran preocupación ante la idea del "poder del silencio" que ha acogido una mayoría de este Tribunal, especialmente cuando se trata de interpretar asuntos de suma importancia en nuestro derecho constitucional, en este caso, el proceso mismo para enmendar nuestra Ley Suprema. Nunca podemos olvidar que, en nuestro ordenamiento

constitucional democrático, todo poder tiene límites.[72]

En ese sentido y para preservar

---

[72] Ya me había expresado en esa dirección en cuanto a los poderes de este Tribunal.  Hoy lo hago nuevamente en cuanto a los poderes de la Asamblea Legislativa: "Todo poder, incluyendo el del Tribunal Supremo, tiene límites". In re Aprobación

nuestras profundas raíces democráticas, no debemos alejarnos de la idea de que "[p]or encima del Poder [está] el derecho".[73]

Estoy de acuerdo con las conclusiones de la Opinión mayoritaria en cuanto a que nos encontramos ante una controversia justiciable, que el Partido Independentista Puertorriqueño (PIP) tiene legitimación para presentar este caso y que no incurrió en incuria. También comparto el criterio de que la Resolución Concurrente Número 35, que propuso celebrar un referéndum para enmendar la Constitución de Puerto Rico alterando la composición de la Legislatura, no contó con los votos que el texto constitucional requiere para su aprobación. Sin embargo, difiero del análisis que emplea la mayoría para resolver que el aval legislativo a la Resolución Concurrente Número 60, que propuso consultarle al Pueblo en un referéndum si consiente restringir el derecho a la fianza, tuvo el efecto

---

de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, 2012 T.S.P.R. 32, Opinión disidente de la jueza asociada Fiol Matta, pág. 2. En ese sentido, se trata de una divergencia fundamental de visión sobre el origen y el uso del poder en nuestro ordenamiento constitucional. La necesidad de limitar el poder aplica con igual fuerza a todas las ramas de gobierno. Hoy nos corresponde identificar las fronteras del poder legislativo para iniciar un proceso que alteraría nuestra Ley Suprema teniendo en mente que "[c]uando a la autoridad representativa no se le imponen límites, los representantes del pueblo no son ya defensores de la libertad, sino candidatos a la tiranía". Bertrand de Jouvenel, El Poder: historia natural de su crecimiento, Ed. Nacional, Madrid, 1956, pág. 335, citando a Benjamin Constant.

[73] Íd, pág. 332, citando a Cicerón en La República, III, XVII.

de aprobar la Resolución 35 con sólo mencionarla. En este aspecto, coincido con la Opinión disidente emitida por el juez presidente Hernández Denton. Ciertamente, las deficiencias serias e irremediables en el proceso llevado a cabo por la Asamblea Legislativa para dar paso al referéndum que permitiría enmendar la Constitución y la falta de rigurosidad demostrada por ese cuerpo en el desempeño de sus facultades requieren que el Tribunal Supremo, en el ejercicio de su responsabilidad constitucional, invalide la actuación legislativa por apartarse de las exigencias contenidas en nuestra Ley Suprema y en los reglamentos legislativos.

Más allá de esas determinaciones y sus fundamentos, entiendo necesario expresarme separadamente sobre el peligroso razonamiento que exhibe, en múltiples ocasiones y con certeza de convicción, la Opinión que hoy emite una mayoría del Tribunal. La frase "nada impide" que ésta repite constantemente es una señal de alarma. La Opinión mayoritaria presenta una visión preocupante sobre la interacción entre el poder gubernamental y las protecciones constitucionales al concluir que, si la Constitución no prohíbe una acción particular de manera expresa, no hay límites al ejercicio del poder.

En esta ocasión, esa visión toma forma en la conclusión del Tribunal de que basta que la Asamblea

Legislativa cumpla parcialmente con el riguroso proceso para enmendar nuestra Constitución, sin importar cuán accidentado, escabroso, torpe o irresponsable haya sido, para que sea validado por los tribunales. La mayoría está profundamente equivocada: en lo que concierne a la Constitución, no basta con llegar al destino; igual de importante es revisar cómo se llegó.

Es cierto que el proceso para enmendar la Constitución, como lo describe la Opinión mayoritaria, es uno "particularmente detallado y definido".[74] Pero no por eso la ausencia de algún detalle es sinónimo de una carta blanca. La falta de definición de cierto aspecto del proceso no equivale a un consentimiento para delinear ese punto como mejor convenga en una situación particular. Y es aquí que encontramos dos fallas fundamentales de la Opinión del Tribunal. En primer lugar, concluye erróneamente que ese detalle y esa definición relevan al Tribunal de su rol interpretativo como si se tratara únicamente de la aplicación mecánica de un proceso totalmente particularizado. En segundo lugar, justifica su metodología de buscar únicamente lo prohibido expresamente. Con toda honestidad, ninguna de estas conclusiones me parecen válidas. Nuestra Constitución no es un mapa exacto. Por el contrario, ofrece coordenadas. La Opinión mayoritaria ignora esto. Por eso, utiliza la inclusión de mandatos

---

[74] Opinión del Tribunal, pág. 17.

específicos en el texto constitucional como una excusa para concluir que este Tribunal no tiene nada que interpretar, cancelando así nuestro rol constitucional, y que la ausencia de una prohibición expresa equivale a una autorización.

La Opinión mayoritaria revela la noción de que la Constitución supone solamente los límites del poder gubernamental. Nada más lejos de la verdad. <u>La Constitución, además de establecer límites, es la fuente del poder gubernamental.</u>[75] Por lo tanto, no debemos recurrir

---

[75] Según González Casanon, una constitución, "inevitablemente, condiciona la acción de los gobernantes, limita su poder y expresa los poderes o derechos de los miembros de la comunidad". J.A. González Casanon, *Teoría del Estado y Derecho Constitucional*, 2da. ed., Ed. Vivens, pág. 193. Según el autor, la función de la constitución es "regular la organización de las diversas instituciones u órganos del Estado, asignando a cada una las competencias pertinentes y fijando tanto las relaciones fundamentales que deben producirse entre ellas como el procedimiento que éstas normalmente han de seguir en las mismas". *Íd*, págs. 217-218. Como manifestamos en <u>Fuster v. Buso</u>, 102 D.P.R. 327, 345 (1974): "En la Edad Media cobra preminencia la noción del constitucionalismo. Aunque, desde luego, el contenido de ese concepto se ha desarrollado considerablemente a través de los siglos, su idea central sigue siendo la misma. Esta es que el gobernante, o el gobierno, no son absolutos, sino que su poder tiene límites, está limitado". De forma semejante, González Casanon expresa que "el Derecho Constitucional [es] el conjunto de normas jurídicas, fundamentales y principales, organizadoras de la sociedad estatal, sistematizadoras de sus instituciones, <u>limitadoras de la discrecionalidad y arbitrariedad de los gobernantes</u>, garantizadoras de los derechos y libertades de los ciudadanos y <u>orientadoras y directoras de la Política del Estado</u>". (Énfasis suplido.) González Casanon, *op. cit.*, pág. 193. *Véase, además*, C.H. McIlwain, <u>Constitutionalism: Ancient & Modern</u>, Cornell University Press, 1947, pág. 9: "That it defines the authority which the people commits to its government, and in doing so thereby limits it. That any exercise of authority beyond these limits by any government is an exercise of power without right".

a la Constitución únicamente para encontrar lo que no se puede hacer. La Constitución permite el ejercicio del poder y, en ciertas ocasiones, como la de autos, establece cómo debe ejercerse ese poder, cuál será el proceso. Es especialmente preocupante la insistencia de la Opinión mayoritaria en que no existen prohibiciones expresas y detalladas en la Constitución que se violen por el proceso accidentado llevado a cabo por la Asamblea Legislativa y en que eso es suficiente para validar el mismo. Parecería que, si la Constitución no lo prohíbe expresamente, "*anything goes*".[76] Esto es particularmente alarmante cuando se trata de posibles alteraciones al texto constitucional. Precisamente, en *Berríos Martínez v. Gobernador II*, rechazamos esa visión en el contexto específico de las enmiendas a la Constitución: "También partimos de la premisa que, en el ejercicio de su poder soberano, el pueblo incluyó en el Art. VII de la Constitución, *supra*, unos <u>límites expresos</u> e **implícitos** sobre el alcance de las

---

[76] No podemos perder de perspectiva que no estamos ante el ejercicio por parte de la Asamblea Legislativa de una facultad dentro de su poder de razón de estado. De ser ese el caso, nuestra intervención se limitaría a revisar si se vulneró algún derecho constitucional de la ciudadanía. Pero, incluso en esas circunstancias, el poder gubernamental tiene límites inherentes. <u>Culebra Entreprises Corp. v. ELA</u>, 143 D.P.R 935 (1997), Opinión concurrente y disidente del juez asociado Hernández Denton, págs. 970-971. De otro lado, en <u>Pueblo v. Díaz</u>, 160 D.P.R. 1 (2003), resolvimos e interpretamos que el principio de legalidad, como manifestación del debido proceso de ley constitucional, **a pesar de no estar expresamente en el texto constitucional**, era un "ideal adoptado por nuestra sociedad como parte de nuestros valores democráticos", por lo que "constituye un <u>límite</u> al Poder Legislativo en la formulación de política pública al aprobar estatutos penales". (Énfasis suplido.) *Íd*. pág. 27.

enmiendas que se podrán incorporar".[77] Es nuestro deber, como intérpretes de la Constitución, encontrarlos. La mayoría del Tribunal hace lo contrario.

La Opinión mayoritaria indica que "nada impide que el Senado de Puerto Rico mediante una Resolución Concurrente posterior reitere lo hecho en una Resolución Concurrente anterior".[78] Esto, para resolver que la Resolución 60, a través de la frase en la que alude a lo dicho en la Resolución 35, incluyó todo el contenido de la Resolución 35 y se le presentó a la Legislatura para que avalara el referéndum sobre la reforma legislativa que no había obtenido los votos necesarios anteriormente. Asimismo, señala que su interpretación es cónsona con la Constitución por el simple hecho de que la Constitución "guarda silencio en cuanto a la definición de las resoluciones concurrentes".[79] Ello le parece suficiente para concluir que una resolución concurrente que propone enmendar la Constitución se puede aprobar a través de otra resolución concurrente aprobada con un propósito totalmente desvinculado sólo porque la segunda menciona la primera. Su argumento es que "[l]os padres de la Constitución no impusieron ese requisito [de seguir el mismo trámite y diseño temático que los proyectos de ley] a la resolución

---

[77] (Énfasis suplido.) 137 D.P.R. 195, 201 (1994).

[78] Opinión del Tribunal, pág. 35.

[79] *Íd.*

concurrente, por lo cual no debe imponerlo este Tribunal".[80]

Aprovechar la ausencia de una expresión para construir un significado que resulta poco probable y acomodaticio no me parece el mejor método de análisis que este Tribunal podría emplear.[81]

Este recurso a los "silencios" de la Constitución socava otras determinaciones significativas de la Opinión.

---

[80] (Énfasis suprimido.) *Íd.* pág. 36. A propósito de la expresión "padres de la Constitución", no debemos olvidar que nuestra Ley Suprema también tuvo una madre, la delegada María Libertad Gómez. Por otro lado, para una argumentación sobre la existencia del requisito de tramitar las resoluciones concurrentes de la misma forma que los proyectos de ley, en la Constitución y el Reglamento del Senado, *véase* la Opinión disidente del juez presidente Hernández Denton, págs. 17-22.

[81] Aunque me uno a la Opinión disidente del juez presidente Hernández Denton en cuanto al aspecto de la aprobación de la Resolución 35 mediante la votación por la Resolución 60, entiendo meritorio mencionar en esta ponencia que la supuesta voluntad de dos terceras partes de los miembros de la Asamblea Legislativa de aprobar el contenido de la Resolución 35 cuando votaron por la Resolución 60 viene del mismo lugar que la Opinión mayoritaria dice que vendrían los requisitos de trámite para aprobación de una resolución concurrente: "de la nada". *Véase* Opinión del Tribunal, pág. 36. Reiterar en una resolución posterior lo que se expresó en una resolución que no fue aprobada válidamente no puede tener el efecto de aprobar retroactivamente la resolución que no obtuvo los votos, menos aun cuando, al votar por la segunda resolución, se estaba considerando un proyecto desvinculado del primero. Votar por la Resolución 60 no conllevó volver a votar por la Resolución 35. La única frase de toda la Resolución 60 que mencionó la Resolución 35 constituye tan sólo una expresión, no la voluntad de la Asamblea Legislativa debidamente aprobada. La Opinión mayoritaria concluye lo contrario y se refiere a <u>su interpretación</u> como un "hecho" que "**[n]ingún juez de este Tribunal puede controvertir**". Opinión del Tribunal, pág. 33. ¡Claro que hay hechos que son incontrovertibles! Uno es que la Resolución 60 obtuvo los votos requeridos y la Resolución 35 no. Sin embargo, no hay tal certeza sobre si la Resolución 35 fue aprobada por referencia a través de la votación de la Resolución 60. Si no hubiese habido duda sobre esta controversia, este Tribunal no habría expedido el presente recurso, no lo habría atendido mediante certificación intrajurisdiccional y no habría celebrado una vista oral para analizar a fondo los argumentos a favor y en contra.

Así, con el fin de concluir que la publicación de la propuesta de enmienda constitucional se hizo correctamente, la Opinión del Tribunal alude a que el historial de la Convención Constituyente "guarda silencio" en cuanto a cómo debe ser la publicación requerida.[82] De igual manera, para decidir que la naturaleza temporera de la Junta Constitucional Revisora de Distritos Senatoriales y Representativos y su disolución después de cada división decenal no es un impedimento para que se pueda convocar a la Junta fuera de los plazos fijados, la Opinión mayoritaria señala que "[n]o hemos encontrado **nada** en el texto de la Constitución ni en el historial de la Convención Constituyente que **prohíba** el que la Junta Constitucional Revisora de Distritos Legislativos sea convocada en más de una ocasión en una década" y, "[p]or ende, no existe prohibición constitucional alguna que impida que la Junta sea convocada para realizar una revisión de los distritos legislativos en medio de una década".[83] Nuevamente, en lugar de fijarse en los límites que conlleva lo que la Constitución expresa, busca autorizaciones en el silencio.

Por otro lado, la Opinión mayoritaria indica que le parece simplista el argumento del PIP de que cada

---

[82] Opinión del Tribunal, pág. 48.

[83] (Énfasis en el original.) *Íd.* pág. 47.

componente de la reforma legislativa conlleva enmendar una parte de la Constitución. A pesar de que reconoce que "[u]n referéndum que propone al Pueblo una serie de enmiendas a su [ley superior] es un evento complejo, sensitivo y altamente regulado", que además conlleva un desembolso sustancial de fondos públicos,[84] la Opinión mayoritaria propone un análisis mecánico de los requisitos de separabilidad y cantidad de las propuestas de enmienda constitucional.[85] A partir de éste, determina que no es necesario que los legisladores hagan sus propuestas de manera que los electores puedan entender por qué están votando, porque la Constitución no contiene un requisito expreso en cuanto a esto.[86] Según la mayoría del Tribunal, exigirle a la Legislatura más responsabilidad que la establecida expresamente en la Constitución sería una "burla" a nuestro sistema constitucional democrático, pero no lo sería proponer una consulta al Pueblo para enmendar su constitución a través de un proceso plagado de errores.[87]

Constantemente, la Opinión mayoritaria enfatiza la ausencia de limitaciones expresas a lo hecho por la Asamblea Legislativa. Sin embargo, no atiende otro asunto fundamental: si lo que hizo la Asamblea Legislativa estaba

---

[84] *Íd.* pág. 14.

[85] *Íd.* págs. 41-42.

[86] *Íd.* pág. 56.

[87] *Íd.* pág. 50.

autorizado constitucionalmente.[88] Este enfoque es altamente

preocupante pues revela una falta de entendimiento sobre el

rol de nuestra Constitución en el ordenamiento democrático

puertorriqueño. Tal parece que la mayoría ve en nuestra Ley

Suprema una lista de obstáculos molestosos al poder de las

ramas políticas que deben ser aplicados únicamente cuando

ha habido una violación severa de sus disposiciones. Pero

nuestra Constitución no es un estorbo. Por el contrario, es

lo que permite nuestra vida en sociedad, garantiza nuestras

libertades y establece una dirección colectiva hacia el

País que queremos: más justo, más democrático, más social,

más humano. En ese sentido, a veces son las propias ramas

políticas las que obstaculizan el diseño constitucional y

por eso existe la revisión judicial, para reivindicar el

---

[88] A diferencia de los poderes de razón de estado, el poder de la Asamblea Legislativa para iniciar un proceso de enmienda constitucional no es inherente. Por el contrario, es el producto de una autorización expresa de la propia Constitución. Por tanto, es fundamental que la Asamblea Legislativa cumpla cabalmente con las exigencias procesales y sustantivas que la Constitución exige como parte de un proceso de enmiendas. Según González Casanon, "[l]as constituciones … tienen un origen; un contenido; un procedimiento de elaboración; aprobación y puesta en vigor; una aplicación y práctica; unos mecanismos de conservación y defensa; unas mutaciones y un sistema de reforma y derogación". (Énfasis suplido.) González Casanon, *op. cit.*, pág. 209. En ese sentido, "[a]sí como la Constitución prevé su propia reforma … también la Constitución suele prever su defensa jurídica". (Énfasis suplido.) *Íd.* pág. 226. Como manifestación de esos mecanismos de conservación y defensa, "la reforma constitucional desborda el mero trámite procedimental para convertirse en un problema básico de poder constituyente y de soberanía". (Énfasis suplido) *Íd.* pág. 218. Como explica Colón-Ríos, "[e]s un principio básico de todo ordenamiento jurídico que el poder de enmendar una constitución se encuentra sujeto a diversos tipos de límites. (Los más comunes, por supuesto, son de tipo procesal)". J. Colón-Ríos, ¿Pueden haber enmiendas constitucionales inconstitucionales?, 42 Rev. Jur. U.I.P.R. 207, 209 (2008).

mandato constitucional cuando las demás ramas violan, ignoran o minimizan sus disposiciones.[89] Como resolvimos en *Silva v. Hernández Agosto*, "[n]uestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos".[90]

Cabe preguntarse qué quedaría del rol interpretativo de este Tribunal si lo único que importa es averiguar si la Constitución contiene una prohibición expresa a alguna actuación gubernamental en particular. De ser ese el estándar, no habría nada que interpretar; sólo habría que aplicar lo dispuesto expresamente. En ese caso, quedaría seriamente debilitado el concepto de la revisión judicial, el de la interpretación constitucional y la facultad de esta curia para determinar que una actuación de otra rama de gobierno es inconstitucional.[91]

---

[89] "En nuestro sistema constitucional de gobierno compuesto por tres (3) poderes igualmente subordinados a la soberanía del Pueblo, el Poder Judicial es el llamado a administrar la justicia, es decir, a obtener que las normas jurídicas se cumplan en aquellos casos en que han sido violadas o menoscabadas. En virtud de esa función, es al Poder Judicial a quien le corresponde definir los límites del ejercicio de los demás poderes. Por ello, es obligación exclusiva del Tribunal Supremo ser el intérprete final de la Constitución". (Énfasis suplido.) Berríos Martínez v. Gobernador II, 137 D.P.R. 195 (1994), Opinión de conformidad del juez presidente Andréu García, pág. 240.

[90] 118 D.P.R. 45, 55 (1986).

[91] En ese sentido, el deber de este Tribunal de interpretar la Constitución, como parte de la revisión judicial, tiene su génesis en la separación de poderes, nuevamente, como contrapeso al exceso por parte de las ramas políticas. "La separación de poderes sirve para mantener el equilibrio entre las tres ramas de Gobierno con el fin de evitar que se ponga en peligro el sistema democrático, concentrando demasiadas facultades en una de éstas.

Sin revisión judicial, la observancia de los mandatos de la Constitución quedaría al arbitrio y la conveniencia de las ramas políticas. De igual forma, si los tribunales abdican su responsabilidad de exigir que las demás ramas actúen en conformidad rigurosa con la Constitución, corremos el riesgo de que las ramas políticas concluyan que su poder cada vez tiene menos límites. Así no se enmiendan las constituciones. Así no cumplimos con nuestra función judicial. Al contrario, nos alejamos de la función constitucional que la Opinión mayoritaria identifica como la razón principal por la cual este Tribunal fue creado.[92]

Lo anterior cobra mayor relevancia cuando la Constitución que garantiza los derechos individuales y colectivos del Pueblo es la que requiere nuestra protección. Típicamente, la víctima del abuso del poder

---

[…] El desequilibrio se produce tanto cuando una rama le arrebata facultades a otra como cuando una de ellas cede sus poderes a otra. Cuando eso sucede, se rompe el balance y es difícil volver a estabilizarlo". In re Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, 2012 T.S.P.R. 32, Opinión disidente de la jueza asociada Fiol Matta, págs. 16-17.

[92] Opinión del Tribunal, págs. 2 y 6. Ante un aparente silencio constitucional, no sigue automáticamente que la actuación gubernamental está permitida. De eso consiste, precisamente, nuestra labor interpretativa. "Al interpretar una disposición constitucional […], no podemos caer en la tentación de limitar nuestros esfuerzos a un análisis superficial. Los conceptos constitucionales no son palabras adoptadas casualmente; son parte de un diseño delicado, cuyo fin es evitar lo que hoy se ha materializado: la concentración del poder". In re Aprobación de las Reglas para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, 2012 T.S.P.R. 32, Opinión disidente de la jueza asociada Fiol Matta, pág. 4.

gubernamental es un individuo o un grupo social marginado. Ya sea cuando a un acusado se le prohíbe tener un abogado, a un obrero se le castiga por participar en alguna actividad concertada, a un ciudadano se le multa por poner un pasquín en un poste o a una minoría religiosa se le intimida en su culto, la Constitución interviene como escudo para proteger los derechos que ella misma reconoce. Ahora bien, ¿qué ocurre cuando la víctima del abuso de poder gubernamental no es un individuo o un grupo sino la propia Constitución? En esos casos, la Constitución no puede protegerse sola; requiere la intervención de los tribunales.

La Opinión señala que "ante la trascendental importancia de un documento constitucional, [es necesario que] el procedimiento para enmendarlo sea uno particularmente detallado y definido",[93] que limite el proceso de tal manera que no sea tan fácil aprobar enmiendas constantemente para que se pueda mantener la coherencia del texto constitucional y protegerlo de los caprichos momentáneos de las mayorías.[94] Esas premisas son correctas y coincido con la mayoría en que esos principios propician que nuestra constitución sea fuerte y estable. Por eso, me sorprende tanto que la jueza y los jueces que

---

[93] Opinión del Tribunal, pág. 17.

[94] *Íd.* pág. 18.

suscriben la Opinión del Tribunal recurran al planteamiento de que las acciones que se validan en esta resolución están permitidas porque la Constitución no las prohíbe expresamente.

Llama la atención que, por un lado, la Opinión mayoritaria afirma que, "por su evidente importancia, las constituciones no pueden ser enmendadas como si fueran cualquier otro estatuto",[95] pero, por otro lado, recurre al hecho de que no hay requisitos expresos sobre la manera de tramitar una resolución concurrente para concluir que tenemos que ser más laxos con el proceso de aprobación de las resoluciones concurrentes que sientan las bases para enmendar la Constitución.[96] Así, manifiesta que los tribunales deben ser flexibles al estudiar si la Legislatura ha cumplido con las exigencias del

---

[95] *Íd.*

[96] *Íd.* págs. 34-36. Existe un amplio consenso en que el proceso para enmendar una Constitución debe ser más exigente que el utilizado para aprobar una ley ordinaria: "La gran mayoría de las constituciones escritas establecen una serie de requisitos que hacen la modificación de la constitución **más difícil que la adopción de leyes ordinarias**". (Énfasis suplido.) Colón-Ríos, *supra*, pág. 209. "Los llamados procedimientos agravados constituyen el conjunto de trámites, más o menos complejos o difíciles, con los que se pretende que el poder legislativo ordinario lleve a cabo una tarea, parcial o totalmente constituyente, como es la revisión de la Constitución mediante reforma. Tales procedimientos son de lo más variado y todos ellos buscan, como decimos, el máximo consenso, expresado comúnmente por: la mayoría **cualificada** de votos favorables a la reforma; la participación de ambas cámaras (en los sistemas bicamerales) [entre otros]". (Énfasis suplido.) González Castanon, *op. cit.*, pág. 220.

procedimiento constitucional para aprobar leyes; esto con el fin de no convertirse en un obstáculo o un impedimento para el proceso legislativo. Luego, expresa que se debe ser aún más permisivo cuando se trata de la aprobación de resoluciones concurrentes, pues la Constitución no dispuso limitaciones para ello. Al hacerlo, olvida que el camino para enmendar la Constitución requiere mayor rigor en cada uno de sus pasos.[97] La Opinión mayoritaria asevera que, cuando se trata de resoluciones concurrentes, no estamos ante leyes ordinarias. Cierto es. Precisamente por lo extraordinaria que es la Resolución 35 es que este Tribunal tiene que ser más estricto al velar por que los cuerpos legislativos hayan llevado a cabo sus procesos responsablemente.

La Opinión mayoritaria describe el proceso legislativo como uno "complejo, frustrante y, francamente, difícil de comprender".[98] Acto seguido, indica que ello "no necesariamente se traduce a que con cada traspié legislativo se incurra en fallas constitucionales".[99] Me preocupa seriamente que se describan violaciones al proceso constitucional para enmendar la Ley Suprema como un mero "traspié". De esa forma, se trivializa el proceso

---

[97] Es norma universal en el constitucionalismo moderno que no debe ser fácil enmendar una Constitución. Por lo tanto, se debe cumplir rigurosamente con el proceso para enmendarla.

[98] Opinión del Tribunal, pág. 56.

[99] (Énfasis suplido.) *Íd*.

constitucional, excusando la falta de rigurosidad legislativa, con la consecuencia de que la Constitución se debilita. No es deber de este Tribunal justificar los errores constitucionales de las demás ramas de gobierno. Por el contrario, nuestro deber es identificarlos, atenderlos y resolverlos de manera que la Constitución salga fortalecida.

Cuando se inicia un procedimiento para enmendar la Constitución es cuando ésta es más vulnerable. Por lo tanto, debemos ser más exigentes con el proceso empleado. Si no respetamos y fortalecemos los requisitos procesales adoptados para enmendar la Ley Suprema, dando significado y contenido real a su diseño de forma que no pueda ser alterada como resultado de un conjunto de sucesos torpe, viciado y desordenado como el de autos, la Constitución se convierte en un documento frágil, pasivo y maleable de acuerdo con las pasiones momentáneas. Así no se fortalece la democracia.

El contexto en el que surge este caso ilustra lo peligroso que es encontrar en el silencio el fundamento para no ser rigurosos. Por eso, hay una expresión de la Opinión mayoritaria de la que tengo que hacerme eco, mas la pronuncio con una intención diferente: "Nuestro documento constitucional merece mayor respeto".[100]

---

[100] *Íd.* pág. 16.

Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Independentista Puertorriqueño por sí y en representación de sus miembros, representados por el Presidente del Partido, Rubén Berríos Martínez<br><br>Recurridos<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Comisión Estatal de Elecciones, y su Presidente, Héctor J. Conty Pérez<br><br>Peticionarios | CT-2012-0009 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 6 de julio de 2012

En el día de hoy una mayoría de este Tribunal abdica al llamado impostergable de interpretar coherente, íntegra y razonablemente la Constitución del Estado Libre Asociado de Puerto Rico ante embates internos y externos. En su lugar, esa mayoría opta por una metodología interpretativa que dista del ponderado quehacer de un juez de esta Curia y raya en la elaboración de un grimorio judicial para enfrentarse a problemas de índole constitucional.

Disiento del proceder que este Foro adelanta hoy por entender que dicha actuación debilita y vulnera nuestro esquema constitucional. Además, disiento porque lo resuelto por este Tribunal expone a la Constitución en una

situación de interpretación tan laxa como precaria, en perjuicio de la democracia puertorriqueña.

**I**

El 10 de octubre de 2011 el Senado de Puerto Rico aprobó la Resolución Concurrente Núm. 35 (Res. Conc. Núm. 35) con votación de veinte miembros a favor, ocho en contra, uno ausente y dos vacantes.[101] Dicha resolución concurrente propone múltiples y variadas enmiendas al Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico con el "propósito único de **reestructurar el Poder Legislativo**", debido a que "[e]n las elecciones generales de 2008, el pueblo puertorriqueño avaló el Programa de Gobierno presentado por el Partido Nuevo Progresista [y] [e]ste Programa incluía un compromiso de realizar una **Reforma Legislativa**". Res. Conc. Núm. 35, *Exposición de Motivos* (énfasis suplido). Posterior a la aprobación de la Res. Conc. Núm. 35,[102] el 10 de mayo de 2012 el Senado aprobó la Resolución Concurrente Núm. 60 (Res. Conc. Núm. 60) para proponer otra enmienda constitucional, pero a los fines de restringir el derecho a la fianza en particulares circunstancias delictivas.

---

[101] El proceso de aprobación de la Res. Conc. Núm. 35 en la Cámara de Representantes de Puerto Rico no está en controversia, por lo que se omite en la presente Opinión.

[102] Es de notar que la Res. Conc. Núm. 35 se aprobó con la oposición de los senadores de minoría, que objetaron la ausencia del voto de dos terceras partes del total de miembros que componen el Senado. *Véase* Diario de Sesiones del Senado de Puerto Rico, Vol. LIX, Núm. 13, 10 de octubre de 2011, págs. 36208-36210, 36221-36225.

Esta última resolución concurrente incluyó una sección

objeto de controversia en este caso, que lee:

> Sección 2.- La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial ... conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea Legislativa, propuesta en la Resolución Concurrente del Senado Núm. 35, ... la cual **reiteramos** en la presente Resolución Concurrente.

Res. Conc. Núm. 60, Sec. 2 (énfasis suplido).

En síntesis, nuestra labor judicial en el caso de

autos se limita a pasar juicio sobre la validez

constitucional de la Res. Conc. Núm. 35. Debemos examinar

si el tracto legislativo para su aprobación cumple con las

exigencias procesales de la Sección 1 del Artículo VII de

la Constitución del Estado Libre Asociado de Puerto Rico.

Para atender la interpretación improvisada y errante a la

que nos invita el Estado Libre Asociado (peticionario), y

que la mayoría de este Foro asume sin justificación

plausiva, resulta imperativo auscultar si una primera

resolución concurrente que no cumplió con las exigencias

procesales para enmendar la Constitución, **puede ser**

**subsanada** con otra resolución concurrente posterior.

Veamos.

## II

Previo a considerar los asuntos que ocupan nuestra

atención, resulta forzoso exponer los alcances

interpretativos de una controversia constitucional como la

de autos. Cómo acercarse a las disposiciones sobre enmienda constitucional y cómo interpretarlas, resulta una labor ardua, pero ineludible a nuestra función constitucional como últimos intérpretes de nuestra Ley Suprema. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Dicha interpretación, y aquélla hecha a alguna medida legislativa sobre enmienda constitucional, debe ser razonable, según expresa la Opinión mayoritaria al citar al Juez Presidente del Tribunal Supremo de Estados Unidos, señor Roberts. Opinión mayoritaria, acápite XI. Por lo mismo, resulta incongruente que este Tribunal cite la necesidad de interpretaciones razonables, cuando el resultado aquí hallado se distancia de ese adjetivo.

Nuestra labor en controversias como la de autos no es juzgar la sabiduría de las enmiendas propuestas, sino evaluar su constitucionalidad. *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195, 202 (1994); *véase también Córdova Iturregui v. Cámara de Representantes*, 171 D.P.R. 789, 801 (2007) ("la Rama Judicial tiene el poder de determinar si las otras ramas del gobierno observaron las limitaciones constitucionales y si los actos de una de éstas exceden sus poderes delegados"). Ello es así, puesto que realizar lo contrario contravendría al principio de separación de poderes recogido en nuestra Constitución. Const. P.R. Art. I, Sec. 2. En *Berríos*

*Martínez v. Gobernador II* nos expresamos sobre este asunto

y sostuvimos que:

> Al amparo de la facultad que nos otorga el Art.
> V de la Constitución del Estado Libre Asociado,
> L.P.R.A., Tomo 1, de ser los intérpretes máximos
> de la Constitución, tenemos el deber de
> garantizar y vigilar que las enmiendas a nuestra
> Ley Suprema cumplan con lo dispuesto en el Art.
> VII de la Constitución del Estado Libre
> Asociado, L.P.R.A., Tomo 1.

*Berríos Martínez*, 137 D.P.R. en la pág. 200.

Sobre la concepción de lo que es una Constitución y

el modo de enfrentarse a ella ante una propuesta de

enmienda, el *Informe de la Comisión de Preámbulo,*

*Ordenanzas y Procedimientos de Enmiendas a la*

*Constitución, sobre Enmiendas* que se recoge en el Diario

de Sesiones de la Convención Constituyente, expone:

> Una constitución, desde luego, es más que una
> ley ordinaria, es la ley que gobierna al
> gobierno. La estabilidad de la constitución es
> esencial al adecuado desarrollo, dentro de un
> régimen de ley, de las instituciones y
> principios que en ella se organizan y
> establecen. **Las constituciones deben estar fuera**
> **del alcance de la pasión súbita y el juicio**
> **pasajero** y, siendo tan alto el fin que ellas
> cumplen, el procedimiento para enmendarlas debe
> ser lo suficientemente difícil como para invitar
> al análisis sereno y cuidadoso. ... Si bien el
> procedimiento para enmendar la constitución debe
> ser lo suficientemente rígido para impartirle
> estabilidad a la constitución y distinguirla de
> las leyes ordinarias, el procedimiento a su vez
> debe ser lo suficientemente flexible para que la
> constitución pueda ceder ante una opinión
> pública informada y consciente y continuar así
> reflejando los postulados esenciales de vida de
> la comunidad.

4 Diario de Sesiones de la Convención Constituyente,
*Informe de la Comisión de Preámbulo, Ordenanzas y*
*Procedimientos de Enmiendas a la Constitución, sobre*
*Enmiendas* 2559 (1961)(énfasis suplido).

Cuando nos enfrentamos a situaciones complejas y procesos legislativos irregulares sobre una propuesta de enmienda a la Constitución, nuestra función revisora se torna más significativa y se pone a prueba nuestra capacidad de llegar a un resultado que no contravenga los principios y disposiciones que encarna la propia Ley Suprema. Para ello, es meritorio que seamos conscientes de la naturaleza de una Constitución y las formas de interpretar tanto a la Carta Magna, como a aquellos estatutos que incidan sobre ésta.

Una Constitución es "un acto político y legal ... y en su conjunto expresa más o menos adecuadamente las relaciones políticas de una sociedad organizada en un Estado, [además que] fija las estructuras básicas del aparato estatal y funciona como salvaguarda del mantenimiento y desarrollo del sistema sociopolítico". Jerzy Wróblewski, *Constitución y teoría general de la interpretación jurídica* 112 (Arantxa Azurza trad., 2001). La Constitución también se ha definido como "el cauce para que la sociedad se autodirija políticamente, con un ánimo de seguridad jurídica". Pamela A. Contreras Matus, *Interpretación constitucional: un régimen especial*, 11 Revista Derecho y Humanidades 311-321 (2005). En la medida en que se permita que se enmiende la Constitución sin que se cumplan a cabalidad las garantías que ella misma expone, se trastoca el carácter de ella como

documento que salvaguarda el desarrollo de una sociedad democrática. Ahí estriba la importancia de nuestra función como garantes del cumplimiento del contenido de la Constitución.

La Constitución, pues, es un documento con un poder simbólico originario depositado por los delegados de la Asamblea Constituyente y que nos sigue vinculando en tanto como sociedad depositemos en ella la cohesión de nuestro sistema político-democrático. Para mantener esa seguridad jurídica que simboliza la Ley Suprema, es imperativo que nuestra interpretación sobre ella y las leyes que la incidan se enmarque dentro de unos contornos de razonabilidad, coherencia y sensatez.

Al enfrentarnos al texto magno, como jueces debemos tener presentes varios principios de interpretación constitucional. Ello resulta de gran importancia para evitar llegar a conclusiones erradas como parte de metodologías aleatorias, tal cual hizo la Opinión mayoritaria en el caso de autos. Así, la doctrina ha elaborado una serie de principios de interpretación constitucional, los que apuntamos aquí:

1- *Principio de la unidad constitucional*- "La interpretación tiene que estar orientada siempre a preservar la unidad de la norma primera como punto de partida de todo el ordenamiento jurídico. El texto constitucional debe ser entendido como un sistema dotado de una unidad de significado en el que cada norma ha de ser interpretada en relación a las demás, de tal manera que se eviten contradicciones con otras normas constitucionales". Contreras Matus, *supra*, en la pág. 315.

2- *Principio de armonización o concordancia práctica*- "Esto significa que cuando dos o más preceptos constitucionales entran en conflicto en la resolución de un caso concreto, debe evitarse la aplicación excluyente de uno en perjuicio de otro.... Se debe interpretar el texto constitucional de modo que no se produzca el sacrificio de una norma constitucional en aras de otra norma del mismo rango". *Id.*

3- *Principio de la corrección funcional*- "El intérprete debe cuidar de respetar el esquema de estructuras de poder y de distribución de funciones y tareas entre órganos y entes públicos que consagran la Constitución". *Id.*

4- *Principio de la eficacia normativa*- "La interpretación debe tender a maximizar la eficacia de las normas constitucionales, dando preferencia a los puntos de vista que permitan extraer de ellas consecuencias de aplicación inmediata". *Id.*

5- *Principio de función integradora*- "La Constitución se propone la creación y mantenimiento de la unidad política, entendida como la cohesión de diferentes corrientes de opinión, por tanto, se exige que se prefiera para solucionar los problemas jurídicos constitucionales aquellas interpretaciones que tiendan a mantener dicho propósito". *Id.* en las págs. 315-316.

6- *Principio de la fuerza normativa de la Constitución*- "Aun cuando la interpretación de la Constitución pueda ser muy flexible, hay que partir de que la Constitución es una norma jurídica y no puede por consiguiente perder por vía interpretativa la fuerza normativa, es decir, el valor que como Norma Suprema posee". *Id.* en la pág. 316.

Como veremos más adelante, la Opinión que hoy emite este Tribunal ignora cualquier principio y metodología de interpretación constitucional. Así, la Opinión mayoritaria elabora una propia y novedosa interpretación, incurriendo en lo que le criticó al Partido

Independentista Puertorriqueño (P.I.P), al decir que su estándar "comes from...well, from nowhere". Opinión mayoritaria, acápite VII-B (citando a la Juez Asociada del Tribunal Supremo de Estados Unidos, señora Kagan, en *Martel v. Clair*, 132 S. Ct. 1276, 1285 (2012)).[103] La interpretación constitucional que realiza la Opinión emitida y que es avalada por una mayoría de esta Curia es de poco calado, además que constituye un intento de reducir a lo trivial cualquier interpretación que se haga sobre la Carta Magna.

## III

El Estado Libre Asociado (E.L.A.) nos convida a resolver que el requisito del voto de dos terceras partes del número total de miembros de cada cámara (2/3 x 100 = 66.66%) para proponer enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico, Const. P.R. Art. VII, Sec. 1, se refiere únicamente a dos terceras partes de los miembros juramentados y no a la totalidad de escaños existentes. Sostiene su alegación en que, conforme a la definición provista por la más reciente versión del diccionario de la Real Academia Española, el

---

[103] Huelga aclarar que no toda idea o teoría innovadora está destinada a la incorrección o fatalismo innato, puesto que toda teoría o doctrina tiene un comienzo al que no le precedió nada. No obstante, al elaborar una teoría interpretativa sobre los alcances de la Constitución, se debe realizar en armonía con la propia Constitución y la concepción ideológica que emana de ella y se ha elaborado en torno a ella. Además, debe hacerse en conjunto con otros acercamientos e interpretaciones que sobre esa Ley Suprema se hayan hecho. Evidentemente, la Opinión que suscribe la mayoría de este Foro se distancia diametralmente de estos principios básicos de interpretación constitucional.

término *miembro* significa "[i]ndividuo que forma parte de un conjunto, comunidad o cuerpo moral" y que, a su vez, *individuo* se define como "[p]ersona, con abstracción de las demás". *Alegato de la parte Peticionaria*, pág. 22. Por tanto, arguye que como la Res. Conc. Núm. 35 obtuvo el voto afirmativo de veinte de los veintinueve Senadores activos al momento en que se llevó a cabo la votación (20/29 x 100 = 68.96%), la misma satisfizo el imperativo constitucional. El P.I.P., por su parte, plantea que las dos terceras partes se refieren al número total de escaños existentes en cada cámara. Bajo este criterio, como el Senado se componía de treinta y un escaños al momento en que se realizó la votación, incluyendo dos vacantes, la medida no obtuvo los votos necesarios para ser aprobada válidamente (20/31 x 100 = 64.51%). El P.I.P. tiene razón.

Con el propósito de auscultar el significado verdadero de la frase "total de los miembros de que se compone cada cámara" utilizada en nuestra Carta Magna, debemos realizar un análisis integrado de la totalidad del documento bajo escrutinio antes de acudir a fuentes exógenas que nada tienen que ver con nuestro ordenamiento jurídico. Cónsono con esta apreciación, vemos que la Sección 2 del Artículo III de la Constitución presenta una definición numérica al disponer que **"[e]l Senado se compondrá de veintisiete Senadores** y la Cámara de

Representantes de cincuenta y un Representantes, **excepto cuando dicha composición resultare aumentada a virtud de lo que se dispone en la Sección 7 de este Artículo"**. Const. P.R. Art. III, Sec. 2 (énfasis suplido). De esta forma, contrario a otras constituciones, la nuestra no fijó un número variable de integrantes de cada cámara,[104] sino un número fijo: veintisiete en el Senado y cincuenta y uno en la Cámara de Representantes, sujeto a variación únicamente por virtud de la aplicación de la Sección 7 del Artículo III, conocida comúnmente como la Ley de Minorías.[105] *Véase* Escuela de Administración Pública U.P.R., *La Nueva Constitución de Puerto Rico* 365 (1954).

Además, como parte de un análisis integrado y de unidad constitucional, para definir las exigencias de la Sección I del Artículo VII de la Constitución, notamos que el léxico utilizado en esta sección remite inexpugnablemente al lenguaje del Artículo III, Sección 2. A saber, el Artículo VII, Sección 1, expone que el cálculo se tomará del "número total de los miembros de que se **compone** cada cámara", mientras que el Artículo III,

---

[104] El ejemplo más evidente de este tipo de sistema se encuentra en la Sección 3 del Artículo I de la Constitución de Estados Unidos, la cual estableció originalmente un esquema proporcional de un Representante por cada treinta mil habitantes. Const. EE.UU. Art. I, Sec. 3.

[105] En síntesis, la Ley de Minorías dispone una fórmula de aumento de escaños legislativos para "[c]uando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura". Const. P.R. Art. III, Sec. 7. Como parte de esa fórmula, limitó el número de legisladores añadidos a nueve en el Senado y diecisiete en la Cámara de Representantes. *Id.*

Sección 2, define que el "Senado se **compondrá** de veintisiete Senadores". De una metodología basada en el propio lenguaje, podemos definir los propósitos depositados en estas cláusulas de la Constitución, manteniendo así la unidad que ella representa.

Debido a los resultados obtenidos en la última contienda electoral, la precitada Sección 7 del Artículo III entró en efecto y la composición del Senado de Puerto Rico para este cuatrienio quedó fijada finalmente en treinta y un miembros. Por consiguiente, la Constitución requiere que un mínimo de veintiún Senadores expresen su anuencia mediante voto afirmativo para cumplir con el requisito de dos terceras partes.

Ahora bien, ¿qué sucede cuando surgen vacantes en una cámara legislativa? ¿Acaso era la intención de nuestros constituyentes que los escaños vacantes fueran excluidos del cálculo a la hora de obtener las dos terceras partes requeridas y que se contaran sólo los miembros activos, según plantea el E.L.A.? Un vistazo al Diario de Sesiones de la Convención Constituyente nos convence de que no era ésa su intención.

Como bien señala la mayoría, un debate suscitado en la Convención Constituyente entre los delegados don Miguel A. García Méndez y quien posteriormente se convirtiera en Juez Presidente de este Tribunal, don José Trías Monge, arroja luz sobre la respuesta a la incógnita ante nuestra

consideración. El Diario muestra que el delegado García Méndez propuso una enmienda para que se robustecieran aún más los requisitos para alterar nuestra Constitución mediante la exigencia de que toda enmienda constitucional fuera aprobada no sólo por dos terceras partes del total de miembros de ambas cámaras legislativas, sino, además, por el voto afirmativo de dos terceras partes de los electores que participasen en un referéndum. Trías Monge asumió un turno en contra de la medida en donde se expresó de la siguiente manera:

> [E]stamos insertando en esta proposición de enmiendas, las garantías esenciales a la estabilidad de la constitución, en cuanto se indica que únicamente podrán proponerse enmiendas a esta constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes de los miembros que componen cada cámara. O sea, el punto fundamental es cuanto a las garantías de limitación en la etapa iniciativa de la enmienda a la constitución. Ahí debidamente reconocemos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, únicamente podrá hacerse por no menos de *dos terceras partes **absolutas** de los miembros que componen las cámaras legislativas.*

3 Diario de Sesiones de la Convención Constituyente 1829 (1961)(énfasis suplido).

Con estas palabras Trías Monge aclaró que el requisito de dos terceras partes en la Asamblea Legislativa era lo suficientemente riguroso como para asegurar la estabilidad necesaria que debe brindarse a toda Constitución, por lo que se hacía innecesario imponer medidas adicionales tan onerosas como requerir también la

aprobación de dos terceras partes del voto popular. Acto seguido, la Asamblea Constituyente rechazó la enmienda del señor García Méndez, prevaleciendo la postura favorecida por Trías Monge.

La discusión reseñada demuestra que los constituyentes interpretaron el mecanismo de dos terceras partes como una exigencia de difícil cumplimiento que, junto con una simple mayoría de electores, aseguraba la protección de la Constitución contra ataques súbitos y constantes que respondieran más al vaivén político cotidiano que a la verdadera voluntad generalizada de nuestro Pueblo. La definieron, pues, como dos terceras partes **absolutas**. En ese contexto, no puede caber duda de que con ello se referían al número total de puestos de que se compondría cada cámara. A la luz de estos pronunciamientos, interpretar lo contrario no sería sensato, pues podría conllevar que una enmienda constitucional fuese aprobada válidamente mediante el voto afirmativo de un número reducido de legisladores.

Llevado al absurdo, la interpretación del E.L.A. permitiría que sólo dos legisladores, de tres activos, aprobasen válidamente una propuesta de enmienda constitucional en su cámara, siempre que el resto del cuerpo legislativo estuviera vacante; después de todo, el voto de esos dos miembros representaría más de dos terceras partes del número total de miembros de que se

compondría esa cámara. Evidentemente, nuestra Constitución no permite tal absurdo. Además, adoptar la proposición del E.L.A. llevaría a un escenario indeseado porque dejaría a merced de los propios legisladores definir el "número total de los miembros" según la conveniencia que persigan. Ello propiciaría a que un grupo de legisladores gestionen la renuncia o el impedimento de que se ocupe un escaño vacío, con tal de llegar al número deseado y necesario de las dos terceras partes.

Aparte de lo mencionado, resulta pertinente resaltar que este Tribunal se expresó en torno a la frase "número total de los miembros" bajo otras secciones del Artículo III que no están hoy bajo controversia. A esos efectos, en *Noriega v. Jarabo*, 136 D.P.R. 497 (1994), comentamos:

> Por mandato constitucional el quórum de la Cámara de Representantes se constituye con una mayoría del **número total de los miembros** que la componen.... También, por mandato constitucional, se requiere una mayoría del **número total de los miembros** que componen el cuerpo para aprobar un proyecto de ley.... Es decir, que si el **número total de miembros de la Cámara es de cincuenta y un (51) Representantes**, excepto cuando dicha composición es aumentada en virtud de las disposiciones sobre representación de partidos de minoría, **el quórum del Cuerpo se constituye con veintiséis (26) Representantes.** Así mismo, se requieren los votos de veintiséis (26) Representantes para lograr una **mayoría absoluta para la aprobación de un proyecto de ley, resolución conjunta o concurrente.**

*Noriega v. Jarabo*, 136 D.P.R. en las págs. 528-529 (énfasis suplido).

Esta misma postura asumimos al evaluar otra disposición constitucional con lenguaje similar. La Sección 4 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "[n]inguna ley se declarará inconstitucional a no ser por una mayoría **del número total de jueces de que esté compuesto el tribunal** de acuerdo con esta Constitución o con la ley". Cont. P.R. Art. V, Sec. 5. En *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 392 (1985), reiterando lo que ya habíamos clarificado desde, irónicamente, *P.I.P v. E.L.A.*, 109 D.P.R. 685 (1980), resolvimos que "[e]n el caso de reclamación de inconstitucionalidad de leyes ... [la Constitución] requiere mayoría absoluta de [los] miembros [del Tribunal Supremo] **indistintamente de que hubiese vacantes, por lo que éstas se sumarían en el número ideal de sus miembros"**. *Sánchez Rodríguez*, 116 D.P.R. en la pág. 395 (énfasis suplido). De hecho, esta norma constitucional goza de tal importancia que limita igualmente nuestra facultad para declarar inconstitucional un reglamento judicial, *Ortiz v. Dir. de los Tribunales*, 152 D.P.R. 161 (1980), e impide que confirmemos una sentencia de inconstitucionalidad dictada por un tribunal de menor jerarquía en caso de que los jueces de esta Curia se encuentren divididos en partes iguales.

A pesar de su pertinencia, sorprendentemente el E.L.A. ni siquiera se expresa sobre nuestros

pronunciamientos en estos casos. El peticionario no explica en su alegato por qué debemos interpretar de manera distinta las frases **"número total de jueces de que esté compuesto el tribunal"**, recogido en la Sección 4 del Artículo V, de la frase **"número total de los miembros de que se compone cada cámara"** dispuesto en la Sección 1 del Artículo VII. La realidad es que no existe razón válida que amerite que adoptemos interpretaciones distintas de frases virtualmente idénticas.[106]

Anteriormente hemos expresado que nuestro:

> [O]rdenamiento constitucional requiere que las tres ramas reconozcan y respeten los ámbitos constitucionales de cada una. Así pues, la deferencia judicial que le concedemos a la Rama Legislativa y a la Rama Ejecutiva tiene como corolario necesario que **ellas también tengan la misma deferencia hacia los poderes conferidos por nuestra Constitución a la Rama Judicial**, para así evitar que se menoscabe el sistema republicano de gobierno.

*Acevedo Vilá v. Meléndez Ortiz*, 164 D.P.R. 875, 884 (2005) (énfasis suplido y énfasis original suprimido).

Según surge del historial legislativo de la Res. Conc. Núm. 35, antes de aprobarse la resolución se trajo a la discusión del Senado el hecho de que la aprobación de

---

[106] Es de reseñar que durante la Vista Oral del caso de autos celebrada en este Tribunal el 27 de junio de 2012, se discutió el alcance de la frase "número total de ..." de los Artículo V y VII de la Constitución. Tras exponer nuestra interpretación en *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 392 (1985), se le cuestionó al licenciado Eliezer Aldarondo Ortiz, representante del Estado Libre Asociado de Puerto Rico, si el peticionario proponía una interpretación distinta para el proceso de enmienda a la Constitución *vis à vis* a la interpretación que esta Curia ha dado a la Sección 4 del Artículo V de la Constitución, por lo que se proponían dos interpretaciones distintas para textos idénticos en una misma Constitución. A estas preguntas, el Lcdo. Aldarondo Ortiz respondió que sí. Transcripción de Evidencia de la Vista Oral, págs. 32 y 34.

la medida no contaba con el voto de dos terceras partes del número total de miembros que compone la Cámara Alta. Diario de Sesiones del Senado de Puerto Rico, Vol. LIX, Núm. 13, 10 de octubre de 2011, págs. 36208-36210, 36221-36225.[107] Ante tal reclamo, el argumento se rechazó haciendo abstracción del contenido del Diario de Sesiones de la Convención Constituyente y de nuestros pronunciamientos, según acabamos de reseñar. Este proceder demuestra que el Senado de Puerto Rico no brindó deferencia hacia la Rama Judicial en su interpretación sobre lo que significa "número total de los miembros", al insistir en dar por aprobada la Res. Conc. Núm. 35. Tal actuación mina nuestro ordenamiento constitucional y sistema republicano porque desvanece el respeto, consideración y deferencia entre las tres ramas de gobierno.

Tras discutir y demostrar que la Res. Conc. Núm. 35 no fue aprobada según las exigencias procesales de la Sección 1 del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico, debemos examinar si la Res.

---

[107] Cabe mencionar que en esa sesión senatorial igual se trajeron a colación las disposiciones del *Mason's Manual of Legislative Procedure*, manual de procedimiento parlamentario que usa la National Conference of State Legislatures, en donde participa el Senado de Puerto Rico. Diario de Sesiones del Senado, *supra*, págs. 36221-36222. El *Mason's Manual* dispone en la Sección 512.4: "Where a constitution, charter, or controlling provision of law requires a two-thirds vote of all members, a vote less than that number, although two-thirds of a quorum, is not sufficient. Even though there are vacancies, a vote equal to two-thirds of the total membership is required". *Mason's Manual of Legislative Procedure*, Sec. 512.4 (ed. rev. 2010).

Conc. Núm. 60 pudo subsanar dicho incumplimiento, defecto o "traspié legislativo". Opinión mayoritaria, acápite XI.

## IV

Según mencionamos anteriormente, la pregunta de umbral que nos hacemos ahora es si la Res. Conc. Núm. 60 puede subsanar un defecto de índole constitucional en la aprobación de la Res. Conc. Núm. 35. Como demostraremos, es jurídicamente imposible que la constitucionalidad de la Res. Conc. Núm. 35 se sostenga a base de una medida posterior, cuando la resolución anterior nunca llegó a tener vigencia ni existencia jurídica, lo que redunda en una reiteración o validación de la nada, de lo nulo, de lo inexistente. Como jueces, no podemos apostar a entendimientos centrífugos de la sensatez y la coherencia. Todo lo contrario, en ánimos de preservar la independencia judicial, la validez constitucional y la legitimidad que tenemos como Tribunal al interpretar la propia Constitución, debemos interpretar la Carta Marga y los procesos legislativos concernientes a ella de una manera integrada y armoniosa con la filosofía detrás de la Constitución para mantener vigorosamente la fuerza normativa que la caracteriza.

Desde la creación de la Constitución, ha permeado un espíritu de permitir cambios en ella que se adecúen a las exigencias de nuevos tiempos y realidades, pero sin que

dichas enmiendas surjan como parte de procesos poco rigurosos. *Córdova Iturregui v. Cámara de Representantes*, 171 D.P.R. 789, 802 (2007) ("se estableció un procedimiento lo suficientemente rígido como para impartirle estabilidad a la Constitución y distinguirla de las leyes ordinarias. De esta forma, se establecieron límites explícitos al proceso de enmendar la Constitución"); *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195 (1994). La Escuela de Administración Pública de la Universidad de Puerto Rico también había recomendado el mismo principio a la Convención Constituyente: "La tarea de los delegados a la Convención Constituyente es, por lo tanto, redactar una cláusula de enmienda que permita modificar la Constitución de acuerdo con la demanda social de un cambio fundamental y que, sin embargo, evite pueda ser cambiada tan fácilmente como una ley". Escuela de Administración Pública U.P.R., *La Nueva Constitución de Puerto Rico* 522 (1954).

Dentro de este marco ideológico sobre el proceso de enmendar la Constitución, debemos entonces auscultar el proceso legislativo en torno a la Res. Conc. Núm. 35 que faculta el referéndum del próximo 19 de agosto de 2012 para enmendar el Artículo III de la Constitución.

La Opinión que emite este Foro en el día de hoy realiza un acto de omisión de la unidad y de la fuerza normativa que encierra la Constitución. Así, soslaya el

marco ideológico que subyace al Artículo VII de la Carta
Magna (*De las enmiendas a la Constitución*), al permitir
que un "traspié legislativo" que incumple con dicho
Artículo VII tome valor jurídico.  En *Berríos Martínez*
expresamos que:

> Los límites necesarios al proceso de revisión de
> una Constitución pueden ser **explícitos o
> implícitos.** Los primeros constan expresamente en
> la Constitución; los implícitos son aquellos
> 'cuya existencia sólo puede ser deducida
> indirectamente, bien como una consecuencia
> lógica de los presupuestos en que descansa el
> sistema constitucional considerado en su
> conjunto, bien como correlato de las singulares
> cualificaciones que se producen en determinados
> preceptos de la Constitución'".

*Berríos Martínez,* 137 D.P.R. en la pág. 211 (citas
omitidas).

Partiendo de este acercamiento a la interpretación de
la Constitución, resulta inconcebible la teoría novedosa
de la Opinión mayoritaria de que una resolución
concurrente que verse sobre un asunto particular
(limitación de la fianza) pueda reiterar otra resolución
concurrente que nunca llegó a tener vida jurídica y que a
su vez aborda sobre otro asunto (reforma legislativa).  La
nueva interpretación de la mayoría sobre las enmiendas a
la Constitución parte de la premisa de que una medida
legislativa que es nula *ab initio* por contravenir el
requisito constitucional de haber sido aprobada por no
menos de dos terceras partes del número total de miembros
de cada cámara, puede ser revivida posteriormente por un
simple "reiteramos".  Se trata de revivir un natimuerto.

Esa mayoría ignora que jurídicamente no se puede reiterar o subsanar lo *irreiterable* o insubsanable porque la nulidad de la Res. Conc. Núm. 35 versa sobre un elemento esencial para su propia existencia. Ergo, la inexistencia de la Res. Conc. Núm. 35 por vicio de inconstitucionalidad no tiene posibilidad de subsanarse y la resolución resulta nula *ab initio*.[108]

La Opinión mayoritaria también argumenta que como la Constitución es silente en cuanto a los requisitos y definición de una resolución concurrente, el Senado estaba facultado a realizar cualquier gestión dentro de la Res.

---

[108] Independientemente se hable de reiterar o de ratificar, como surgió en la discusión de la Vista Oral del 27 de junio de 2012, Transcripción de Evidencia de la Vista Oral, págs. 52-54, el resultado sería el mismo.

Por un lado, "[a]l indagar sobre la definición de 'ratificar' encontramos que se refiere al acto de 'aprobar o confirmar actuaciones, palabras, opiniones, decisiones, decretos y reglamentos, **dándolos por legales, valederos y ciertos'**". *Córdova Iturregui v. Cámara de Representantes*, 171 D.P.R. 789, 804 (2007), nota al calce 8 (cita omitida) (énfasis suplido y énfasis original suprimido). Partiendo de esta definición, si se ratificara la Res. Conc. Núm. 35, se daría por legal, valedero y cierto una medida que no contó con las exigencias constitucionales, por lo que se daría por válido lo inválido, creando un desconcierto jurídico inaudito.

En la alternativa, si nos refiriéramos al vocablo *reiterar*, la Opinión mayoritaria señala éste significa "volver a decir o a hacer algo". 2 Real Academia Española, *Diccionario de la lengua española* 1934 (22da ed. 2001). Lo que soslaya la Opinión de esta Curia al utilizar una fuente extrajurídica que no alcanza a arrojar luz sobre esta controversia, es que *reiterar* puede significar volver a decir o a hacer algo *correcto*, como algo *incorrecto*, ya que el diccionario utilizado no delimita el vocablo a la naturaleza correcta de lo dicho o hecho. Partiendo de esta premisa, *reiterar* la Res. Conc. Núm. 35, después que fue aprobada inválidamente, como concluye la Opinión mayoritaria bajo el acápite VII-B, no tiene otro significado que **volver a decir o a hacer el acto inválido o inconstitucional que se hizo previamente**. En otras palabras, reiterar la invalidez reproduce invalidez.

Conc. Núm. 60 para validar la Res. Conc. Núm. 35. Con tal proceder se ignora cualquier principio de interpretación constitucional, lacerando así la unidad constitucional y vulnerando toda garantía de firmeza y estabilidad jurídica en el propio texto magno. Si el espíritu rector detrás del Artículo VII es no permitir fáciles enmiendas a la Constitución, de manera que se "pueda mantener su coherencia, libre de los **caprichos momentáneos y arbitrarios de las mayorías**", *Berríos Martínez,* 137 D.P.R. en las págs. 210-211 (énfasis suplido), tal cual reconoce la Opinión mayoritaria en el acápite VI, entonces nos resulta incomprensible que en esta ocasión el Tribunal permita el inicio de un proceso de enmienda constitucional que contraviene ese espíritu rector y que objetivamente denota ilegalidad. Nos encontramos, pues, ante un límite implícito al proceso de enmienda constitucional.

Es cierto que la Constitución no abunda sobre la naturaleza de una resolución concurrente, sino que simplemente hace mención a que mediante dicha medida legislativa se podrán proponer enmiendas al texto constitucional. No obstante, la falta de definición sobre estas piezas legislativas no representa una carta en blanco sobre el proceso de enmienda constitucional, sino que se debe evaluar e interpretar en conjunto e integradamente con el resto de la Constitución, preservando siempre el componente ideológico que recogimos

previamente en torno a los procesos de enmienda constitucional.

A base de una interpretación integral de las disposiciones constitucionales y del espíritu rector sobre las enmiendas a la Carta Magna, debemos concluir que una resolución concurrente que intente enmendar la Constitución debe seguir el mismo rigor de aprobación que establece la Sección 17 del Artículo III, respecto a la regla de un solo asunto. Esa misma exigencia se recogió para las resoluciones conjuntas, al requerirse para su aprobación el mismo trámite de un proyecto de ley. Const. P.R. Art. III, Sec. 18. Resultaría incongruente con la ideología rigurosa de enmiendas a la Ley Suprema que ante la ausencia de requisitos sobre una resolución concurrente para enmiendas constitucionales, deba interpretarse que éstas podrán aprobarse mediante exigencias más laxas que las de una ley o resolución conjunta, cuando las resoluciones concurrentes son la única vía de iniciar un proceso de enmienda constitucional.

A pesar de lo anterior y dentro del contexto del cuatrienio presente, la aprobación de la Res. Conc. Núm. 60 tampoco cumplió con el Reglamento del Senado, adoptado por virtud de la Sección 9 del Artículo III de la Constitución. Éste define las resoluciones concurrentes como "aquellas medidas aprobadas por ambos Cuerpos, las cuales se utilizan para: a) Proponer enmiendas a la

Constitución de Puerto Rico; b) Consignar expresiones de la Asamblea Legislativa que no tienen carácter de legislación; c) Disponer sobre el gobierno interno de la Asamblea Legislativa". Reglamento del Senado de Puerto Rico, R. del S. 27, 12 de enero de 2009, Sec. 17.1. Como se puede apreciar, las resoluciones concurrentes se utilizan tanto para asuntos menos trascendentales, como para otros de gran envergadura, como una enmienda constitucional. Conscientes de ello, no podemos caer en la candidez de decir que como estas medidas no tienen fuerza de ley y son expresiones del Poder Legislativo, las resoluciones sobre enmienda a la Constitución se deben analizar e interpretar aisladamente del resto del andamiaje constitucional, como pretende hacer la Opinión mayoritaria.

Además de la definición anterior, el propio Reglamento del Senado regula las resoluciones concurrentes al expresar:

> Todo proyecto de ley o **resolución** tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo, de manera que, de la lectura del título se entienda el propósito de la medida.
>
> **Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto.**

*Id.* Sec. 15.6 (énfasis suplido).

Más adelante, continúa:

> Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, **se tramitarán en la misma forma que un proyecto**

**de ley**, siendo referidas para su consideración y estudio a las Comisiones Permanentes o Especiales que a estos efectos se disponga. Una vez aprobadas dichas Resoluciones Concurrentes serán enviadas al Gobernador, aun cuando éstas no requieren su aprobación, así como a los funcionarios concernidos para que éstos procedan a la ejecución de los trámites correspondientes que se establecen en nuestro ordenamiento constitucional y jurídico.

*Id.* Sec. 17.3 (énfasis suplido).

A base de lo anterior, resulta imperativo llegar a la conclusión de que el Senado no sólo incumplió con los requisitos del Artículo III y del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico, sino que también incumplió con los requisitos de su propio Reglamento al aprobar la Res. Conc. Núm. 60 que versa sobre más de un asunto: (1) la enmienda constitucional para limitar el derecho a la fianza y (2) la enmienda constitucional para realizar una reforma legislativa. A modo de silogismo, si el Reglamento del Senado exige que toda resolución concurrente que proponga enmiendas a la Constitución sea aprobada "en la misma forma que un proyecto de ley", *Id.* Sec. 17.3, y la forma en que será aprobado un proyecto de ley se define en el Reglamento del Senado análogamente a como lo hace la Constitución,[109] es forzoso concluir que toda resolución concurrente que propusiera enmiendas a la Constitución debía ser aprobada

---

[109] "No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula". Const. P.R. Art. III, Sec. 17.

como exige la Sección 17 del Artículo III de la Constitución. Como se incumplió con el Reglamento del Senado, con la Sección 17 del Artículo III y el Artículo VII de nuestra Ley Suprema, es menester que se elimine de la Res. Conc. Núm. 60 el asunto de la *reiteración* de la Res. Conc. Núm. 35.

Antes de proseguir sobre la importancia de cumplir con los propios reglamentos legislativos, es necesario demostrar el incumplimiento de la Res. Conc. Núm. 60 con el Reglamento del Senado y la Constitución al versar sobre más de un asunto: la limitación al derecho a la fianza y la reforma legislativa. En *Herrero v. E.L.A.*, 179 D.P.R. 277 (2010), tuvimos una controversia en donde nos dimos a la tarea de interpretar la regla de un solo asunto de la Sección 17 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico. Tras brindar un trasfondo histórico sobre la regla de un solo asunto, expusimos que "la cláusula se introdujo para prevenir el *logrolling*". *Id.* en las págs. 292-293. Acto seguido, indicamos que una de las modalidades más conocidas del *logrolling* son los *riders* ("disposiciones de ley no relacionadas con el asunto principal de la legislación, ... que son añadidas o 'montadas' en proyectos de ley". *Id.* en las págs. 293-294). Lo que se promueve con esta regla de un solo asunto es prevenir el *logrolling* e impedir la aprobación de leyes

con disposiciones que no son advertidas en su título (*riders*). *Id.* en la pág. 295.

Asimismo, indicamos en aquel caso que el requisito de un solo asunto debe interpretarse liberalmente, pero "sin dejar de lado el propósito y objetivo de la exigencia constitucional". *Id.* en la pág. 296. Por lo tanto, expresamos que al examinarse la validez de una ley a la luz de la regla de un solo asunto, es necesario **auscultar todas sus disposiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título**. *Id.* Como observamos, en *Herrero v. E.L.A.* este Tribunal sólo mantuvo la misma política liberal en cuanto a la regla de un solo asunto, mas no facultó a la Asamblea Legislativa con una licencia abierta para adoptar medidas con multiplicidad de asuntos que no sean afines entre sí ni estén comprendidos dentro del asunto general.

En el caso de autos, la Opinión mayoritaria cita a *Herrero v. E.L.A.*, pero sin mucha elaboración sólo se limita a comentar sobre la liberalidad de la interpretación de la regla de un solo asunto. Para evaluar la Res. Conc. Núm. 60 a la luz de la regla de un solo asunto, debemos analizar si los asuntos contenidos tienen "una relación razonable, de modo que haya cierto vínculo de interdependencia". *Id.* en la pág. 301.

Los asuntos contenidos en dicha resolución concurrente son (1) limitación al derecho a la fianza y (2) reiterar la reforma legislativa (Sec. 2). Su título expresa: "Para proponer ... una enmienda a la Sección 11 del Artículo II de la Constitución ... cuyo fin será otorgarle discreción a los jueces para conceder o denegar el derecho a permanecer en libertad bajo fianza a los acusados de asesinato cometido [en ciertas circunstancias]". Res. Conc. Núm. 60. El título no hace mención a la intención de reiterar la Res. Conc. Núm. 35 ni mucho menos abunda sobre realizar una reforma legislativa.

La pregunta que surge es si limitar el derecho a la fianza y la reforma legislativa están comprendidos bajo un solo asunto general. Diáfanamente surge que el único vínculo que hay entre estos asuntos es que ambos son un intento legislativo para enmendar la constitución el 19 de agosto de 2012. El asunto de la limitación al derecho a la fianza no tiene ninguna relación, ni tan siquiera incidental, con la reforma legislativa, puesto que ésta se puede realizar sin interferir con ese derecho de nuestra Carta de Derechos. Tanto es así, que en las alegaciones del E.L.A. y del P.I.P, ambas partes coinciden en que bajo la Sección 1 del Art. VII de la Constitución la proposición de limitación al derecho a la fianza y la proposición de reforma legislativa son dos asuntos

separados e independientes. Esto difícilmente se pueda controvertir por algún Juez o Jueza de este Tribunal. *Véase* Opinión mayoritaria, acápite VII-B.

Demostrado que son dos asuntos independientes y disímiles bajo la Res. Conc. Núm. 60, es innegable que ésta se aprobó en contra de las Secciones 15.6 y 17.3 del Reglamento del Senado y, por consiguiente, en contra de la Sección 17 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico. Las implicaciones del *rider* que se efectuó en la mencionada resolución concurrente, se ejemplifican claramente mediante los votos de una Senadora, la Hon. Sila M. González Calderón. La Senadora votó en contra de la Res. Conc. Núm. 35, pero luego votó a favor de la Res. Conc. Núm. 60. Aquí ocurrió lo que se quiso prevenir con la inclusión de la regla de un solo asunto en la Constitución de Puerto Rico: "evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto". 2 Diario de Sesiones de la Convención Constituyente 896 (1961). Bajo la teoría de la mayoría de esta Curia de que la Res. Conc. Núm. 60 reiteró una resolución concurrente anterior que no fue aprobada por no contar con los votos necesarios, entonces se debe contar el voto de la Senadora González Calderón como un voto de reiteración, cuando ella evidentemente se opuso a la Res. Conc. Núm. 35. Sin mayor

explicación, aquí hubo *logrolling* en su modalidad de *rider* en perjuicio de la Senadora.

Por último, para que un Cuerpo legislativo funcione eficientemente, se tienen que obedecer las reglas del propio cuerpo. *Noriega v. Jarabo*, 136 D.P.R. 497, 533 (1994). No se puede pretender que el Reglamento en cuestión haya sido aprobado para hacer omisión de sus reglas cuando no convengan al propósito ulterior detrás de alguna medida legislativa. "[E]l Presidente de [una] Cámara ... no puede obviar o ignorar las limitaciones jurídicas que puedan existir aun sobre los poderes de gobierno interno de su Cámara. Y es al Tribunal Supremo a quien le corresponde aclarar los contornos de tales poderes". *Acevedo Vilá v. Meléndez Ortiz*, 164 D.P.R. 875, 937 (2005) (Op. Disidente J. Fuster Berlingeri). Es por ello que esta Curia viene obligada a exigirle al Senado a que cumpla con su propio Reglamento.[110] Lástima que una mayoría de este Foro abdique a tal obligación.[111]

---

[110] Cónsono con lo anterior, hemos manifestado que:

> [E]n nuestra jurisdicción hemos acogido la doctrina de deferencia judicial a la adopción e interpretación por parte de las cámaras legislativas de sus reglas y procedimientos. Sin embargo, ello no significa que dichos procesos y reglamentos sean inmunes a una intervención judicial, pues este Tribunal no puede abdicar a su responsabilidad de determinar si tales actos legislativos se enmarcan dentro de los poderes constitucionales facultados.

*Acevedo Vilá v. Meléndez Ortiz*, 164 D.P.R. en la pág. 891.

[111] Resulta pertinente señalar que el Reglamento del Senado pudo haber sido enmendado el mismo día de la sesión en que se aprobó la Res. Conc. Núm. 60, para así alterar las secciones que incidían sobre la aprobación de esa resolución concurrente. Tal

**V**

Es en controversias como la de autos, donde el proceso legislativo para enmendar la Constitución estuvo marcado por irregularidades insubsanables, cuando los integrantes de este Tribunal vienen llamados a ejercer celosamente su deber de preservar la unidad constitucional y su poder normativo. Nuestro compromiso con defender la Constitución se extiende a evitar hasta la apariencia de que este Tribunal se invista como adlátere del "traspié legislativo" que mancilla el proceso democrático de enmienda a la Constitución.

Disiento del proceder de la mayoría de esta Curia porque según lo aquí demostrado las medidas legislativas que promueven el proceso de enmienda constitucional no cumplieron con los requisitos básicos para iniciar dicho proceso. Avalar los dislates legislativos en procesos que por su naturaleza cimera deben guardar la mayor seriedad y pulcritud, nos convierte en cómplices de tan desatinado proceder de ofensa constitucional.

Por las razones antes esbozadas, declararía inconstitucional la Res Conc. Núm. 35 e inválido el

fue el argumento certero de la Jueza Asociada señora Pabón Charneco en la Vista Oral celebrada en este Tribunal. Transcripción de Evidencia de la Vista Oral, pág. 47. Sin embargo, dichas enmiendas no se realizaron y la Res. Conc. Núm. 60 se aprobó con el Reglamento según hemos citado anteriormente. Por supuesto, de haberse propuesto enmiendas al Reglamento o suspensiones de algunas disposiciones, éstas debían hacerse conforme las Secciones 2.1 y 2.2 de ese cuerpo reglamentario: con el voto afirmativo de no menos de la mayoría absoluta del total de miembros del Senado.

intento de reiterar dicha resolución por medio de la Res. Conc. Núm. 60. Por consiguiente, y bajo la mácula de inconstitucionalidad del proceso de enmienda a la Constitución para lograr una reforma legislativa, ordenaría paralizar la consulta al Pueblo sobre enmiendas al Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, a celebrarse mediante referéndum el próximo 19 de agosto de 2012. Al llegar a esta conclusión resulta improcedente e innecesario expresarnos sobre los requisitos sustantivos de la Sección 1 del Artículo VII de la Constitución, en cuanto al asunto del número de proposiciones de enmienda en el mismo referéndum. Igualmente, resulta innecesario expresarnos sobre el asunto de la publicidad de las medidas legislativas en cuestión, puesto que tras una declaración de inconstitucionalidad, ello sería inconsecuente.

Anabelle Rodríguez Rodríguez
Juez Asociada